SNYDER ♦ DORENFELD, LLP
5010 Chesebro Road
Agoura Hills, CA 91301
PHONE: (818) 865-4000
FAX: (818) 865-4010
DAVID K. DORENFELD, State Bar No. 145056
MICHAEL W. BROWN, State Bar No. 205380

CATHY JACKSON LERMAN, PA
7857 W. Sample Rd., Suite 140
Coral Springs, FL 33065
PHONE: (954) 663-5818
FAX: (954) 341-3568
CATHY J. LERMAN, Florida State Bar No. 338788
*Pro Hac Vice* Application to be filed

SALPETER GITKIN, LLP
Museum Plaza – Suite 503
200 S. Andrews Avenue
Fort Lauderdale, FL 33301
PHONE: (954) 467-8622
FAX: (954) 467-8623
JAMES P. GITKIN, Florida State Bar No. 570001
*Pro Hac Vice* Application to be filed

Attorneys for Plaintiffs

FILED
CLERK U.S. DISTRICT COURT
APR 17 2012
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SANDRA BRISSETTE, LIBERTY CITY CHURCH OF CHRIST, INC., WILLIAM LEE, GENNET THOMPSON, and GERTRUDE "TRUDY" MORGAN, individually and on behalf of a class of similarly situated persons,

        Plaintiffs,

v.

EPHREN TAYLOR, MESHELLE TAYLOR, CITY CAPITAL CORPORATION, ERX ENERGY, LLC, EQUITY TRUST COMPANY, ROBERT BATT, BANK OF AMERICA, NATIONAL ASSOCIATION, MISSOURI BANK

Case No. CV12-03322 MMM (FFMx)

**CLASS-ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

-1-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

ASSOCIATION, MISSOURI BANK
AND TRUST, BOK FINANCIAL
CORP D/B/A BANK OF KANSAS
CITY, ENTRUST NEW DIRECTION
IRA, INC.. n/k/a NEW DIRECTION
IRA, INC., THE ENTRUST GROUP,
INC., ENTRUST ADMINISTRATION,
INC., SUNWEST TRUST, INC., and
DOES 1-10

Defendants.

Plaintiffs SANDRA BRISSETTE, LIBERTY CITY CHURCH OF CHRIST, INC., WILLIAM LEE, GENNET THOMPSON and TRUDY MORGAN ("Plaintiffs"), individually and on behalf of a class of similarly situated entities and/or persons, respectively, bring this action, by and through their undersigned counsel, and allege as follows:

## I.  INTRODUCTION

1.    This action arises out of a well-executed, carefully-crafted fraud scheme (in fact, a Ponzi scheme, *i.e.*, a fraudulent investment operation that pays returns to prior investors from the monies paid by subsequent investors because the scheme does not actually generate revenue-producing activity) of the most insidious kind, *i.e.*, a religious-affinity-fraud orchestrated and/or facilitated by Defendants EPHREN TAYLOR, MESHELLE TAYLOR,   ERX ENERGY, LLC, EQUITY TRUST CORPORATION, ROBERT BATT, BANK OF AMERICA, MISSOURI BANK AND TRUST, BOK FINANCIAL CORP, D/B/A BANK OF KANSAS CITY, ENTRUST NEW DIRECTION IRA, INC. n/k/a NEW DIRECTION, IRA, INC., THE ENTRUST GROUP, ENTRUST ADMINISTRATION, INC. SUNWEST TRUST, INC., and CITY CAPITAL CORPORATION (described sometimes hereinafter as "Defendants").

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

2.    As is typical with Ponzi schemes, incoming principal funds from newer investors were used to pay artificially high returns or dividends to already existing investors.   Defendants sold many of their targets promissory notes and/or unqualified, nonexempt securities (in their Self Directed Individual Retirement Accounts ("SDIRAS"))[1] and then diverted the investment monies to themselves or shell corporations they controlled; and/or the principal investment funds of an investor was used to repay that same investor their purported returns or interest payments until the fraudulent scheme collapsed when it ran out of new investors (more accurately described as victims).

3.    Defendants TAYLOR, MTAYLOR, CITY CAPITAL CORPORATION, ERX,  BATT, and EQUITY TRUST will be referred to herein collectively as the "CITY CAPITAL CONSPIRATORS."

4.    The CITY CAPITAL CONSPIRATORS intentionally targeted and induced hundreds of innocent, working class, church-going, "socially conscious," people (most of whom were minorities or African-Americans) and their churches and other faith-based organizations to transfer and invest their hard-earned money in shell

---

[1] A SDIRA is an Individual Retirement Account ("IRA") held by a trustee or custodian that permits investment in a much broader set of assets than is permitted by most IRA custodians.  However, investors in SDIRAs, whose administrators are also known as "custodians" or "trustees," are permitted to invest in a variety of nontraditional investment options of their own choosing including tax lien certificates, promissory notes, real estate,  businesses, LLCs and private placement securities.  A stark contrast exists between the "administration" performed by trustees and custodians of SDIRAs ("CUSTODIANS"), as compared to the "administration and management" performed by of the trustees and custodians of IRAs ("CIRAs").  CIRAs are considered fiduciaries of the IRA account such that CIRAs are responsible for maintaining and managing the securities in the IRA account, keeping track of distributions and dividend income, and making sure everything is done legally and correctly.

-3-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

2  companies with a false sense of security that their money was insured, protected and
3  invested by persons in legitimate, no risk, multi-million dollar, profitable, "leading"
4  public and private companies with "the highest ethics," and an overriding sense of
   social responsibility.

5

6  5.     In fact, the CITY CAPITAL CONSPIRATORS were neither licensed nor
7  registered to sell securities or advise on investments under state or federal law.  The
8  purported "investments" they offered were neither licensed nor registered.  The
9  CITY CAPITAL CONSPIRATORS sold Plaintiffs "interests" in nonexistent or
10 failing ventures and illegal gambling operations secured by worthless promissory
11 notes or nothing at all.

12

13 6.     Defendants CITY CAPITAL and ERX as well as Amorocorp, Inc. a/k/a/
14 Amoro Management Group a/k/a Amoro Management, Inc., a/k/a Amoro Corp. f/k/a
15 Ephren Taylor Capital Corporation (all collectively referred to herein as "Amoro"),
16 Incoming, Inc. and Resilient Innovations, LLC are referred to herein as the CITY
17 CAPITAL AFFILIATED COMPANIES.

18

19 7.     Defendants falsely led Plaintiffs and the other Class members to believe that
20 their "investments" in the CITY CAPITAL AFFILIATED COMPANIES would help
21 others who were less fortunate.  Plaintiffs, relying on those representations, in good
22 faith gave their hard-earned money to the Defendants. Many investors lost their
23 entire life savings.

24

25 ## II.  JURISDICTION AND VENUE

26 8.     The Court has subject matter jurisdiction over this matter under 28 U.S.C.
27 §1332 (d) (2) and the Class Action Fairness Act. Plaintiffs and certain Defendants
28 are citizens of different states. The amount in controversy exceeds $5,000,000,

-4-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

exclusive of interest and costs.

9.    This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965, the due process clause of the U.S. Constitution, and the California long-arm statute, *Code of Civil Procedure* § 410.10, which allows courts to "exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

10.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' additional claims arising under California state law for, *inter alia,* California *Business and Professions Code* § 17200 involving unfair competition and violation of California Corporations Code section 25000, *et seq.*, and for Elder Abuse pursuant to The Elder Abuse and Dependent Adult Civil Protection Act, *Welfare and Institutions Code* § 15600, *et seq.*

11.    Venue in this district satisfies the requirements of 28 U.S.C. §1391 (b) (1)-(2) because some Plaintiffs and Defendants reside in this jurisdiction and some of the actions and events giving rise to the claims occurred in this District.

12.    Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of California *Business and Professions Code* § 17200 *et seq.*

13.    This is a private Attorney General action brought on behalf of the general public.  As detailed below, Defendants have engaged in a pattern and practice of uniformly misrepresenting and/or repudiating their contractual and legal obligations. Equitable relief is appropriate to ensure adequate controls are in place to remedy the

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what transpired.

14.     Based upon the obligations imposed upon Defendants and their experience in the industry, Defendants either knew, recklessly disregarded, reasonably should have known or were obligated under the law to provide correct and prompt information on the status of Plaintiff's SDIRAS and notify Plaintiffs if said SDIRAS were in default. Defendants failed to provide correct and prompt information; as a result Plaintiffs were subjected to unlawful, unfair and/or fraudulent treatment.

15.     Defendants knew or should have known that their SDIRAs were being used to perpetuate Ponzi Schemes and other fraudulent enterprises on their customers, including Plaintiffs and the other Class Members, resulting in significant and/or total loss of their customers' investment accounts.

16.     The conduct of Defendants is of a continuing nature that requires prompt relief.  Defendants have uniformly represented to the general public through their representatives that their actions were legally appropriate when in fact they were not and/or have concealed material facts (as detailed throughout this Complaint); and the disclosure of such information was necessary in order to make Defendants' other representations not misleading for want of disclosure of such omitted facts or because Defendants possess superior knowledge of the true facts.

17.     This private Attorney General action is brought by the Plaintiffs listed above to remedy violations of California's state consumer protection statutes arising out of Defendants' and/or their representatives' misrepresentations, omissions of material facts, and breaches of agreements.

**CLASS-ACTION COMPLAINT**

18.     Members of the general public also face irreparable harm, such as, *inter alia*, not being fully informed of the true facts, not having the full value of any monies wrongfully received or saved provided to them, having the status of their SDIRA wrongfully misrepresented, and/or the financial information as to the value of their investment being falsely reported.

## III.  THE PARTIES

19.     Plaintiff SANDRA BRISSETTE ("BRISSETTE") is a resident of Glendale, California. On or about July of 2006, SANDRA BRISSETTE invested approximately $61,000 through an ENTRUST SDIRA in a fraudulent enterprise resulting in a total loss of her investment.

20.     Plaintiff LIBERTY CITY CHURCH OF CHRIST, INC. ("LIBERTY CITY") is a Florida corporation with its principal place of business, which is a house of worship, in Miami, Florida. In mid-2008, LIBERTY CITY invested $100,000 in Defendants' fraudulent enterprises.

21.     Plaintiff WILLIAM LEE ("LEE") is an individual and a resident of Raleigh, North Carolina. On or about February of 2009, LEE invested $160,000 into the CITY CAPITAL CONSPIRATORS' Socially Conscious Investment Ponzi Scam as defined below.

22.     Plaintiff GENNET THOMPSON ("THOMPSON") is an individual and a resident of Delray Beach, Florida. On or about July of 2009, THOMPSON invested $17,200 in the CITY CAPITAL CONSPIRATORS' Socially Conscious Investment Ponzi Scam as defined below and in February of 2010, THOMPSON invested $10,500 in the Sweeps Machine Investment Ponzi Scam as defined below.

-7-

**CLASS-ACTION COMPLAINT**

23.   Plaintiff TRUDY MORGAN ("MORGAN") is an individual and a resident of Lithonia, Georgia.  On or about MORGAN invested approximately $30,000 into the Sweeps Machine Investment Ponzi Scam as defined below.

24.   Defendant EPHREN TAYLOR a/k/a EPHREN TAYLOR II a/k/a EPHREN TAYLOR, JR. a/k/a EPHRAIM TAYLOR a/k/a EPHRAIN TAYLOR ("TAYLOR") is an individual who last resided in the State of New York.

25.   Defendant MESHELLE TAYLOR ("MTAYLOR") is an individual who last resided in the State of New York. At all times material hereto, TAYLOR and MTAYLOR were husband and wife.

26.   At all times material hereto, MTAYLOR was a beneficial and/or actual owner of all securities and interests owned by TAYLOR.  TAYLOR and MTAYLOR will be referred to collectively herein as ("THE TAYLORS").

27.   Defendant CITY CAPITAL CORPORATION ("CITY CAPITAL") is a Nevada corporation with its principal place of business in New Jersey.

28.   Defendant ERX ENERGY, LLC ("ERX") is a wholly-owned subsidiary of CITY CAPITAL and is a Nevada corporation with its principal place of business in New Jersey.

29.   Defendant EQUITY TRUST CORPORATION ("EQUITY TRUST") is an Ohio corporation that bills itself as "the nation's leading provider of self-directed IRAs and 401ks, with over 128,000 clients in all 50 states and close to $10 billion dollars of retirement plan assets under administration."

-8-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

30.     Defendant ROBERT BATT ("BATT") is an individual and resides in Cleveland, Ohio. At all times material hereto BATT was an employee of EQUITY TRUST and held the position of Retirement Account Specialist.

31.     Defendant BANK OF AMERICA, NATIONAL ASSOCIATION ("BOFA") is a National Banking Association with its principal place of business in Charlotte, North Carolina.

32.     Defendant MISSOURI BANK AND TRUST ("MBT") is a Missouri corporation with its corporate headquarters in Kansas City, Missouri.

33.     Defendant BOK CORPORATION D/B/A BANK OF KANSAS CITY ("BKC") is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma. At all times material hereto, BKC was doing business in Kansas City, Missouri.

34.     BOFA, MBT and BKC will be referred to herein collectively as the "BANK DEFENDANTS."

35.     Defendant ENTRUST NEW DIRECTION IRA, INC. n/k/a NEW DIRECTION IRA, INC. ("NEW DIRECTION") is a Colorado corporation with its principal place of business in Denver, Colorado.

36.     THE ENTRUST GROUP is a California ("ENTRUST GROUP") corporation with its principal place of business in Los Angeles, California. ENTRUST GROUP touts itself as the "the only self-directed IRA administrator that serves you right in your community." ENTRUST GROUP, until December of 2011, had a national network of affiliated companies which were franchisees of the ENTRUST GROUP.

-9-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

37.   ENTRUST ADMINISTRATION, INC. "(ENTRUST ADMIN") is a California corporation with its principal place of business in Los Angeles, California.

38.   At all times material hereto, NEW DIRECTION was a franchisee of DEFENDANT ENTRUST GROUP until December of 2011.

39.   At all times material hereto, Defendant ENTRUST ADMIN was a wholly-owned subsidiary of Defendant ENTRUST GROUP.

40.   NEW DIRECTION, ENTRUST GROUP and ENTRUST ADMIN will be referred to collectively herein as "ENTRUST."

41.   Defendant SUNWEST TRUST, INC. ("SUNWEST") is a New Mexico corporation with its principal place of business in Albuquerque, New Mexico.

42.   At all times material hereto, Defendant TAYLOR was an officer, director and principal shareholder of Defendant CITY CAPITAL.

43.   At all times material hereto, TAYLOR served as a member of the Audit committee for CITY CAPITAL as well as Principal Financial Officer.

44.   At all times material hereto, Defendants TAYLOR and MTAYLOR were owners, officers, directors, shareholders and /or controlling principals that owned, controlled, managed, and/or directed the activities of and/or obtained unlawful monies or gains from the CITY CAPITAL AFFILIATED COMPANIES.

45.   Certain individuals who were co-conspirators with the CITY CAPITAL CONSPIRATORS are not named in this Complaint. The remaining CITY CAPITAL

-10-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

co-conspirators which have been identified to date are not sued because they are either under criminal investigation, have filed for bankruptcy or they have no attachable assets. As to those who have not yet been identified, Plaintiffs will seek leave to join them upon identifying same.

## IV. CLASS ACTION ALLEGATIONS

46. Plaintiffs bring this action on their behalf and as a class action pursuant to Rules 23(a) & (b)(3) of the *Federal Rules of Civil Procedure* on behalf of all persons and/or entities who purchased and owned any "investment" offered, sold, solicited or consummated by the CITY CAPITAL CONSPIRATORS in CITY CAPITAL AFFILIATED COMPANIES from January 1, 2006 until the present day (the "Class Period") and who suffered damages as a result (the "Class").

47. Excluded from the Class are:

   a. Defendants;

   b. Members of the immediate family of each of the Defendants that are not corporate entities;

   c. Any person who was an executive officer, employee and/or director of any Defendant during the Class Period;

   d. Any person, firm, trust, corporation, officer, director or any other individual or entity in which any Defendant has a controlling interest or which is affiliated with any of the Defendants;

   e. Any independent contractor of any Defendants who participated in the sales of the investment vehicles outlined herein;

   f. Any person who is a named plaintiff in or has opted into a class of litigants in a separate lawsuit concerning the purchase of securities and/or investments from the CITY CAPITAL CONSPIRATORS; and;

-11-

## CLASS-ACTION COMPLAINT

g. The legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

48.   The members of the Class, purchasers of Defendants' investments during the Class Period, are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that the Class members total over 500 and may be in excess of 1,000.

49.   Plaintiffs' claims are typical of the claims of members of the Class. Plaintiffs and all members of the Class sustained damages as a result of conduct alleged herein, including but not limited to fraud, negligence, conversion, breach of fiduciary duty, and state and federal securities violations and other malfeasance as specified herein. Plaintiffs and the Class members will be referred to collectively herein as "VICTIMS."

50.   Plaintiffs will fairly and adequately protect the interest of the members of the Class and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Class that Plaintiffs seek to represent.

51.   A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The damages suffered by individual Class members may be relatively small, some as little as $5,000; therefore the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

52.   Common questions of law and fact exist as to all members of the Class and

-12-

**CLASS-ACTION COMPLAINT**

predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

    a.    Whether the CITY CAPITAL CONSPIRATORS breached legal and fiduciary duties to the Plaintiffs;

    b.    Whether the Defendants failed to disclose material conflicts of interests to the Plaintiffs;

    c. Whether the investment vehicles sold by CITY CAPITAL CONSPIRATORS constituted "securities" under federal and state securities law;

    d. Whether CITY CAPITAL CONSPIRATORS' conduct violated the federal securities laws;

    e. Whether CITY CAPITAL CONSPIRATORS offered and sold unregistered securities;

    f. Whether Defendants' statements to the investing public during the Class Period materially misrepresented the business and financial condition of the CITY CAPITAL AFFILIATED COMPANIES;

    g. Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and, if so, the appropriate measure thereof;

    h. Whether Defendants' conduct constitutes financial elder abuse; and

    i. Whether the Defendants' conduct constitutes unfair competition.

53.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

54.    The names and addresses of the Defendants' customers and investors who purchased "investments" during the Class Period are obtainable from information in

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

the possession of the Defendants and/or their agents. Notice can be provided to such owners via first class mail or e-mail using techniques and a form of notice similar to those customarily used in class actions.

## V.  FACTUAL ALLEGATIONS

### THE CREATION OF EPHREN TAYLOR'S PUBLIC IMAGE AND THE BUILDING OF HIS CREDIBILITY THROUGH SHELL COMPANIES

55.    As part of his fraud scheme, TAYLOR created a public image based on lies and misrepresentations.  While some of TAYLOR'S investment success "stories" and personal financial dealings may have been real, the majority of them were purely fabricated.  Many of these are listed below.

a.    He claimed to have come from humble beginnings;

b.    He bragged that he started working at 12 years old and became a millionaire at the ripe old age of 16.

c.    He claimed to have "retired" with his "vast fortune" but became "bored" and came back to work in 2000.

d.    He claimed that he had (in 1998) launched a company with a high school partner called GoFerretGo.com that became a multi-million dollar company.  Through repeated use of the GoFerretGo.com success story, TAYLOR was able to claim membership in the ultra exclusive "Teenage Millionaire Club."

e.    He repeatedly claimed in several different types of media that GoFerretGo.com had a value of $3.5 million at some point during its less-than-three-year history.   However, GoFerretGo.com mysteriously dissolved in 2001.

f.    He maintained (from at least 2004 to 2010) a personal website,

-14-

SNYDER ♦ DORENFELD, LLP

www.ephren.com, which targeted minority and African-Americans and provided investment advice and information on the CITY CAPITAL AFFILIATED COMPANIES although TAYLOR was never a licensed investment broker, dealer or advisor.

g.     In 2006, he proclaimed himself the "youngest African-American CEO of any publicly traded company in United States history" and started preaching (literally) the concept of "socially conscious investing."

h.     From 2006 forward, he portrayed himself as a "Minister," financial guru, investment wizard, multi-million dollar business manager and philanthropic rock star," none of which was true.

i.     He claimed he was a successful businessman overseeing $250 million in assets of two publicly-traded companies.

j.     On May 13, 2007, TAYLOR posted an article on his website (www.urbanwealth.net) announcing his Urban Wealth Tour. The Urban Wealth Tour was an 18 city tour beginning in Columbus, Ohio where TAYLOR spoke to communities and churches about economic empowerment and investment opportunities through the CITY CAPITAL AFFILIATED COMPANIES.     From 2007 until 2010, TAYLOR conducted at least three of these national Urban Wealth tours which were used to solicit new investors for the CITY CAPITAL AFFILIATED COMPANIES.     TAYLOR would advise participants to bring their 401k statements and IRA statements so he could review them and, of course, convince them to invest in CITY CAPITAL AFFILIATED COMPANIES.

k.     In mid-2007 and beyond, TAYLOR'S carefully created persona gained national media attention.     TAYLOR appeared on 20/20, The Today Show, the Montel Williams Show, Fox News, CNBC, and on a

-15-

multitude of Christian television and radio shows.

l.    He also became a commentator on news and financial television shows and radio broadcast (all of this exposure and publicity did nothing but add to TAYLOR'S credibility as an elite investment advisor and added authenticity to his investment recommendations in the CITY CAPITAL AFFILIATED COMPANIES).

m.    He also took advantage of the success of his award winning books, none of which he actually wrote, to solicit investors. TAYLOR conducted several national book tours across the U.S. Book tours gave TAYLOR the opportunity to expand his visibility as a successful businessman and professional investment advisor.

n.    In August of 2008, TAYLOR spoke at the Democratic National Convention to the Young Leader's Summit on his socially conscious corporate investment strategy.

o.    He used the Internet to facilitate fraudulent schemes by continually repeating the purported success stories of his many business ventures.

56.    In 2004 Defendant TAYLOR formed Christian Capital Group, LLC ("Christian Capital"), a Missouri limited liability company.  Defendant TAYLOR was the "executive trustee" of Christian Capital.

57.    According to a press release issued by Christian Capital and TAYLOR, Christian Capital was a non-profit ministry that employs biblical principles to help individuals increase their financial resources through low-risk investment opportunities.

58.    As alleged herein, certain of the Defendants acted intentionally or with

-16-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

deliberate recklessness in that they knew that the securities of the CITY CAPITAL CONSPIRATORS were unregistered and that the CITY CAPITAL CONSPIRATORS were not licensed to sell securities or serve as investment advisors and that the statements they disseminated to the investing public were false when made.

59.   Defendants were motivated to engage in this fraudulent conduct because it is believed that Defendants financed extravagant lifestyles for themselves and/or the fraudulent conduct benefitted their corporate entities and personal businesses from the proceeds of their illegal securities offering.

60.   The investments constitute investment contracts and therefore qualify as securities under Section 2 (a) (a) of The Securities Act of 1933, 15 U.S.C.§77b(1) and Section 3(a)(10) of The Securities and Exchange Act of 1934, 15 U.S.C.§78(a)(10).

61.   No registration statement has ever been filed in connection with the investment contracts offered and sold by certain of the Defendants as alleged herein and no exemption from registration applies.   Few, if any, of the purchasers or offerees qualified as accredited investors under the federal securities law.

62.   In May of 2006, TAYLOR became CEO of CITY CAPITAL CORPORATION.

63.   In October of 2006, CITY CAPITAL CORPORATION signed a $50 million credit facility with the Lucian Group.  This credit facility was terminated on June 13, 2007 seven (7) months later.

///

-17-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

64.     The CITY CAPITAL CONSPIRATORS were able to reach their VICTIMS by devising and implementing sophisticated plans targeting minorities and African Americans through television and radio ads, including Christian radio and television stations, e-mail advertising, personal speaking engagements in communities and churches, You Tube videos, appearances on national television shows and news reports, personal meetings, blogs and websites and other devices. The ads tricked Plaintiffs and other VICTIMS into believing that the CITY CAPITAL CONSPIRATORS were able to use the VICTIMS' monies, from self-directed IRAs, 401ks, and personal credit, credit cards and cash to purchase investments in the CITY CAPITAL AFFILIATED COMPANIES that would help working class families, single mothers, create new jobs, and affordable homes in these poorer communities while "guaranteeing" that investors would double their return on investment ("ROI") within 12 months "risk free." These schemes are known as the Socially Conscious Investment Ponzi Scams.

65.     In fact, the Sweeps Income sweepstakes machine investment through CITY CAPITAL'S wholly-owned subsidiary, Clean Sweeps Holding Group, LLC, was guaranteed as "100% RISK-FREE" such that Plaintiffs were assured in writing by Defendants that if they did not recoup their initial investment in the CITY CAPITAL CONSPIRATORS' Sweeps machines within one year or three months (Defendants used both pitches), their monies would be returned. This scheme is referred to as the Sweeps Machine Investment Ponzi Scam.

66.     The CITY CAPITAL CONSPIRATORS for their Sweeps Machine investment scheme were able to reach their targeted VICTIMS by devising and implementing sophisticated plans targeting potential investors through television and radio ads, e-mail advertising, personal speaking engagements in communities and churches, You Tube videos, appearances on national television and radio ads, personal meetings,

-18-

**CLASS-ACTION COMPLAINT**

blogs and websites and other devices to attract and convince investors to use monies from their self-directed IRAs, 401ks, personal credit, credit cards and cash to purchase sweepstakes machines through CITY CAPITAL that were to be put in retail establishments around the country with promises of a no risk, guaranteed rate of return 100% legal gambling operation.

67.    TAYLOR'S Urban Wealth tours permitted TAYLOR and the other CITY CAPITAL CONSPIRATORS to take their Ponzi schemes to a national level by convincing civic and religious leaders to permit TAYLOR to speak at a scheduled event and give TAYLOR access to their members and participants.    Many times TAYLOR gave a sermon from the pulpit of a church on Sunday and later that day or the next day offered his investment advice to church members-from that same pulpit. TAYLOR always told his audiences in closing to "Google" him and read all of his positive press.

68.    Sometime in mid-2007, the CITY CAPITAL AFFILIATED COMPANIES started using a Tennessee business address. But the address was a UPS store.

69.    In May of 2011, INCOMING filed a Form 8K/A with the Securities and Exchange Commission amending certain SEC related disclosures going back to events that occurred in August of 2010. This Form 8K/A states that TAYLOR, and BELL among others were shareholders as well as managing and/or directing the operations of INCOMING, VERDE, ECHOLS and RESILIENT. INCOMING had a working capital deficit of $163,117 as of May 31, 2010.

70.    Although the Form 8-K/A of May 2011 for INCOMING states that its shares cannot be sold absent registration or exemption under federal securities laws, the CITY CAPITAL CONSPIRATORS illegally offered the Plaintiffs and other Class

-19-

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

members "investment opportunities" in VERDE, FOOTHILL, INCOMING, RESILIENT, ERX, VERDE, GLOBAL and ECHOLS to purchase oil wells or biofuel facilities allegedly being managed by BELL and the companies BELL owned including VERDE, FOOTHILL, VERDE, GLOBAL and ECHOLS.

71.   In or around 2007, CITY CAPITAL AFFILIATED COMPANIES also sold interests in the phantom "Goshen Division" of CITY CAPITAL CORPORATION. The Goshen Division (a/k/a Goshen Energy and a/k/a Goshen Energy Division) is described by the CITY CAPITAL CONSPIRATORS as focusing "primarily on developing biodiesel and other alternative fuels created from plant matter and waste oil. This division partners primarily with small colleges and has been involved in natural gas and oil reclamation projects with select clients, where marginal wells are revitalized, creating on- going cash-flow."

72.   But by this time the CITY CAPITAL CONSPIRATORS knew that Goshen had already lost the rights to the one oil and gas lease that they had attempted to purchase because of lack of funds.

73.   The Goshen Division was also mentioned in a press release by Defendants dated June 9, 2009 indicating that CITY CAPITAL, through its wholly-owned subsidiary City Capital Petroleum, LLC, had acquired a "retail petroleum distribution center with a convenience store attached" in New York with supposedly "un-audited revenues of $3million in 2008."

74.   TAYLOR is quoted in the June 9, 2009 press release as stating "With our Goshen Energy division producing bio-fuels, we anticipate using our physical stations to distribute the fuel. This will create a vertically integrated company from production to retails."

-20-

**CLASS-ACTION COMPLAINT**

75.   Shortly after TAYLOR became CEO of CITY CAPITAL CORPORATION, he began moving investor funds from CITY CAPITAL CORPORATION to the bank accounts of Resilient, Incoming and ERX as well as his personal bank accounts. It is unknown what happened to those investor funds once they were diverted to these bank accounts.

76.   On March 3, 2009, Defendant TAYLOR did an interview with a writer for forbes.com. The story centered on TAYLOR'S early success in business and again repeated the story about TAYLOR becoming a millionaire at 16. The story noted that TAYLOR was CEO of Defendant CITY CAPITAL and mentioned investments in oil wells through the CITY CAPITAL AFFILIATED COMPANIES. However, the facts were that the CITY CAPITAL AFFILIATED COMPANIES had lost the rights to lease of the oil and gas property it had purchased in 2007 because CITY CAPITAL did not make the July 2007 installment payment.

77.   On February 27, 2011, TAYLOR was named one of the Top 5 Richest African American CEOs.

## LAWSUITS AND OTHER LEGAL TROUBLES FOR TAYLOR AND HIS AFFILIATED ENTITIES

78.   In September of 2004, TAYLOR was sued for fraud in the case of <u>Williford et al v. Ephren Taylor, Jr.</u> ("Williford Complaint") in Missouri both personally and as trustee of the Prosperity Ministries trust. Also named as defendants in the suit were his wife, MTAYLOR, his father, (also named Ephren Taylor) and his father's church, Johnson County Church of Christ ("Johnson County Church").

79.   To give him credibility with church members, TAYLOR made it appear in his

-21-

1    investment presentations that the Prosperity Fund a/k/a Prosperity Ministries was

2    affiliated with the church where TAYLOR'S father's (also named Ephren Taylor)

3    was pastor, the Johnson County Church of Christ. However, when TAYLOR'S

4    father and the Johnson County Church of Christ was sued on one of TAYLOR'S

5    investment deals gone bad-that turned out not to be true.

6

7    80.    After this set back on one of TAYLOR'S first religious-affinity–frauds, rather

8    than give up on his scams, TAYLOR decided to expand his fraudulent schemes

9    nationally.

10

11    81.    On October 5, 2005, Defendant TAYLOR and his company, Amoro

12    Investment Corporation, a Tennessee corporation, was sued in San Francisco,

13    California (Lake Street Partners, Inc. v. Amoro Investment Corporation, et al, Case

14    number 05-445583, Superior Court City and County of San Francisco).

15

16    82.    The complaint alleged that Defendant TAYLOR and Amoro Investment

17    Corporation entered into two written promissory notes with the plaintiff/investor for

18    a total of one million dollars ($1,000,000) and that TAYLOR guaranteed both notes

19    personally. However, when Plaintiff demanded payment, TAYLOR refused.

20

21    83.    It is unknown whether Defendant TAYLOR and Amoro Investment

22    Corporation ever paid the plaintiff in the Lake Street Partners case. However, on

23    August 27, 2007, Defendant TAYLOR'S company, Amoro Investment Corporation

24    was administratively dissolved by the state of Tennessee. Indeed, the California

25    "office" address TAYLOR used for the CITY CAPITAL AFFILIATED

26    COMPANIES was nothing but a Mailboxes, Etc. store.

27

28    84.    On July 6, 2007 the SEC revoked the registration of securities for AmoroCorp

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

for failure to make required periodic filings. It is believed that TAYLOR deliberately failed to make the required SEC periodic filings so that no one could ascertain the actual financial status of AmoroCorp by reviewing its publicly filed financial statements.

85.    On December 8, 2008, TAYLOR, CITY CAPITAL, AmoroCorp, Ephren Capital Corporation, Escrow Express, LLC, Amoro Management Group LLC, and Own the Pond, LLC were sued in Kansas Federal District Court for securities fraud. Plaintiff claimed damages of $150,000. (Escalada et al v. Taylor et al, Case number 6:2008cv1379, Sedgwick, Kansas).

86.    In September and October of 2010, most of the Clean Sweeps operations were shut down by local law enforcement as illegal gambling operations. However, the CITY CAPITAL CONSPIRATORS continued to take in and process investment funds without advising investors that they had discontinued their operations!

87.    On June 3, 2010, the State of Illinois, Securities Department issued a Temporary Order of Prohibition charging TAYLOR, CITY CAPITAL and Clean Sweep Holdings with failure to register securities and soliciting through an unregistered Dealer/Salesperson based upon advertising by Defendants on the radio in Chicago from April 12-16, 2010.

88.    On December 21, 2010, a Cease and Desist Order was issued by the State of Alabama Securities Commission against Defendants TAYLOR, CITY CAPITAL CORPORATION and others.

89.    The Alabama resident who had filed the complaint with the State of Alabama had attended an investment seminar in Orlando, Florida where TAYLOR was a

-23-

**CLASS-ACTION COMPLAINT**

speaker. This investor was issued two promissory notes, one for $50,000 and one for $25,000. The notes had an annual return on investment (ROI) of 20.00% (net after fees) and an annual cash return of $10,000.00 per unit. The Alabama Securities Commission concluded that the CITY CAPITAL CONSPIRATORS were operating as an unlicensed and unregistered securities dealer and therefore violated Alabama securities law.

90.    In February of 2011, the I-Team Fox News ("I-Team") in Atlanta published a news article and aired a news story concerning a scandal linked to Bishop Eddie Long and his church.  Long's church is the New Birth Missionary Baptist Church ("New Birth") in Georgia. The article states that TAYLOR made a presentation at New Birth about the Clean Sweeps sweepstakes video game machines and then the parishioners started investing in CITY CAPITAL.

91.    However the I-Team investigation revealed that in September of 2010 police in Virginia had raided a number of sweepstakes store fronts and charged 11 owners or companies with illegal gambling.  One of them was CITY CAPITAL through Clean Sweeps. Bishop Long posted a You Tube video appealing to TAYLOR to return his parishioners' investment money which Long indicated totaled about $1,000,000.

92.    TAYLOR responded to Bishop Long's plea by stating that CITY CAPITAL was already working on settling with all of the New Birth members and returning their money.  However, there is no evidence that any New Birth members received any of their investment monies back as TAYLOR had promised.

93.    In March of 2011, the North Carolina Attorney General announced an investigation of Clean Sweeps Holdings based upon consumer complaints from

-24-

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

buyers of investments in Clean Sweeps via CITY CAPITAL.

94.     In April of 2011, the plaintiffs in the case of <u>Anita Dorio et al  v. EPHREN TAYLOR and   CITY CAPITAL ("Dorio Case")</u> filed in Harris County, Texas, received a judgment of $1,226,000.00 against the defendants based upon allegations of fraud against TAYLOR and CITY CAPITAL in the  investment solicitation of the plaintiffs after meeting TAYLOR at their church and also having a personal, private meeting with TAYLOR in Texas.

95.     The Dorio complaint further alleges that TAYLOR had described his business successes to the plaintiffs from a teenager and indicated he could get a  better return on investment for plaintiffs than anyone else. In addition, TAYLOR indicated that he would provide superior returns and a "superior set of ethics."

96.     The Dorio complaint stated that TAYLOR told the plaintiffs that the investments were not risky because they were secured with tangible assets.  Plaintiffs moved their entire life savings of over $1.3 million dollars to TAYLOR and CITY CAPITAL and then plaintiffs were unable to get any answers on what happened to their money and did not receive return of their investment funds.  The DORIOS, once they became aware of the fraud, posted a lengthy story about having lost their life savings to TAYLOR'S fraud on www.scaminformercom as a warning to other potential Taylor victims.

**EQUITY TRUST AND BATT WERE ACTIVE PARTICIPANTS IN THESE INVESTMENT PONZI SCHEMES AND RELIGIOUS-AFFINITY-FRAUDS**

97.     The CITY CAPITAL CONSPIRATORS were locked arm-in-arm as they advertised and  promoted nationally their close working relationship.  In fact, in

-25-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

documents they went so far as to state that CITY CAPITAL CORPORATION both "controlled the investments" transferred to EQUITY TRUST and worked "directly" with EQUITY TRUST.

98.   In investor solicitation documents prepared by the CITY CAPITAL CONSPIRATORS, the "close working relationship" between EQUITY TRUST and CITY CAPITAL was emphasized as proof of the legitimacy the investments being offered by the CITY CAPITAL CONSPIRATORS. In addition, investor solicitation documents tout that CITY CAPITAL pre-paid all setup and management fees for EQUITY TRUST.

99.   By their own admission, the CITY CAPITAL CONSPIRATORS illegally controlled the investment monies, belonging to Plaintiffs and other Class members, in EQUITY TRUST.

100.   EQUITY TRUST and BATT viewed and treated TAYLOR and the other CITY CAPITAL affiliated companies as their partner and client, not the Plaintiffs and other Class members, which is why when the money ran out and the Ponzi scheme crumbled, EQUITY TRUST and BATT refused to assist the Plaintiffs and other Class members in trying to understand what happened to their investment money and where their money had been invested.

101.   Upon information and belief, EQUITY TRUST sent e-mail solicitations and letters to potential CITY CAPITAL CONSPIRATOR targets touting the opportunity for inexperienced investors to open a SDIRA and invest in the CITY CAPITAL AFFILIATED COMPANIES.

102.   EQUITY TRUST and BATT did not just assist the CITY CAPITAL

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

CONSPIRATORS. Rather, they solicited potential investors, advertised investment opportunities in the CITY CAPITAL AFFILIATED COMPANIES and convinced the VICTIMS to invest even though the CITY CAPITAL CONSPIRATORS were not licensed or registered to sell securities and the investments the CITY CAPITAL CONSPIRATORS were selling were illegal under state and federal securities law.

103. Defendant EQUITY TRUST is prominently mentioned in marketing documents prepared for CITY CAPITAL and the CITY CAPITAL AFFILIATED COMPANIES as the ONLY company that manages self-directed IRAs for CITY CAPITAL. However, both ENTRUST and SUNWEST TRUST also provided self-directed IRA custodial services to some of the VICTIMS.

104. BATT served as the sole liaison between EQUITY TRUST and investors in the CITY CAPITAL AFFILIATED COMPANIES.

105. BATT was introduced to the Plaintiffs and other Class members as TAYLOR'S personal investment banker. BATT gave TAYLOR another layer of credibility through his position as an agent/employee of EQUITY TRUST and established TAYLOR as an affluent investment advisor.

106. BATT also served as a business and personal "reference" for TAYLOR and the CITY CAPITAL AFFILIATED COMPANIES. If potential investors inquired as to TAYLOR'S investment success, experience, etc. they were given BATT'S contact information and BATT would provide an excellent reference regardless of whether the potential investor was going to invest through a self-directed IRA or in cash.

107. BATT was present at multiple investment seminars, including many at churches, given by TAYLOR where TAYLOR referred to EQUITY TRUST as his

-27-

**CLASS-ACTION COMPLAINT**

business partner and TAYLOR stated that CITY CAPITAL "managed" the investments of its clients/investors that were held by EQUITY TRUST.

108.  TAYLOR frequently emphasized EQUITY TRUST's size and experience as a CUSTODIAN as further evidence of the strength of the CITY CAPITAL team and used the EQUITY TRUST name frequently to add credibility to the investment schemes the CITY CAPITAL CONSPIRATORS were constantly pumping in press releases and other media.

109.  TAYLOR marketed the CITY CAPITAL investment vehicles to potential investors as a seamless way to invest.  TAYLOR kept emphasizing in other interviews and articles as well as blogs that the "ease" of investing in CITY CAPITAL as "hassle free" was a major advantage because CITY CAPITAL managed and controlled the investment therefore providing busy investors with a worry-free investment opportunity.

110.  The CITY CAPITAL CONSPIRATORS kept tight control over the direction of investments and creation of self-directed IRAs to BATT and EQUITY TRUST. The CITY CAPITAL CONSPIRATORS wanted to make sure they controlled the investment and the communications with the investors in the CITY CAPITAL AFFILIATED COMPANIES such as Plaintiffs and the other Class members so that no suspicions were aroused.

111.  The CITY CAPITAL AFFILIATED COMPANIES starting defaulting on investor loans and notes in mid-2007.

112.  Yet BATT and EQUITY TRUST kept making money on the "administration" of the VICTIMS' self-directed IRA accounts.  In fact, BATT boasts in his Linked-In

CLASS-ACTION COMPLAINT

biography that during his tenure with EQUITY TRUST he was ranked number seven (7) in sales during EQUITY TRUST'S 36 years of business by generating $3,000,000 in new revenue for EQUITY TRUST.

113. As of December 31, 2007, CITY CAPITAL CORPORATION had less than $100,000 in cash and AmoroCorp owed CITY CAPITAL CORPORATION over $2 Million.

114. In addition, CITY CAPITAL CORPORATION was in default on one of its notes payable with a principal of $250,000 and accrued interest of $475,683.

115. Also as of this time, CITY CAPITAL CORPORATION had not filed its 2005 or 2006 tax returns.

116. In 2008 CITY CAPITAL CORPORATION first issued the 3 Simple Steps marketing brochure where EQUITY TRUST was prominently mentioned. The CITY CAPITAL CONSPIRATORS falsely indicated that Plaintiffs' and the other Class members' self-directed IRA deposits were insured by the FDIC for up to $250,000. In fact, only cash deposits were insured by the FDIC. The marketing documents of CITY CAPITAL indicated that all fees for EQUITY TRUST were pre-paid by CITY CAPITAL.

117. In April of 2008, TAYLOR indicated that he was opening a new CITY CAPITAL office around Wall Street in New York. The address for this "Wall Street" office turned out to be a "virtual office," *i.e.*, simply rental of an address and not a real physical location.

118. The CITY CAPITAL CONSPIRATORS maintained an 800 number for

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

www.iracashflow.com and www.citycapcorp.com where unlicensed and unregistered telemarketing sales reps sold SDIRA investment vehicles with BATT as the sole contact and EQUITY TRUST as the exclusive CUSTODIAN. All of the sales reps were paid on a commission basis only and the entire operation was illegal.

## USING MONEY FRAUDULENTLY OBTAINED FROM THE PLAINTIFFS TO FINANCE MUSIC VIDEOS

119.   In January of 2009, THE TAYLORS uploaded a You Tube video of MTAYLOR'S first record release titled "I can be that." It is unknown exactly which of the VICTIMS' investment monies were used to produce this music video and the corresponding record but it is believed that the TAYLORS used monies from the Plaintiffs and other Class members to fund production of her record and music video through an entity called Resilient Music.. It is unknown whether MTAYLOR ever made any sales from this record.

120.   The TAYLORS made another music video and record in 2010 starring MTAYLOR. This record, titled "Billionaire (I don't care)" was produced by Flash Rodriguez, CEO of the FEAM Group who was supposedly an artist development expert in the music industry. It is unknown which VICTIMS' monies was used to finance this music production.

## THE SWEEPS MACHINE INVESTMENT PONZI SCAM

121.   On January 7, 2010, the CITY CAPITAL CONSPIRATORS uploaded a video to YouTube about a Sweep Income RISK-FREE Investment Opportunity presented by a self-made millionaire, TAYLOR.

122.   Money for an investment in the Clean Sweeps machines would come in to a

-30-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

Clean Sweeps Bank of America account (Account number 237018134155) controlled by the CAPITAL CITY CONSPIRATORS from either:

    a. EQUITY TRUST for self-directed IRA investments or 401k transfers;

    b. Credit card payments which were processed for CITY CAPITAL related entities; or

    c. Cash payments deposited by investors into to a Bank of America Clean Sweeps account ("Sweeps Monies").

123. Then the Sweeps Monies would be moved by the CITY CAPITAL CONSPIRATORS from the Sweeps Monies account to multiple accounts owned and/or controlled by the CITY CAPITAL CONSPIRATORS and/or the CITY CAPITAL AFFILIATED COMPANIES.

124. The bank and credit card accounts for purchase of Clean Sweeps machines were finally shut down by Bank of America for suspicious activity in October of 2010.

125. Telemarketing sales reps for CITY CAPITAL illegally operated a "telephone room" where they sold Sweeps machines as an investment which could be purchased through the client's SDIRA through EQUITY TRUST, with credit cards or with cash. The sales reps were paid on a commission basis only.

126. Investors who had already "qualified" for the Socially Conscious Investment Ponzi Scam were also "qualified" to apply for the Sweeps Machine Investment Ponzi Scam. Indeed many investors invested in both of the schemes with no idea that neither was a legal, legitimate investment opportunity.

127. The CITY CAPITAL CONSPIRATORS also initiated thousands of

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

"Robocalls" (A Robocall is a term for an automated phone call that uses both a computerized autodialer and a computer-delivered pre-recorded message) to prior and current investors in the CITY CAPITAL AFFILIATED COMPANIES to attempt to sell them Clean Sweeps machines.

128.  By May of 2010, the CITY CAPITAL CONSPIRATORS were telling potential investors in the Clean Sweeps scam that CITY CAPITAL had been in the sweepstakes machine business for 3 years, had over 100 locations, 3,000 machines and that 20% of the proceeds of the sweepstakes machines went to charity.  None of these statements were true.

## MORE FRAUDULENT AND FAILED VENTURES

129.  On June 15, 2010, CITY CAPITAL filed a Form 10-K ("June 09 10K") with the SEC.  This annual report was for the CITY CAPITAL'S fiscal year ending December 31, 2009.  The June 09 10K indicates that CITY CAPITAL sold its operating subsidiary Perfect Turf, Inc. and incurred a loss of $64,170.00.

130.  The June 09 10K further states that City Laundry Services, LLC ("City Laundry") which was formed on January 22, 2009 purchased laundry cleaning businesses.

131.  The June 09 10K indicates that CITY CAPITAL purchased 3 laundries between February and April of 2009 and sold 2 of the 3 in November of 2009.  None of the laundries were operational by December of 2010 and in fact the last laundry was shut down due to CITY CAPITAL's failure to pay the rent.

132.  CITY CAPITAL also purchased City Juice Systems KS, LLC ("City Juice")

## CLASS-ACTION COMPLAINT

SNYDER ◆ DORENFELD, LLP

which later acquired L.A. Juice Company, Inc. and Blends 101, LLC. Both the L.A. Juice location and the Blends 101 location were closed by CITY CAPITAL after attempts to sell them failed. City Beauty Systems, LLC ("City Beauty") purchases health and beauty businesses and was still in existence at the time of the filing of the June 09 10K. However, although CITY CAPITAL received investment monies in City Beauty, no investment properties were ever purchased by City Beauty and no one knows what happened to those investment monies.

133. According to CITY CAPITAL'S SEC filings, City Capital Petroleum, LLC ("City Petroleum") purchased gas stations. Upon information and belief, City Capital Petroleum never purchased a gas station it only leased it. This gas station closed in 2010 due to declining revenues.

134. Nitty Gritty, LLC was owned by City Capital and was a social network and internet training site. CITY CAPITAL indicated it was for sale in the June 09 10K.

135. CITY CAPITAL owned 33% of The Millionaire Lifestyle Group which ceased operations in December of 2009.

136. CITY CAPITAL also owned a 2.18% interest and managing member in NYC Liquidation Group, LLC. These were Ebay drop-off locations which were closed in July of 2009 after being purchased for over a quarter of a million dollars in January of 2009.

137. CITY CAPITAL owned a 40% interest in The Male Room, LLC which was closed in December of 2009.

138. As of December 31, 2009 CITY CAPITAL had a total of 28 employees: 15

-33-

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

administrative staff and 13 customer service employees.

139.  CITY CAPITAL incurred net losses of $6,316,328 for the year ending December 31, 2009 and $2,602,457 for the year ended December 31, 2008.  Yet EPHREN TAYLOR received compensation of cash and stock of over one million dollars from CITY CAPITAL in each of those years.

140.  As of December 31, 2009 CITY CAPITAL had closed nine properties and generated $94,010 in revenues from its credit investor program.

141.  The June 09 10K indicates that CITY CAPITAL'S accounting firm expressed doubt that CITY CAPITAL could continue as a going concern because of its accumulated deficit of $18,468,522.

142.  As of December 31, 2009, CITY CAPITAL had a working capital deficit of $7,186,142.

143.  As of December 31, 2009, TAYLOR'S AmoroCorp owed CITY CAPITAL $1,635,174 as the balance on an outstanding promissory note for monies borrowed by AmoroCorp from CITY CAPITAL.

144.  In late 2009 and early 2010, some of the promissory notes of investors held in EQUITY TRUST SDIRAs with the CITY CAPITAL AFFILIATED COMPANIES began maturing and the investors wanted to cash out.  However, these investors were unable to do so.  EQUITY TRUST and BATT by February of 2010 were receiving multiple calls from anxious investors in the CITY CAPITAL AFFILIATED COMPANIES who wanted their money back.  However, EQUITY TRUST and BATT simply referred the investors back to TAYLOR.

CLASS-ACTION COMPLAINT

SNYDER ♦ DORENFELD, LLP

## TAYLOR'S EMPIRE BEGINS TO CRUMBLE AS THE FRAUD GETS EXPOSED

145. Beginning in May of 2010, the CITY CAPITAL CONSPIRATORS started receiving an increasing number of customer complaints in their telemarketing call center in Raleigh, North Carolina.  Customers who had purchased Sweeps machines in late 2009 or early 2010 were complaining that they had not received any income from the machines as they had been promised, or that their machines had never been placed and activated or that the amount of return investment they received was substantially lower than what they had been told they would receive or that they were being overcharged by EQUITY TRUST.

146.   Sometime prior to June of 2010, EQUITY TRUST started notifying VICTIMS who had invested in Sweepstakes machines through EQUITY TRUST SDIRAs that EQUITY TRUST was terminating its services as their CUSTODIANS.  The CITY CAPITAL CONSPIRATORS approached SUNWEST TRUST about serving as the CUSTODIANS for these VICTIMS and thereafter the VICTIMS moved their SDIRAs from EQUITY TRUST to SUNWEST TRUST.

147.   By August of 2010, the CITY CAPITAL telemarketing call center in Raleigh could not handle all of the complaint calls and the frustration of dealing with the non-stop angry customer calls. This caused many CITY CAPITAL employees to walk out or simply not show up for work again.

148.   EQUITY TRUST and BATT were also receiving calls from worried and angry investors trying to find out what happened to their investments. EQUITY TRUST and BATT, however, refused to assist the investors including Plaintiffs. The accounts of the Plaintiffs revealed little about their investments other than their

-35-

SNYDER ♦ DORENFELD, LLP

initial purchase of the business, machine or real estate and that they held a promissory note. EQUITY TRUST and BATT refused to provide any other information.

149. It is estimated that less than 20% of the investment proceeds received by the CITY CAPITAL CONSPIRATORS were ever actually invested in real estate, sweeps machines or anything else. The remaining proceeds were misappropriated and diverted by the CITY CAPITAL CONSPIRATORS to pay themselves, pay earlier investors, or solicit new investors to perpetuate the Defendants' fraudulent schemes.

150. On November 2, 2010, CITY CAPITAL announced the resignation of Defendant TAYLOR as CEO and Chairman of the Board of CITY CAPITAL effective October 22, 2010.

151. On November 23, 2010, TAYLOR held a conference call with investors of CITY CAPITAL. TAYLOR told the investors that they would receive a full refund for their investments. That refund never materialized.

152. On June 3, 2010 (the same day that the Illinois Securities Department issued a Temporary Order of Prohibition) Defendants issued a press release announcing that 21 Clean Sweeps terminals had been placed in Rolesville, North Carolina. Incredibly, the press release states that the Clean Sweeps program is *100% legal*.

## HOW THE NAMED PLAINTIFFS HAVE BEEN DUPED AND SWINDLED BY TAYLOR

## PLAINTIFF BRISSETTE PURCHASED AN INVESTMENT IN A

CLASS-ACTION COMPLAINT

## PONZI SCHEME RUN BY TAYLOR AND OTHERS

153.   BRISSETTE became aware in late 2005 that a company named Amoro, which was purportedly a financial services company providing private asset management services was soliciting new investors/clients in the Los Angeles area and surrounding cities in California.

154.   BRISSETTE met TAYLOR, CEO of Amoro, when he spoke at an investment seminar she attended.

155.   TAYLOR was also the CEO of a company called Own the Pond, LLC through which he also provided financial investment advisor services.  In addition, he had authored a book on successful financial investing strategies which he claimed was a Wall Street Best Selling Book.

156.   BRISSETTE was looking for investment options to add long-term income, as well as to diversify her portfolio.

157.   TAYLOR claimed that his investment strategies offered better-than-average investment returns through the use of a SDIRA with ENTRUST.  In order to invest with TAYLOR, BRISSETTE had to make the investment through an ENTRUST SDIRA.

158.   Although ENTRUST had an office in Los Angeles near BRISSETTE'S home, she was directed to ENTRUST'S Denver, Colorado office to open and fund her SDIRA with ENTRUST.

159.   BRISSETTE opened SDIRA accounts with ENTRUST and then ENTRUST

## CLASS-ACTION COMPLAINT

SNYDER ♦ DORENFELD, LLP

transferred BRISSETTE'S SDIRA funds to Amoro.

160.   To this day, BRISSETTE still has never been notified by ENTRUST that her promissory note is in default or that she did not receive all of the interest due on the promissory note held in her SDIRA.

## PLAINTIFF LIBERTY CITY UNKNOWINGLY INVESTS IN A PONZI SCHEME

161.   In November of 2007, at a church conference in Terrell, Texas at Southwestern Christian College, representatives of LIBERTY CITY met TAYLOR who was one of the main speakers for a program known as the Sound Doctrine Foundation.

162.   In 2008, representatives of LIBERTY CITY again saw TAYLOR conduct a seminar entitled "Young Person Empowerment" in south Florida. Representatives of LIBERTY CITY talked to TAYLOR after the seminar and TAYLOR indicated he was going to be in Miami again soon and he would come to LIBERTY CITY to speak with their members about investing.

163.   TAYLOR came back to Miami in mid-2008 and met with various representatives of LIBERTY CITY who decided to invest a portion of the LIBERTY CITY building fund into TAYLOR'S investment properties through CITY CAPITAL.

164.   TAYLOR told LIBERTY CITY that CITY CAPITAL was involved in buying depressed homes and then rehabbing the houses and selling them at a nice profit much greater than that offered by other investment opportunities.

-38-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

SNYDER ◆ DORENFELD, LLP

165.   TAYLOR advised LIBERTY CITY to create a limited liability company to make and hold the investment which TAYLOR would set up and manage. TAYLOR formed Title One Holdings, LLC ("Title One") and then LIBERTY CITY in March of 2008 deposited a cashier's check for $100,000 into the Title One bank account which TAYLOR controlled.

166.   LIBERTY CITY does not know what happened to their investment, or the properties they were allegedly investing in through the CITY CAPITAL CONSPIRATORS but they do know that their investment is now worthless.

## PLAINTIFF WILLIAM LEE INVESTS IN DEFENDANTS' PONZI SCHEMES

167.   In February of 2009, Plaintiff WILLIAM LEE invested $160,000 in City Laundry. This was after LEE had attended an investment presentation where he heard TAYLOR talk about 3 Simple Steps.

168.   The investment opportunity was initially presented to LEE by Anthony Hall, a contractor working for the CITY CAPITAL CONSPIRATORS.

169.   LEE was told by Defendants that the assets of City Laundry were worth more than twice the purchase price and that City Laundry would be "debt free." In fact, most of the equipment was leased in the City Laundry location LEE was investing in, but this was not disclosed to LEE by the CITY CAPITAL CONSPIRATORS at the time he made the investment.

170.   LEE, like other Class members, received a one year promissory note from City Laundry as the "Maker" signed by TAYLOR. The promissory note contained a 20%

-39-

## CLASS-ACTION COMPLAINT

annual interest rate for one year. It was verbally agreed that once the transition from promissory note to an equity position was made, that the profits in excess of 20% were to be split evenly between LEE and CITY CAPITAL.

171.   LEE had been told that the ultimate goal was for Defendants to give LEE an equity position in City Laundry. At the time of the investment, Defendants had indicated that City Laundry was a growing business with no debt. Again, this representation was false, but LEE was not aware of that because, despite his repeated requests, he was not permitted to review the books and financial records of City Laundry either before or after his investment.

172.   In April of 2009, LEE was asked to sign as a personal guarantor on the equipment lease for City Laundry. LEE did not know that the City Laundry equipment was subject to such an equipment lease until after he had made the investment in City Laundry. The CITY CAPITAL CONSPIRATORS told LEE that unless this equipment was leased for City Laundry, they could not move forward with the business and it would fold. LEE did not want to lose the money he had already invested in City Laundry, so he agreed to personally guarantee the equipment lease.

173.   LEE again requested financial information and the books and records of City Laundry in order to determine if he wanted to become an equity member of City Laundry. But LEE never received any information.

174.   In November of 2009, CITY CAPITAL sold the City Laundry Blue Ridge Cleaners for $10,002 (which was the balance of a promissory note due to be paid by CITY CAPITAL including interest) that it had purchased for $148,500 in March of 2009.

-40-

**CLASS-ACTION COMPLAINT**

175.  In November of 2009, CITY CAPITAL sold the City Laundry 39th Street Laundromat for $20,000 that it had purchased for $97,625 in February of 2009.

176.  On February 1, 2010, LEE, like other Class members, requested his money back before the promissory notes became due on February 10, 2010.

177.  LEE'S EQUITY TRUST account revealed little about his investment other than the initial purchase of the business and that the investment was secured by a promissory note.  It appears that EQUITY TRUST was charging fees multiple times and deducting them from LEE'S and the other Class members' accounts.  CITY CAPITAL was also supposed to be paying the fees so it is unknown why EQUITY TRUST would be deducting anything from Plaintiffs' accounts.

178.  LEE decided to exit the investment because of the lack of information, reports or financial data received from Defendants despite repeated requests. But LEE has not received return of his monies.

179.  LEE was asked to attend a meeting in May of 2010 with CITY CAPITAL management to discuss the situation.  However, when LEE got to the meeting, LEE was told that he could not review the books and records for City Laundry or City Petroleum unless LEE executed a confidentiality, non-disclosure and indemnification agreement. LEE refused to sign the documents.

180.  At this meeting LEE was told that CITY CAPITAL did not have the funds to pay back the monies due LEE on the promissory notes because TAYLOR had loaned a bunch of money to some churches and these churches defaulted on their loans.

181.  In November of 2010, LEE learned that CITY CAPITAL was trying to sell City Laundry for $15,000 but had been unable to find a buyer because the buyer had

-41-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

to qualify to take over the lease payments on the City Laundry dry cleaning equipment. CITY CAPITAL had not paid the rent, and there was a large amount outstanding i.e., $100,000.

182.  In March of 2011, LEE was named as a defendant along with City Laundry, TAYLOR, and Kinta Dixon in a law suit in Jackson County, Missouri seeking damages for breach of the equipment leases by City Laundry and breach of the personal guarantees of TAYLOR, LEE and Dixon. LEE and the other defendants had a judgment entered against them for $133,457.33. LEE is still attempting to get the CITY CAPITAL CONSPIRATORS to assist him in satisfying the judgment.

183.  LEE and the other Class Members were told repeatedly that CITY CAPITAL had set up a trust fund to reimburse VICTIMS of the CITY CAPITAL Ponzi schemes and that Defendants would return LEE'S investment funds.  Sadly, those representations were also false and LEE has been forced to file this action to try to recoup his lost investment monies.

## PLAINTIFF GENNET THOMPSON INVESTS IN DEFENDANTS' PONZI SCHEMES

184.  Sometime prior to July of 2009, THOMPSON saw an advertisement on the Black Entertainment Television Network ("BET") advertising investment opportunities with Defendants. Defendant TAYLOR was the spokesperson and was talking about investing in real estate through a SDIRA with a guaranteed rate of return. The SDIRA was renewable for one or two years.

185.  THOMPSON called the toll-free number on the television ad and requested information on the investments Defendants offered. When THOMPSON called to

-42-

inquire about investing, she was told by Defendants' representative that the ROI on her investment through the SDIRA was guaranteed to double. Defendants requested THOMPSON's e-mail address so they could send her further information.

186.   Defendants also advised THOMPSON that their SDIRA products provided an opportunity for "socially conscious" investing such that the monies invested through the SDIRA were used to fund affordable homes, local businesses and revitalization projects for working class families and "green initiatives" involving oil wells and biofuel.

187.   On July 1, 2009, THOMPSON received an e-mail from the CITY CAPITAL CONSPIRATORS via Defendant TAYLOR. This e-mail outlined the CITY CAPITAL CONSPIRATORS' investment program and advised that THOMPSON could double her return on investment by investing with the Defendants through City Capital's socially-conscious programs.

188.   After THOMPSON faxed the completed Client Application then THOMPSON was advised to call the Defendants' toll free number and set up an appointment to get her questions answered about Defendants' programs by an investment counselor.

189.   THOMPSON also received an e-mail purportedly from TAYLOR including the 3 Simple Steps marketing brochure (first issued by CITY CAPITAL CORPORATION in 2008) where EQUITY TRUST was prominently mentioned.

190.   3 Simple Steps is 64 pages long. The length is probably intentional.  It is too long for most investors to have time to read and long enough that Defendants can point to it and declare that they had adequately disclosed the risk of their investment schemes. The Introduction begins with "How would you feel if you were to discover

-43-

SNYDER ♦ DORENFELD, LLP

an investment strategy that earned *at least (emphasis in original)* twice what you current investments get now…"

191.   3 Simple Steps further states: "On the other hand, if 100% of your investment money-including 100% of your annual profits could be plowed back into your ongoing investments without taxation, can you imagine how much faster your nest egg would grow?"

192.   3 Simple Steps lists the options in which THOMPSON could choose to invest the proceeds of her self-directed IRA in the CITY CAPITAL AFFILIATED COMPANIES:

    a.   Money Market, CDs, Saving Accounts (but Defendants advised that these are "probably not the top choices").

    b.   Stock, bonds, mutual funds (but Defendants advised that they are "too much work").

    c.   Collectibles (but Defendants advised that there is a "much smaller, niche market of potential buyers if you need to go liquid quickly").

    d.   Real Estate Properties (Defendants stated this is the most common investment for SDIRAS but this investment option "is only practical if you have a professional management group doing all the work, so you don't have to").

    e.   Notes or Mortgages-Defendants advised this is a good use of investment funds because "you control it with the note or mortgage and earn whatever rate you establish" however Defendants caution that "there is essentially no way to increase the return through the life of the loan."

    f.   Cash-Flowing Businesses-Defendants recommended this option

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

as a way to "collect all profits from a thriving business tax-free (or tax-deferred)!"

g. Producing Oil or Gas Properties-Defendants recommended this investment option to THOMPSON and state "Who doesn't dream of owning their own oil well?"

h. Alternative Fuels and "Green Technologies"-Defendants also recommended this option so that THOMPSON could invest "in the growing demand for cleaner, "greener" energy sources."

193. Defendants' advised THOMPSON in 3 Simple Steps that a self-directed IRA is like "becoming your own bank" and that banks and brokerage houses don't recommend self-direction because banks want to keep investors money" in their vault."

194. Defendants assured THOMPSON that everything about the transaction was all arms-length yet you retain complete control (yet in other documents Defendants indicated that CITY CAPITAL CORPORATION or one of CITY CAPITAL AFFILIATED COMPANIES managed the investments and did all of the work); if you have a self- directed account, you can begin doubling your interest immediately"; once your rollover funds are released to the new custodial trustee, "you begin receiving *at least* twice your current rate of return the day you assign your funds to the City Capital program."

195. Defendants also stated: "You do <u>nothing</u>. We do everything. And *you* get the profits."

196. THOMPSON also received another document, dated 2008, from Defendants entitled "Eliminate the Roadblocks to Profitable & Secure Real Estate

-45-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

Investing (Eliminate the Roadblocks)." This document is 29 pages long and again describes Defendants' real estate investing programs.

197.     Defendants in Eliminate the Roadblocks describe CITY CAPITAL CORPORATIONS' investment program as using real estate investing to create socially-conscious investing opportunities and to empower communities.

198.     The CITY CAPITAL CORPORATION program outlined in Eliminate the Roadblocks also includes the CITY CAPITAL CORPORATION "One Year Limited Mortgage Payment Guarantee" which provides for "unseen vacancies" in the investment property and guarantees that the property will be rented for the first year or CITY CAPITAL CORPORATION will pay the mortgage.

199.     Based upon the representations, promises, assurances and guarantees provide by Defendants via phone, e-mail, radio ad, television ads, advertising materials and brochures, THOMPSON in July of 2009 contacted Defendants and advised them she was ready to make an investment in Defendants' SDIRA Real Estate program. THOMPSON was instructed to use EQUITY TRUST for her SDIRA by Defendants. THOMPSON invested $16,000 through a SDIRA with EQUITY TRUST and received a promissory note signed by TAYLOR.

200.     On February 19, 2010, THOMPSON received an e-mail from Defendants via EPHREN TAYLOR.    This e-mail, with the subject line, "Congratulations, you're in the door…" solicited to THOMPSON the promise of a "once in a lifetime opportunity."

201.     THOMPSON then e-mailed Ebony Rowland, a representative of Defendants at CITY CAPITAL, to get the necessary documents to make an

-46-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

investment in Defendants' "Sweep Income Investment." Rowland e-mailed back "EPHREN just announced this opp (opportunity) on CNN and took it public." Ms Rowland indicated that as a result they were "swamped" with calls by investors trying to get in on this "opportunity."

202.     THOMPSON ordered 3 machines from Defendants and paid $10,500 via wire transfer for all three machines. The Sweeps Terms and Conditions stated that THOMPSON received a "100% Satisfaction Guarantee" from Defendants. This 100% Satisfaction Guarantee stated that if THOMPSON did not recoup her investments from the return on investment of the machines within 3 months of the Sweeps machine placement then THOMPSON's investment monies would be returned to her.

203.     In August of 2010, THOMPSON was notified that as of September 1, 2010 all three of THOMPSON's terminals were placed at a location on Newtown Road in Virginia Beach, Virginia.

204.     Then on October 20, 2010, THOMPSON received a letter from Defendants advising her that the Virginia Beach location had been shut down since mid-September and was not producing income so CITY CAPITAL CORPORATIONS sent her a check for her losses of $262.17.

205.     Defendants indicated they would continue to send THOMPSON checks for her financial loss until the Virginia Beach location was back on line. Defendants stated that they anticipated the Virginia Beach location being back on line within 30 days of October 20, 2010.

206.     THOMPSON never received another check and the Virginia Beach

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

location never reopened. THOMPSON also never received return of her investment funds despite repeatedly requesting same.

207.     But the CITY CAPITAL CONSPIRATORS continued their operations and fraudulent schemes through new corporate shells.

208.     On December 11, 2010, THOMPSON sent an e-mail to an employee of CITY CAPITAL who had served as her "investment counselor". The e-mail indicated that she had received a call from a "Scott" who wanted to know if THOMPSON wanted to continue the Sweeps program with another company that he worked for. Scott had indicated that the Clean Sweeps machines were being placed in other stores and that Scott's company was taking over the operations. However, THOMPSON declined and never heard from Scott again.

209.     Thompson has filed this action after failing to obtain return of her investment monies despite many promises by Defendants that Thompson's monies would be returned and the receipt by Thompson of multiple fraudulent settlement proposals from Defendants.

**PLAINTIFF   TRUDY   MORGAN   INVESTS   IN   THE   SWEEPS MACHINE INVESTMENT PONZI SCHEME**

210.     MORGAN met TAYLOR in 2009 at her church in Lithonia, Georgia when TAYLOR was invited to speak to the congregation about successful investing and the investment programs that were recommended by TAYLOR.

211.     When TAYLOR spoke at MORGAN'S church, he was accompanied by BATT.

-48-

CLASS-ACTION COMPLAINT

212.    TAYLOR introduced BATT to MORGAN'S congregation as "TAYLOR'S personal banker." However, BATT was not a banker, BATT was a sales agent of Defendant EQUITY TRUST who also worked for CITY CAPITAL.

213.    In fact, BATT was an agent/employee of EQUITY TRUST whom Defendants utilized exclusively at that time as a self-directed IRA custodian for investors of CITY CAPITAL and its subsidiaries. TAYLOR and the other CITY CAPITAL CONSPIRATORS required that CITY CAPITAL investors use the EQUITY TRUST for their self-directed IRAs.

214.    At the meeting at MORGAN'S church, TAYLOR discussed his long standing success as a businessman, teenage millionaire story and his investment advice to the participants like MORGAN who were trying to find more successful investment strategies and a greater return on investment.

215.    After hearing TAYLOR speak, MORGAN decided to transfer her $20,000 IRA account to EQUITY TRUST per the CITY CAPITAL CONSPIRATORS' instructions. BATT was MORGAN'S sole contact at EQUITY TRUST and handled all communications.

216.    The Ponzi schemes orchestrated by the CITY CAPITAL CONSPIRATORS were particularly well planned because the "investments" of the Plaintiffs and other Class members in the Clean Sweeps machines were set up to automatically renew or "rollover" each year such that the investors could not liquidate their investments automatically at the end of the investment period and, in fact, were not even notified at the end of any investment period that they could withdraw their investment funds or" choose" to reinvest; the interest or profit that purportedly was being earned on the investment "appeared" in the

-49-

CLASS-ACTION COMPLAINT

SNYDER ♦ DORENFELD, LLP

investors/VICTIMS' self-directed IRA accounts at EQUITY TRUST or on their Clean Sweeps investment account statements automatically and regardless of whether the accrued interest/profit had actually been placed in the account. (It had not for the majority of investors/VICTIMS).

217.     A few months after she made her initial investment, MORGAN was told that the CITY CAPITAL CONSPIRATORS were trying to reach her (which she believed was not true) and that she needed to move her self-directed IRA from EQUITY TRUST to SUNWEST TRUST. MORGAN was told that the change was necessary because EQUITY TRUST had become "jealous" of all the money CITY CAPITAL was making. Again MORGAN and the other Class members were directed to one employee of SUNWEST TRUST for any information on his investment with Defendants.

218.     In May of 2010, MORGAN'S self-directed IRA was moved to SUNWEST TRUST in Albuquerque, New Mexico.

219.     MORGAN received a booklet from SUNWEST TRUST titled "A Custodial Self-Directed Traditional IRA Plan Agreement").

220.     MORGAN also received a "Prohibited Transactions-Summary" from SUNWEST TRUST.

221.     The CITY CAPITAL CONSPIRATORS in May of 2010 formed a Georgia limited liability company for MORGAN called Infinite Acquisitions 119 LLC ("Infinite Acquisitions") to hold her investments.

222.     MORGAN'S investment of $19,070.00 in Clean Sweeps was wired

**CLASS-ACTION COMPLAINT**

SNYDER • DORENFELD, LLP

1  from her Infinite Acquisitions bank account to CITY CAPITAL'S Bank of America
2  bank account (Bank of America, account # 237018134155, routing number
3  026009593). MORGAN also invested cash of $10,000 in the Sweeps Machines.

5  223.      MORGAN received two Certificates of Satisfaction providing a
6  guarantee that if the sweepstakes machines she purchased do not generate revenue
7  within 12 months, then MORGAN could return the machines and would receive her
8  money back.

10  224.      MORGAN then received a letter dated June 3, 2010 from the CITY
11 CAPITAL CONSPIRATORS indicating that they were "working" to have her
12 machines in place by July 18, 2010, some 7 months after she had initially transferred
13 her retirement funds to them. No explanation was ever given MORGAN for the
14 delay.

16  225.      MORGAN was notified in August of 2010 that her 6 Sweeps Machines
17 had been placed in Virginia Beach, Virginia.

19  226.      MORGAN was surfing the Internet in September of 2010 and found out
20 by accident that the Virginia Beach location where her 6 sweeps machines were
21 placed had been shut down as an illegal gambling operation.

23  227.      MORGAN then called CITY CAPITAL and spoke to Richard Wynn, a
24 manager, who assured MORGAN that she would be receiving her anticipated
25 income from the Sweeps Machines and that MORGAN'S machines would be
26 operational again in Virginia Beach by November 10th.

28  228.      Thereafter MORGAN received a letter dated October 20, 2010

**CLASS-ACTION COMPLAINT**

indicating her machines would be back on line within 30 days and a check for $524.34 from Defendants which represented her anticipated profit from each of the 6 machines, i.e., $87.39 per machine for 6 machines.

229.    This check was from CITY CAPITAL'S Bank of America account. MORGAN went to Bank of America to cash the check but was advised by the bank representatives that there was no money in the bank account.

230.    MORGAN has never received return of her investment monies, anticipated profits from her investment or interest.

231.    On November 16, 2010, MORGAN received an e-mail from James Contaccessa at www.selfdirectedassets.com indicating that Contascessa had become aware that CITY CAPITAL could be a fraud and that individuals running the company have committed a scam.

232.    On March 17, 2011, MORGAN received an e-mail from MTAYLOR with a link to a video about another "leader's summit" where TAYLOR was a speaker on successful investment strategies.   MTAYLOR continued to shamelessly promote TAYLOR and encourage potential victims to invest even after the CITY CAPITAL Ponzi scheme collapsed.

233.    MORGAN and other Class members were told repeatedly after the Sweeps Machine program was shut down that CITY CAPITAL had set up a trust fund to reimburse VICTIMS.

234.    MORGAN received the same settlement documents, tolling agreement and information as the other Plaintiffs and Class members but she did not receive

-52-

SNYDER ♦ DORENFELD, LLP

any of her money back.  All of the representations made by Defendants that Plaintiffs and the other Class members were going to be made whole have proven to be false and MORGAN has been forced to file this action to try to recoup her lost investment monies, interest, overcharges and other damages

## ENTRUST, EQUITY TRUST, and SUNWEST WERE NOT PASSIVE CUSTODIANS;   RATHER,   THEY   ACTIVELY   FACILITATED MULTIPLE FRAUDULENT ENTERPRISES

235.     The CITY CAPITAL CONSPIRATORS utilized the CITY CAPITAL AFFILIATED COMPANIES and investment vehicles to facilitate their Ponzi schemes. Chief among the investment vehicles used was an SDIRA.  As discussed above, SDIRA rules permit investment in a much broader set of assets than are permitted by most IRA custodians. ("Custodians" or "trustees," the name given the manager/administrators of regular IRAs, are mainly banks and broker-dealers that restrict investment holdings in regular IRAs to approved stocks, bonds, mutual funds and CDs, i.e., more traditional investments).

236.     However CUSTODIANS, though sharing similar but misleading names with CIRAs, deny any type of fiduciary responsibilities. In fact, as will be established herein, it is very, very difficult to ascertain exactly what CUSTODIANS claim to be responsible for, if anything, in "administering" SDIRAs. It is even more difficult to rationalize how the CUSTODIANS' mystery "services" justify the exorbitant fees that ENTRUST, EQUITY TRUST, and SUNWEST (collectively "JOINT CUSTODIANS") charge their customers including the Plaintiffs herein.

237.     The monies deposited into SDIRAs "administered" by these JOINT CUSTODIANS were stolen from Plaintiffs and the other Class Members through

-53-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

fraud, Ponzi schemes, and other criminal conduct encouraged, facilitated, aided, abetted, promoted and consummated by the CITY CAPITAL CONSPIRATORS.

238.     The JOINT CUSTODIANS reported substantial increases in the value of each VICTIM'S SDIRAs via IRS Form 5498 year after year when, in fact, the monies in the VICTIMS' SDIRAs had been stolen by the CITY CAPITAL CONSPIRATORS months or years before.

239.     The JOINT CUSTODIANS substantially assisted in the CITY CAPITAL CONSPIRATORS' fraudulent schemes by mismanaging the Plaintiffs' SDIRA accounts and violating their own internal policies.

240.     But for the CITY CAPITAL CONSPIRATORS' mandated, exclusive use of the JOINT CUSTODIANS to "administer" the "investments" of Plaintiffs and other Class Members, the retirement accounts and life savings of these VICTIMS would not have been stolen.

241.     The JOINT CUSTODIANS gave Plaintiffs and the other Class Members a false sense of security by making false and deceptive representations that their "investments" would be safe, insured, accurately administered, and legally sound. Plaintiffs and the other Class Members, relying on those representations, in good faith gave their hard-earned money to the JOINT CUSTODIANS who enabled the CITY CAPITAL CONSPIRATORS to steal the VICTIMS' monies.   Most investors lost their entire life savings.

242.     Although Defendants ENTRUST, SUNWEST and EQUITY TRUST charged excessive fees for their CUSTODIAN "administrative services," Defendants failed to perform one of the few "duties" they actual concede exists for

-54-

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

CUSTODIANS which is to maintain custody of the paperwork proving ownership of a designated asset by the SDIRA.

243.    From 2006 continuing to the present, the JOINT CUSTODIANS inaccurately reported account values that concealed the CITY CAPITAL CONSPIRATORS' repeated defaults and delinquent interest payments and continued to allow reinvestments in the CITY CAPITAL CONSPIRATORS' securities even after learning that the CITY CAPITAL CONSPIRATORS were engaged in the sale of unlawful securities continued to do so over the course of many months despite numerous detailed customer complaints alerting the JOINT CUSTODIANS to serious problems with the investments.

244.    Many of the VICTIMS' SDIRA account statements reflected missing documentation . The SDIRA statements prepared by the JOINT CUSTODIANS contained notations year after year that documentation reflecting ownership of the investment such as the original promissory note, an original collateral agreement , the LLC operating agreement, and/or a stock certificate evidencing ownership in some of the CITY CAPITAL AFFILIATED COMPANIES to name a few were never received and/or the LLC operating agreement was never received yet the CUSTODIANS charged the VICTIMS administrative fees to manage their accounts and still failed to follow up and obtain their own mandated paperwork for each investment account leaving many VICTIMS to ponder exactly where their money went and what it was used for. Most VICTIMS to this day still do not know where their money went.

245.    The JOINT CUSTODIANS, through a myriad of nonsensical, confusing and overly complex illusory, adhesion contracts and documents, as well as false, misleading and deceptive advertising diverted millions of dollars belonging to

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

Plaintiffs and the other Class Members to the CITY CAPITAL CONSPIRATORS.

246.    The JOINT CUSTODIANS have publicly acknowledged the fact that they are aware that SDIRAs are and were being used by fraudsters to swindle their customers and that such fraud claims are escalating.

247.    One or more of the JOINT CUSTODIANS provided CUSTODIAN services to the following fraudsters:  Ephren Taylor, Robert Stinson, Jr.,  Aaron W. Duncan, Advanced Technology Marketing LLC, Douglas Vaughn,  Kurt Barton, Randell Morrison, Steven Edward Gwin, Jerry A. Smith, Jasen M. Snelling,  Al Parrish, Richard A. Daniels, Casey Charles, William Wise, Christian Stanley, Trevor Cook, Gibraltar Partners Inc., Oxford Global Advisors, International Bank and Trust, Chris Cornett, and Joseph Gennaco to name a few who bilked their victims out of tens of millions of dollars through SDRIAS. Yet the JOINT CUSTODIANS continue to facilitate fraudulent enterprises without the least hesitation.

248.    Fraudsters are acutely aware that their affiliation with and use of CUSTODIANS entice inexperienced investors, who might otherwise be more cautious, into an investment scam because the investors believe they are protected by large, purportedly well-funded CUSTODIANS with secure, trusting names like "Trust Company", "Trustee," or "Custodian."

249.    In fact, CUSTODIANS actually attempt to disclaim responsibility for anything and everything through their highly technical contracts full of unintelligible legalese that even experienced lawyers cannot decipher while being handsomely paid to do nothing other than provide the means and method through which tens of thousands of people can be and have been scammed of their life savings.

///

-56-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

250.   The JOINT CUSTODIANS have acknowledged that although they claim to be a "passive" CUSTODIAN, they have stopped "allowing customers to invest" in some SDIRA programs upon discovering issues with the investment promoter/Fraudster which contradicts their purported status as a "passive" custodian.

251.   The JOINT CUSTODIANS knew that the CITY CAPITAL CONSPIRATORS were making the investment decisions for the Plaintiffs and other Class members as well as paying the administrative fees of the CUSTODIANS at times so the JOINT CUSTODIANS knew that the Plaintiffs' SDIRAS were being illegally controlled and managed by third parties-not the SDIRA account owners.

252.   The SEC issued an Investor Alert in September of 2011 warning consumers about the popularity of SDIRAS among fraud promoters particularly in Ponzi schemes.

253.   The JOINT CUSTODIANS have tried to limit their liability in their adhesion contracts to serve their best interests while at the same time facilitating criminal conduct directly resulting in the total loss of their customers' investments.

254.   Since at least 2005 it has been known in the CUSTODIAN industry that Ponzi schemers were utilizing SDIRAs to facilitate their criminal enterprises.  Yet the JOINT CUSTODIANS have done nothing to detect, prevent, stop or warn their customers about this popular fraudulent investment scheme using CUSTODIAN services.

255.   Fraudsters, including some of the Defendants herein, insisted and required that their VICTIMS, including Plaintiffs and the other Class Members, utilize SDIRAs administered by the Joint CUSTODIANS because the Defendants

-57-

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

knew, but the Plaintiffs and other Class Members did not know, that the SDIRAs of the Plaintiffs and other Class Members were set up to automatically renew or "rollover" each year such that the investors/VICTIMS could not liquidate their investments automatically at the end of the investment period and, in fact, were not even notified at the end of any investment period that they could withdraw their investment funds or "choose" to reinvest.

256.     In addition, Defendants knew that the investment interest that purportedly was being earned in the SDIRAs of Plaintiffs and other Class Members "appeared" in the account statement of the VICTIMS' SDIRAs administered by the JOINT CUSTODIANS regardless of whether the accrued interest on the investment was actually deposited in the VICTIMS' accounts.  It was not for the majority of VICTIMS.

257.     The administration of the SDIRAs by the JOINT CUSTODIANS gave the illusion to Plaintiffs that their SDIRAs were increasing in value and that their investments were profitable and legitimate. However, the JOINT SDIRAS  failed to conduct a sufficient review of the SDIRAs of the VICTIMS in order to ascertain problems inherent with the accounts on their face.

258.     The JOINT CUSTODIANS periodically sent out investment account statements or made them available through the Internet to VICTIMS showing what appeared to be extraordinary investment returns in their SDIRAs thus maintaining the deception that the schemes of the Defendants were providing high returns and that the value of the VICTIMS' SDIRAs was increasing.

259.     In fact, VICTIMS' investment monies were stolen within days or weeks after ENTRUST, EQUITY TRUST and SUNWEST wired the funds to the CITY

-58-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

CAPITAL CONSPIRATORS.

260.     Under the plan documents of the JOINT CUSTODIANS, the JOINT CUSTODIANS had a duty to furnish periodic reports to the Plaintiffs concerning the status of their account and a statement of assets.  Instead the JOINT CUSTODIANS fraudulently concealed information that they had a duty to disclose i.e., that the securities held by the Plaintiffs' SDIRAS had defaulted and/or that the CITY CAPITAL CONSPIRATORS had failed to make distributions into their accounts.

261.     CUSTODIANS, such as ENTRUST, SUNWEST and EQUITY TRUST, are required to report the fair market value ("FMV") of the SDIRA assets annually on Form 5498 and to report  the value of any distributions to the SDIRA owner on Form 1099-R.  However, ENTRUST, EQUITY TRUST and SUNWEST failed and refused to ascertain the FMV of the SDIRAs owned by Plaintiffs and the other Class Members.  Instead, the JOINT CUSTODIANS reported the same value year after year unless, of course, the CITY CAPITAL CONSPIRATORS provided a greater value to the CUSTODIAN who then recorded it as the updated value of the SDIRA thus further deceiving Plaintiffs and the other Class Members into believing their investments were increasing in value and secure.

262.     The JOINT CUSTODIANS had actual knowledge that the CITY CAPITAL CONSPIRATORS had defaulted on the securities held in the Plaintiffs and other Class members SDIRAs while at the same time the CITY CAPITAL CONSPIRATORS were taking in new investors and investments. The CITY CAPITAL CONSPIRATORS started defaulting on the securities held by the JOINT CUSTODIANS by at least 2008 while the Ponzi schemes did not implode until late 2010.

///

-59-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

263.     Defendants ENTRUST, SUNWEST and EQUITY TRUST maintain company websites that target inexperienced investors to invest through SDIRAS.

264.     In order to enhance the appearance of legitimacy of their CUSTODIAN services, the JOINT CUSTODIANS sponsored Webinars about the safety, efficiency and profitability of investing in SDIRAs.

265.     EQUITY TRUST sponsored Webinars about investing in its SDIRAs featuring IRS agents as speakers.  Such marketing ploys lead the average consumer, including Plaintiffs and the other Class Members, to believe that the JOINT CUSTODIANS' services are validated and approved by the IRS.

266.     It is well known in investment circles and among securities regulators that "IRS Approved" sales pitches to solicit consumers seeking IRA custodial services are frequently used as a fraudulent method of investment advertising and marketing solicitations.

267.     ENTRUST, SUNWEST TRUST, and EQUITY TRUST also encouraged Plaintiffs and the other Members of the Class to utilize Limited Liability Companies ("LLC") to hold their SDIRA investments.

268.     It is common knowledge among securities regulators that fraudsters favor LLCs or partnerships to hold investments to evade the consumer protection requirements of state and federal securities law.  The consumer protection laws require investment promoters to disclose in writing all relevant facts and risks about both themselves and the offered investment.

269.     However, if a fraudster utilizes a LLC then they can hide personal

-60-

**CLASS-ACTION COMPLAINT**

bankruptcies and previous securities violations as well as avoid written disclosure of the investment risks, actual marketing costs, and actual investment experience of the fraudster. The VICTIMS, who are inexperienced investors, would be none the wiser.

270.     The JOINT CUSTODIANS utilized deceptive and unfair trade practices as well as false and misleading advertising to entice consumers, including Plaintiffs and the other Class Members, to utilize their CUSTODIAN services with claims of attainment of new found riches and untold wealth.

271.     What the JOINT CUSTODIANS failed to disclose was that their SDIRAs were being used by fraudsters to steal their customers' monies.   This omission of a material fact and/or active concealment by the JOINT CUSTODIANS caused Plaintiffs and other Class Members to invest in what they believed was a legitimate, profitable investment opportunity but that instead was really a Ponzi scheme or fraudulent enterprise designed to bilk the targeted investors.

272.     In addition, through use of substantive and procedurally unconscionable contracts, ENTRUST, SUNWEST TRUST, EQUITY TRUST and the other Defendants were able to utilize contracts of adhesion to bind Plaintiffs and the other Class Members to an illusory contract with no meaningful bargaining between the parties because of the economic disparity between the Plaintiffs and other Class Members and the JOINT CUSTODIANS. Moreover, the Victims were **forced** to use the CUSTODIANS selected by the CITY CAPITAL CONSPIRATORS.

273.     The contracts of ENTRUST, SUNWEST and EQUITY TRUST are best described as contracts "such as no man in his sense and not under delusion would make on the one hand, and no honest and fair man would accept on the other." Sears Termite & Pest Control, Inc. v. Robinson, 883 So. 2d 153,158 (Ala. 2003).

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

274.     The JOINT CUSTODIANS' contracts are so grossly unfair that no reasonable person would accept them if they had a choice. But the VICTIMS had no choice.

275.     The JOINT CUSTODIANS permitted the CITY CAPITAL CONSPIRATORS to illegally control the investment accounts of the Plaintiffs and other Class Members.

276.     The JOINT CUSTODIANS enjoyed free marketing services by the CITY CAPITAL CONSPIRATORS who placed their name in marketing documents and e-mails to the VICTIMS detailing the fact that the selected CUSTODIAN was the ONLY custodian that managed SDRIAs for that particular fraudulent scheme.

277.     The JOINT CUSTODIANS aided, facilitated and supported the CITY CAPITAL CONSPIRATORS' control of the VICTIMS-so the JOINT CUSTODIANS could maintain a revenue stream of fees comprised of hundreds or thousands of dollars per year per account from each VICTIM for essentially doing nothing.

278.     In fact, the JOINT CUSTODIANS knew that the loans and notes in the VICTIMS' SDIRAs were defaulting repeatedly over multiple years but turned a blind eye. The JOINT CUSTODIANS' failure to accurately report the value of the SDIRAs of Plaintiffs and other Class Members resulted in the VICTIMS being unaware that their investment monies had actually been stolen although their SDIRAs appeared to be increasing in value.

279.     The IRS requires that IRA owners withdraw at least a minimum amount, known as a Required Minimum Distribution ("RMD") from their retirement

-62-

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

accounts annually, starting the year an investor turns age 70 ½ . Thus the RMD requirement demands that retirement assets have a certain degree of liquidity. While RMDs may vary based on the ages of the investor and beneficiary, as well as the rate of return earned on the investment, RMD amounts on most retirement accounts are usually less than 1/20 of the principal in the retirement account.

280.     The JOINT CUSTODIANS knew that the investments of the Plaintiffs and other Class Members who were over age 70 1/2 were completely illiquid and that the CITY CAPITAL CONSPIRATORS were breaching their duty to investors and mismanaging their investments because the investment accounts of the VICTIMS frequently failed to maintain enough cash to pay RMDs. Because the value of the VICTIMS' accounts were grossly inflated, so were the RMD amounts subjecting the JOINT CUSTODIANS' customers to greater penalties upon their failure to take the distribution.

281.     In marketing documents, investment seminars, e-mail solicitations and other advertising used to solicit potential investors such as the Plaintiffs and other Class members, it was repeatedly stated that the CITY CAPITAL AFFILIATED COMPANIES managed the investment assets held by the JOINT CUSTODIANS.

282.     A "managed" account is very different from the legal definition of a SDIRA which mandates that the investor makes all decisions about the account. Yet the JOINT SDIRAS, who claimed to be passive, were routinely taking investment instructions from the Defendants-not the VICTIMS.

283.     As a result, the JOINT SDIRAS knew that the funds in the SDIRAS of the VICTIMS were not going to be used for their intended purpose yet did nothing.

-63-

**CLASS-ACTION COMPLAINT**

284.     At all times material hereto, Defendants EQUITY TRUST, ENTRUST and SUNWEST TRUST knew or should have known that the investment seminars, conference calls and presentations they were participating in with TAYLOR and the other Defendants were illegal.

285.     At all times material hereto, Defendants EQUITY TRUST, ENTRUST and SUNWEST TRUST knew or should have known that the investments being made by the Plaintiffs and other Class members were illegal either due to the fact that the investments themselves constituted an illegal enterprise (i.e., Sweepstakes machines) or due to the fact that the investment sponsors/brokers/promoters, the CITY CAPITAL CONSPIRATORS and the CITY CAPITAL AFFILIATED COMPANIES were neither licensed nor registered in any state to sell the investment or give investment advice as required by state and Federal securities laws.

286.     The JOINT CUSTODIANS knew or should have known that the written investment solicitation documents given the Plaintiffs and other Class members falsely indicated that the SDIRAs of the VICTIMS were insured by the FDIC.

287.     The JOINT CUSTODIANS knew or should have known the written investment solicitation documents given the Plaintiffs and other Class members falsely stated that the promissory notes in the SDIRAS of the VICTIMS were secured by tangible assets. This statement was blatantly false and in fact the JOINT CUSTODIANS knew or should have known that there was no documentation evidencing that the VICTIMS' investments were secured by tangible assets.

288.     The JOINT CUSTODIANS failed to act in accordance with industry standards to maintain custody over, hold, preserve and safeguard the SDIRA assets of Plaintiffs and the other Class members; failed to maintain title of the assets in the

-64-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

SDIRAS; and failed to furnish legally mandated statements accurately reflecting the value of the assets held in the SDIRAS of the VICTIMS.

289.    At all times material hereto the JOINT CUSTODIANS had actual knowledge of their complicit involvement in a highly organized Ponzi scheme and/or were recklessly or willfully blind to their role in materially supporting the scheme.

290.    The JOINT CUSTODIANS' acts and/or omissions in assisting, facilitating and participating in the Ponzi schemes of the CITY CAPITAL CONSPIRATORS render the JOINT CUSTODIANS as a direct and proximate cause of the Plaintiffs' losses and therefore the JOINT CUSTODIANS are liable for the damages incurred by Plaintiffs and other Class members herein.

## THE CITY CAPITAL CONSPIRATORS' CAREFULLY SELECTED BANKS ENABLED THE FRAUDULENT SCHEMES OF DEFENDANTS

291.    The BANK DEFENDANTS, at various times from at least January 1, 2006 to the present, facilitated the fraudulent schemes of the CITY CAPITAL CONSPIRATORS by moving millions of dollars through bank and credit card accounts controlled by the CITY CAPITAL CONSPIRATORS evidencing the BANK DEFENDANTS' participation in the fraudulent schemes, or alternatively, evidence of their gross negligence and wanton disregard of numerous "red flags."

292.    TAYLOR hand- picked the BANK DEFENDANTS who were selected because TAYLOR had insiders who would facilitate his transactions through the BANK DEFENDANTS and ignore irregularities and red flags. These bank employees were either family members or trusted close friends of The TAYLORS.

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

The TAYLORS and the CITY CAPITAL AFFILIATED COMPANIES were given special banking privileges and excluded the TAYLORS as well as the CITY CAPITAL AFFILIATED COMPANIES from ordinary banking due diligence inquiries as well as waiving its own internal policies and procedures.

293.     For instance, TAYLOR maintained multiple accounts with the BANK DEFENDANTS for the CITY CAPITAL AFFILIATED COMPANIES yet the BANK DEFENDANTS failed and/or refused to report or stop suspicious activity on these multiple accounts.  The BANK DEFENDANTS had actual knowledge that the CITY CAPITAL AFFILIATED COMPANIES were illegally selling securities and sweepstakes machines but ignored this illegality and continued to transfer monies within multiple accounts controlled by the CITY CAPITAL CONSPIRATORS.

294.     The BANK DEFENDANTS provided both the imprimatur of legitimacy to the fraudulent schemes of the CITY CAPITAL CONSPIRATORS as well as the banking infrastructure to facilitate many thousands of transactions over a five year period and such transactions continue to this day.

295.     The CITY CAPITAL CONSPIRATORS at times opened bank accounts at small rural branches of the BANK DEFENDANTS and maintained several separate accounts for running their Ponzi schemes.

296.     In fact, the BANK DEFENDANTS received cash deposits of tens of thousands of dollars that were deposited by the VICTIMS directly into the bank accounts controlled by the CITY CAPITAL CONSPIRATORS and then withdrawn in large amounts by the CITY CAPITAL CONSPIRATORS and deposited in accounts not listed in the deposit instructions.

///

-66-

**CLASS-ACTION COMPLAINT**

297.     In audition, the BANK DEFENDANTS received cash deposits from the CITY CAPITAL CONSPIRATORS for the accounts of the VICTIMS that should have immediately been red flagged. It is highly unusual for a corporate entity to be transferring funds to individuals of tens of thousands of dollars in cash without using a corporate check or cashier's check.

298.     Conversely, the VICTIMS were instructed to deposit cash in one or more of the BANK DEFENDANTS accounts. These cash deposits were at least several thousand dollars which should have immediately been red flagged also. Yet the BANK DEFENDANTS did nothing.

299.     The BANK DEFENDANTS failed to scrutinize, were complicit in and/or turned a blind eye to the lack of legitimacy of the tens of millions of dollars through thousands of transactions deposited into their branches and ignored red flag after red flag.

300.     The BANK DEFENDANTS failed and/or refused to identify and report money-laundering and other suspicious activities by the CITY CAPITAL CONSPIRATORS permitting the CITY CAPITAL CONSPIRATORS to divert or steal tens of millions of dollars from the Plaintiffs and other Class members.

301.     The BANK DEFENDANTS failed to implement and/or utilize an effective Bank Secrecy Act/Anti-Money Laundering Compliance Program with internal controls reasonably designed to detect and report money laundering and other suspicious activity.

302.     The BANK DEFENDANTS were complicit in the schemes of the CITY CAPITAL CONSPIRATORS and served as the "lynchpin" of the fraudulent

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

schemes perpetrated by the CITY CAPITAL CONSPIRATORS.

303.     Upon information and belief, other financial institutions closed accounts of the CITY CAPITAL CONSPIRATORS for suspicious activity yet the BANK DEFENDANTS ignored such activity.

304.     The BANK DEFENDANTS, despite their knowledge that the CITY CAPITAL DEFENDANTS were moving millions of dollars through multiple bank and credit card accounts controlled by the CITY CAPITAL CONSPIRATORS, stood idly by and never sought independent verification of the source of the monies.

305.     In fact, some or all of the BANK DEFENDANTS held payroll accounts for the CITY CAPITAL AFFILIATED COMPANIES. Yet when the employees of the CITY CAPITAL AFFILIATED COMPANIES went to cash their payroll checks many of them would bounce.

306.     The employees of the CITY CAPITAL AFFILIATED COMPANIES actually joked with each other about getting to the bank first to make sure they got paid. It would be impossible for the BANK DEFENDANTS not to know that funds were being wrongfully diverted when they were receiving tens of thousands of dollars in deposits from the CITY CAPITAL AFFILIATED COMPANIES yet the CITY CAPITAL AFFILIATED COMPANIES did not have the monies to fund payroll.

307.     Bank of America's Anti-Money Laundering and Anti-Terrorism Financing Policy Statement requires Bank of America to "Know Your Customer." The policy statement provides, *inter alia*: "Since criminals require financial services in order to launder the proceeds of and to fund criminal activities, financial

-68-

SNYDER ♦ DORENFELD, LLP

institutions can play a key role in the detection and prevention of money laundering and the financing of terrorism, principally with the proper Know Your Customer practices. This knowledge of the customer provides a basic understanding of the general activities in which a customer would normally be expected to engage, thus giving an institution a potential opportunity to determine whether detected unusual activity should be reported as suspicious or otherwise handled in accordance with applicable laws and regulations."

308.      This Policy Statement is intended to guard against Bank of America's involvement in criminal activity and to reinforce Bank of America's policy of cooperation with law enforcement and regulatory agencies. Bank of America managers are required to make efforts to ensure that all bank Associates are fully informed regarding this Policy Statement."

309.      The red flags and suspicious activity that should have triggered a money laundering investigation by the BANK DEFENDANTS include the following: (1) repeated cash transactions over $10,000; (2) cashing checks that were made out to "Cash;" (3) using the cash received for the purchase of money orders or for wire transfers; (4) wire transfers and deposits to THE TAYLORS' personal accounts when the BANK DEFENDANTS knew, or had reason to know, that those funds were coming from the business account established by the CITY CAPITAL AFFILIATED COMPANIES);(5) computer-generated holds and warnings for transactions which were ignored by bank employees; (6) repeated lifting of holds on large deposits; and (7) substantial and frequent fund transfers between the various accounts maintained by the CITY CAPITAL AFFILIATED COMPANIES and the various other entities and individuals involved in the schemes described herein.

310.      Plaintiffs are informed and believe that these suspicious transactions

-69-

**CLASS-ACTION COMPLAINT**

were brought to the attention of Bank of America managers and officials both verbally and through reports that documented the transactions, but none of them endeavored to investigate the CITY CAPITAL CONSPIRATORS.

311.     In addition, the CITY CAPITAL AFFILIATED COMPANY accounts were consistently hit with bounced check charges because the accounts were overdrawn.  All red flags that the BANK DEFENDANTS totally ignored.

312.     But for the conduct of the BANK DEFENDANTS in failing to authenticate the origin of the millions of dollars following through the bank and credit card accounts of the CITY CAPITAL CONSPIRATORS, the Ponzi schemes perpetrated by the CITY CAPITAL CONSPIRATORS would never have been successful.

313.     The BANK DEFENDANTS either knew or should have known of the criminality or gross irregularities of the conduct of the CITY CAPITAL CONSPIRATORS with regard to the movement of investor funds. Alternatively, the BANK DEFENDANTS' actions and/or omissions in not conducting any due diligence inquiry into the suspicious activities of the CITY CAPITAL CONSPIRATORS, including the movement of tens of thousands of dollars daily between multiple bank and credit card accounts without justification or supporting documents, was either deliberate or reckless.

314.     The BANK DEFENDANTS turned a blind eye to any wrongdoing and provided knowing assistance and/or dishonest assistance in the CITY CAPITAL CONSPIRATORS' Ponzi schemes by transferring millions of dollars through the CITY CAPITAL CONSPIRATORS' bank and credit card accounts.

///

-70-

**CLASS-ACTION COMPLAINT**

315.   The BANK DEFENDANTS and their employees aided and abetted the CITY CAPITAL CONSPIRATORS by repeatedly providing them with banking services despite numerous and ongoing red flags which reasonably should have put them on notice of wrongful activity.

316.   The BANK DEFENDANTS and their employees repeatedly and willfully disregarded their own guidelines, computer-generated warnings, and understanding of the nature of the business in which the CITY CAPITAL CONSPIRATORS were engaged, allowing transactions to occur which should have been investigated and reported as suspicious activity.  The BANK DEFENDANTS aided and abetted the common scheme of deception perpetrated the CITY CAPITAL CONSPIRATORS, in acting and failing to act in the manner described herein.

317.   Had the BANK DEFENDANTS not participated in and/or willfully disregarded the CITY CAPITAL CONSPIRATORS' wrongful activity -- and instead investigated such activities -- the losses to investors, including Plaintiffs and the Class, would not have occurred, or they would not have occurred to such a large magnitude.

318.   Plaintiffs aver that at all times material hereto the BANK DEFENDANTS had actual knowledge of their complicit involvement in a highly organized Ponzi scheme and/or were recklessly or willfully blind to their role in materially supporting the scheme.

319.   The BANK DEFENDANTS' acts and/or omissions in assisting, facilitating and participating in the Ponzi schemes of the CITY CAPITAL CONSPIRATORS renders the BANK DEFENDANTS as a direct and proximate cause of the Plaintiffs' losses and therefore the BANK DEFENDANTS are liable for

-71-

**CLASS-ACTION COMPLAINT**

the damages incurred by Plaintiffs and other Class members herein.

## THE FRAUDULENT SCHEMES OF THE DEFENDANTS CONTINUE

320.     The CITY CAPITAL CONSPIRATORS continued to illegally solicit and sell investments even after their Ponzi scheme fell through.  Through Global Sweepstakes and Investment Properties LLC, a North Carolina limited liability company, Defendants continued to sell sweepstakes machines and investments in real property.

321.     TAYLOR was still sending solicitation e-mails to the VICTIMS in December of 2010, trying to get VICTIMS to invest in new schemes TAYLOR had designed. In fact, the day after TAYLOR allegedly resigned from CITY CAPITAL as CEO, he sent solicitation e-mails to some of the VICTIMS soliciting further investments on behalf of CITY CAPITAL and the rest of the CITY CAPITAL CONSPIRATORS.

322.     Plaintiffs do not believe TAYLOR ever truly stepped down or relinquished control of the CITY CAPITAL AFFILIATED COMPANIES and believe the CITY CAPITAL CONSPIRATORS are still operating Ponzi schemes through illegal investments to this day.

323.     In February of 2012, CITY CAPITAL issued a press release indicating that Legal Outsourcing Group LLC ("LOG") had been retained to "separate and address the old liabilities and contingencies of CITY CAPITAL CORPORATION."

324.     After that the VICTIMS started receiving phone calls and e-mails from someone claiming to be a representative of LOG scheduling a time to discuss their

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

settlement of claims against CITY CAPITAL and the other TAYLOR-controlled shell companies.

325.    These purported settlements were and are an extension of the fraudulent schemes perpetrated by the CITY CAPITAL CONSPIRATORS. The VICTIMS were required to sign releases and waivers of all liability and, in return, would receive shares of stock in CITY CAPITAL that were worthless, unmarketable and illegally issued (something known by Defendants but unknown by the VICTIMS).

326.    LOG in March of 2012 had to take down its website because of all of the threats LOG received due to its participation in the TAYLOR/CITY CAPITAL settlement process scam where LOG was purportedly resolving investment loss claims.

327.    It is unknown whether LOG was aware that TAYLOR had previously, on multiple occasions, told his many investment income loss victims that he was going to pay them and settle their claims but instead stalled and stalled the settlement process and then never compensated ANY of those victims.

## COUNT I.

## CONVERSION

(Against all Defendants)

328.    Plaintiffs incorporate the allegations and Exhibits contained in all the prior paragraphs of this Complaint as if restated and fully set forth herein.

329.    This is a claim for conversion.

330.    As described more fully above, the "investment" programs of Defendants that Plaintiffs and the other Class members invested in were bogus. Defendants were operating a series of Ponzi schemes which permitted Defendants to

-73-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

exercise unauthorized dominion and control over the property of Plaintiffs and the other Class members when they absconded with the Plaintiffs' and other Class members' money. Defendants took and appropriated that money for their own use.

331.     Defendants' conversion has permanently deprived Plaintiffs and the other Class members of their property.

332.     Plaintiffs and other Class members have repeatedly demanded, and were promised by Defendants, that their funds would be returned but Defendants did not in fact return them.

333.     Defendants' actions have directly caused injury and damages to Plaintiffs and the Class members.

334.   Plaintiffs are entitled to attorney's fees pursuant to the private Attorney General statutes.

335.   Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT II

## INTENTIONAL FRAUD

(Against the CITY CAPITAL CONSPIRATORS)

336.     Plaintiffs incorporate the allegations and Exhibits contained in all the

-74-

SNYDER ♦ DORENFELD, LLP

prior paragraphs of this Complaint as if restated and fully set forth herein.

337.    The    CITY    CAPITAL    CONSPIRATORS    made    several misrepresentations to the public at large and to the Plaintiffs and the Class members as set forth above.

338.    These Defendants knew that these statements were false when they made them.

339.    The CITY CAPITAL CONSPIRATORS intended for Plaintiffs and the Class members to rely upon their false statements.

340.    Plaintiffs and the Class members did in fact rely on these Defendants' false statements, and would never have invested in the CITY CAPITAL AFFILIATED COMPANIES were it not for the false statements.

341.    These Defendants have enjoyed substantial financial gain, and Plaintiffs and the other Class members have suffered severe financial loss as a result of the reliance of Plaintiffs and other Class members on these false statements.

342.    Plaintiffs are entitled to attorney's fees pursuant to the private Attorney General statutes.

343.    Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

-75-

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

## COUNT III.

## NEGLIGENT MISREPRESENTATION

### (Against the CITY CAPITAL CONSPIRATORS )

344.     Plaintiffs incorporate the allegations and Exhibits contained in all the prior paragraphs of this Complaint as if restated and fully set forth herein.

345.     The   CITY   CAPITAL   CONSPIRATORS   made   several misrepresentations to the public at large and to the Plaintiffs and the Class members as set forth above.

346.     These Defendants should have known that these statements were false when they made them.

347.     These Defendants intended for Plaintiffs and the Class members to rely upon their false statements.

348.     Plaintiffs and the Class members did in fact rely on these Defendants' false statements, and would never have invested in CITY CAPITAL were it not for the false statements.

349.     These Defendants have enjoyed substantial financial gain, and Plaintiffs and the other Class members have suffered severe financial loss as a result of Plaintiffs' and Class members' reliance on false statements.

350.  Plaintiffs are entitled to attorney's fees pursuant to the private Attorney General statutes.

## COUNT IV.

## BREACH OF FIDUCIARY DUTY

### (Against the CITY CAPITAL CONSPIRATORS)

351.     Plaintiffs incorporate the allegations and Exhibits contained in all the prior paragraphs of this Complaint as if restated and fully set forth herein.

352.     At all times material hereto, the CITY CAPITAL CONSPIRATORS owed the Plaintiffs and the other Class members a fiduciary duty for reasons including, but not limited to, Defendants held themselves out as investment advisors

-76-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

and custodians to Plaintiffs and the other Class members, and the fact that they purported to serve Plaintiffs and the other Class members as competent custodians of their investments and as participants in a common investment scheme.

353.     These Defendants breached their fiduciary duties through their actions by methods including but not limited to:

a.     Investing the Plaintiffs and other Class members' money in a Ponzi scheme or schemes;

b.     Working together to perpetuate the false notion that TAYLOR was a successful, multimillionaire and would help Plaintiffs make double or triple their ROI;

c.     Mismanaging the CITY CAPITAL investments;

d.     Issuing inaccurate account statements that concealed repeated defaults on the promissory notes that the EQUITY TRUST' clients, including the Plaintiffs and member of the Class had purchased;

e.     Overcharging the Plaintiffs and other Class members for their services; withdrawing funds from CITY CAPITAL for personal use; and

f.     By profiting from these things at Plaintiffs and other Class members' expense.

354.   Plaintiffs are entitled to attorney's fees pursuant to the private Attorney General statutes.

355.   Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of

-77-

**CLASS-ACTION COMPLAINT**

2   material facts known to the Defendants, and each of them, with the intention to deprive
3   the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage
4   such as to constitute malice, oppression, or fraud under California *Civil Code* §3294,
5   thereby entitling Plaintiffs, and each of them, to punitive damages in an amount
6   appropriate to punish or set an example of Defendants, and each of them.
7   Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum
8   according to proof.

9                              **COUNT V.**

10   <u>**UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND**</u>
11   <u>**PROFESSIONS CODE § 17200 et seq.**</u>

12                    (Against all Defendants)
     356.        Plaintiffs incorporate the allegations and Exhibits contained in all prior
13   paragraphs of this Complaint as if restated and fully set forth herein.
14   357.   California *Business and Professions Code* § 17200, *et seq.*, prohibits acts of
15   "unfair competition," including any unlawful, fraudulent or deceptive business act or
16   practice, as well as "unfair, deceptive, untrue or misleading advertising."
17   358.   This private Attorney General action is brought by the Plaintiffs listed above
18   to remedy violations of California's state consumer protection statutes arising out of
19   Defendants' and/or their representatives' misrepresentations, omissions of material
20   facts, and breaches of agreements.
21   359.   Defendants, at all times material hereto, have engaged in "trade or commerce"
22   by advertising, soliciting, offering or distributing a good or service by soliciting
23   consumers within the definition of California *Business and Professions* Code §
24   17200 *et seq.*
25   360.   As discussed herein, this is a private Attorney General action brought on
26   behalf of the general public.  As detailed herein, Defendants have engaged in a
27   pattern and practice of uniformly misrepresenting and/or repudiating their
28   contractual and legal obligations.

-78-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

2  Defendants' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving" investments" in illegal gambling activities, shell

3  companies and ghost investment vehicles orchestrated by Defendants without regard

4  to Plaintiff's legal and equitable rights constitute acts of unlawful, unfair or

5  deceptive business acts and practices that are injurious to the public within the

6  meaning of California's Unfair Competition Law.

7  362.  The conduct of Defendants is of a continuing nature that requires prompt

8  relief.  Defendants have uniformly represented to the general public through their

9  representatives that their actions were legally appropriate when in fact they were not

10  and/or have concealed material facts (as detailed throughout this Complaint); and the

11  disclosure of such information was necessary in order to make Defendants' other

12  representations not misleading for want of disclosure of such omitted facts or

13  because Defendants possess superior knowledge of the true facts.

14  363.    Plaintiffs and the Class Members have suffered, and continue to suffer,

15  actual injury in fact due to the willful acts of Defendants which are contrary to the

16  public policy of California, are substantially injurious to consumers of California and

17  constitute unfair trade practices and competition under Section 17200, *et seq.* of the

18  California *Business and Professions Code.*

19  364.    Defendants' actions discussed herein constitute unfair competition

20  within the meaning of California *Business and Professions Code* § 17200.

21  365.    As a result of the Defendants' conduct as described herein, Plaintiffs

22  were subjected to unlawful, unfair and/or fraudulent treatment and Defendants were

23  unjustly enriched and should be ordered to pay restitution pursuant to *Business and*

24  *Professions* Code §§ 17203 and 17204.

25  366.  Members of the general public also face irreparable harm, such as, *inter alia,*

26  not being fully informed of the true facts and, not having the full value of any monies

27  wrongfully received or saved provided to them.

28  367.  Equitable relief is appropriate to ensure adequate controls are in place to

-79-

**CLASS-ACTION COMPLAINT**

remedy the wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what transpired.  Pursuant to California *Business and Professions Code* § 17203, the Plaintiffs are entitled to preliminary and permanent injunctive relief ordering Defendants to cease this unfair competition, as well as disgorgement of all of Defendants' profits associated with this unfair competition.

368.  Plaintiffs and the Class Members seek an order from this Court prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Defendants perform their obligations under the law and reimburse Plaintiffs and the Class Members all monies owed them as alleged in this Complaint.

369.  Plaintiffs and the Class Members additionally request an order from this Court requiring that Defendants make restitution of profits and return or pay to Plaintiffs all of Defendants' ill-gotten gains obtained from its illegal transactions and Ponzi schemes and/or pay restitution, including the amount of monies that should have been paid had Defendants complied with their legal obligations, or, as equity requires.

370.  The above-described unlawful, unfair or fraudulent business acts and practices engaged in by Defendants continue to this day and/or present a threat of irreparable harm to the general public. Defendants have failed to publicly acknowledge the wrongfulness of their actions and provide the complete relief required by the statute.

371.  Pursuant to California *Business & Professions Code* §17203, Plaintiffs, on behalf of the general public, seek a temporary, preliminary and/or permanent order from this Court prohibiting Defendants from continuing to engage in the unlawful, unfair, or fraudulent business acts or practices set forth in this Complaint and from failing to fully disclose the true facts as set forth herein, and or ordering Defendants or their representatives to stop misleading the public and engage in a corrective campaign, particularly in light of the public misperception created by Defendants' and/or their representatives' misstatements and omissions of material fact, as well as

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

provide appropriate equitable monetary relief as the court deems just and appropriate to all persons with a vested interest therein.

372.   Plaintiffs and the Class Members further request a court order that an asset freeze or constructive trust be imposed over all monies in Defendants' possession which rightfully belong to Plaintiffs.

373.   Plaintiffs request judgment and restitution from Defendants in an amount to be proven at trial for unfair, fraudulent and illegal business practices, damages, statutory penalties, and attorney's fees (pursuant to the Unfair Competition Law and the private Attorney General statute) together with court costs.

374.   Pursuant to California *Business and Professions Code* § 17203, the Plaintiffs are entitled to preliminary and permanent injunctive relief ordering Defendants to cease this unfair competition, as well as disgorgement of all of Defendants' profits associated with this unfair competition.

375.   Defendants' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving" investments" in illegal gambling activities, shell companies and ghost investment vehicles orchestrated by Defendants without regard to Plaintiff's legal and equitable rights constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of California's *Unfair Competition laws*.

376.   Plaintiffs and the Class Members seek an order from this Court prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Defendants perform their obligations under the law and reimburse Plaintiffs and the Class Members all monies owed them as alleged in this Complaint.

377.   Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of

-81-

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT VI.

## NEGLIGENCE

### (Against the BANK DEFENDANTS AND THE JOINT CUSTODIANS)

378.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

379.     THE JOINT CUSTODIANS and the BANK DEFENDANTS owed Plaintiffs a duty of ordinary and reasonable care which arises from their relationships with them and their position and status.

380.     The Defendants also owed Plaintiffs and Class members duties of ordinary and reasonable care applicable to banks and financial institutions holding custody of customer's assets and accounts, as well as just and equitable principals of their respective trades.  The Defendants breached their duties owing to Plaintiffs and the Class members.

381.     The Defendants breached their obligations to Plaintiffs and Class members by and through their:

a.     Failure to maintain actual custody of funds;

b.     Failure to perform sufficient due diligence to safeguard and ensue the existence and continued existence of Plaintiffs' funds;

c.     Failure to perform sufficient due diligence to ensure that account

-82-

## CLASS-ACTION COMPLAINT

statement sent to Plaintiffs did not report false and deceptive asset "values"; and

d.    Failure to disclose material facts to Plaintiffs and the other Class members.

382.    The Defendants' conduct and failures, in sum and substance, breached duties of reasonable care owing to Plaintiffs.

383.    As a result of the wrongful conduct of the Defendants, Plaintiffs and the other Class members have suffered and will continue to suffer economic and non-economic losses, all in an amount to be determined according to proof at trial.

384.    Plaintiffs are entitled to attorney's fees pursuant to the private Attorney General statutes.

## COUNT VII.

## FRAUDULENT CONCEALMENT

### (Against the CITY CAPITAL CONSPIRATORS)

385.    Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

386.    This is a claim for fraudulent concealment.

387.    As described more fully above, Defendants were operating Ponzi schemes through the CITY CAPITAL AFFILIATED COMPANIES.

388.    In furtherance of the Ponzi schemes, Defendants knowingly made material false statements and representations, including but not limited to representing that Defendants' investment programs were legal, legitimate, licensed and registered, delivered two or three times the return on investment of normal investments, that Defendants' investment programs were "guaranteed" and that Defendants through the CITY CAPITAL AFFILIATED COMPANIES had the financial assets to back up the guarantees made by Defendant.

389.    Defendants intended for Plaintiffs to act on their knowingly false

-83-

**CLASS-ACTION COMPLAINT**

representations.

390.     Plaintiffs in fact relied on these false representations to their detriment.

391.     Plaintiffs' reliance upon Defendants' representations was justifiable given the Plaintiffs' lack of knowledge of their falsehood.

392.     As a direct and proximate result of Defendants' false statements, Plaintiffs have sustained damages.

393.  Plaintiffs are entitled to attorney's fees pursuant to the private Attorney General statutes.

394.     Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT VIII.

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Against the JOINT CUSTODIANS)

395.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

396.     The CITY CAPITAL CONSPIRATORS having rendered investment advice to the Plaintiffs and other Class members were themselves fiduciaries owing a fiduciary duty of care to the Plaintiffs and other Class members.

CLASS-ACTION COMPLAINT

SNYDER ♦ DORENFELD, LLP

397. JOINT CUSTODIANS had knowledge of the investment fraud being perpetrated through the CITY CAPITAL AFFILIATED COMPANIES and rendered substantial assistance in their fraudulent conduct.

398. As a result of the JOINT CUSTODIANS' aiding and abetting the fraud perpetrated by the CITY CAPITAL CONSPIRATORS and the CITY CAPITAL CONSPIRATORS' breaches of fiduciary duties, the fraudulent enterprises of the CITY CAPITAL AFFILIATED COMPANIES were allowed to grow and flourish, causing all Plaintiffs to suffer damages, with interest thereon, in an amount to be determined at trial.

399. Plaintiffs are entitled to attorney's fees pursuant to the private Attorney General statutes.

400. Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California Civil Code §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

///
///
///
///
///

**CLASS-ACTION COMPLAINT**

## COUNT IX.

## AIDING AND ABETTING COMMON LAW FRAUD

### (Against the JOINT CUSTODIANS )

401.    Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

402.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

403.    The JOINT CUSTODIANS had knowledge of the fraud being committed by the CITY CAPITAL AFFILIATED COMPANIES and rendered substantial assistance to the CITY CAPITAL AFFILIATED COMPANIES in their fraudulent conduct.

404.    As a result of the Joint CUSTODIANS' aiding and abetting the CITY CAPITAL AFFILIATED COMPANIES, the fraud of the CITY CAPITAL CONSPIRATORS was allowed to flourish, and all Class Members suffered damages, with interest thereon, in an amount to be determined at trial.

405.  Plaintiffs are entitled to attorney's fees pursuant to the private Attorney General statutes.

406.  Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum

-86-

SNYDER ♦ DORENFELD, LLP

according to proof.

## COUNT X.

## VIOLATIONS OF EXCHANGE ACT SECTION 10 (b) and RULE 10b-5

### (Against the CITY CAPITAL CONSPIRATORS)

407.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

408.     During the Class Period alleged herein, Defendants have employed schemes, and devices to make material and misleading statements of fact, and have omitted to state material facts necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; and

409.     Defendants have engaged in practices and a course of business that has operated as a fraud and deceit upon all Class Members.

410.     Defendants knowingly or with deliberate recklessness, engaged in the violations of the federal securities law described herein, and they knowingly, or with deliberate recklessness made the misstatements alleged herein.

411.     The Class Members reasonably relied on Defendants' statement to them and purchased unregistered securities and now have suffered great financial loss because of that reliance.

412.     Plaintiffs are entitled to compensatory and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys General.

## COUNT XI.

## VIOLATIONS OF SECURITIES ACT SECTION 5 (a)

### (Against the CITY CAPITAL CONSPIRATORS)

413.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

414.     From at least January 1, 2006 through the present, Defendants directly

-87-

**CLASS-ACTION COMPLAINT**

and indirectly, singly and in concert, have, and unless enjoined will continue to abuse the instrumentalities of interstate commerce to offer and sell unregistered securities in unexempt offerings to the general public.

415.      Plaintiffs and other Class Members have sustained damages as a result of this illegal activity.

416.      Plaintiffs are entitled to compensatory and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys General.

## COUNT XII.
## AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (Against the BANK DEFENDANTS)

417.      Plaintiffs incorporate the allegations and Exhibits contained in all the prior paragraphs of this Complaint as if restated and fully set forth herein.

418.      At all relevant times, the CITY CAPITAL CONSPIRATORS owed fiduciary duties to Plaintiffs and the Class members by virtue of the trust reposed in them by Plaintiffs and the Class Members.

419.      The CITY CAPITAL CONSPIRATORS' fiduciary duties to Plaintiffs and the Class Members, included a duty of utmost loyalty, good faith, and candor.

420.      As a fiduciary, the CITY CAPITAL CONSPIRATORS had a duty to refrain from taking actions detrimental to Plaintiffs' and the Class members' financial and other interests. As a result of the massive fraud and embezzlement by the CITY CAPITAL CONSPIRATORS, they breached their fiduciary duties owed to the Plaintiffs and the Class members.

421.      The BANK DEFENDANTS participated in the CITY CAPITAL CONSPIRATORS' breach of his fiduciary duty owed to Plaintiffs and the Class Members.

422.      The BANK DEFENDANTS knew of and/or willfully disregarded the CITY CAPITAL CONSPIRATORS' breach of their fiduciary duties.

-88-

423.    Defendants' conduct was a substantial factor in causing Plaintiffs' and the Class Members' damages.

424.    The conduct of Defendants was gross, reckless, and in bad faith or willful disregard of the rights and interest of the Plaintiffs and the Class members.

425.    In aiding and abetting the breach of fiduciary duties detailed above, Defendants acted intentionally, maliciously, and oppressively, with a willful and conscious disregard of the rights of Plaintiffs and the Class Members, so as to constitute oppression, fraud, or malice under the law.

426.    Accordingly, Plaintiffs and the Class Members are entitled to recover punitive and exemplary damages in an amount sufficient to punish Defendants and to deter similar conduct in the future.

427.    Plaintiffs are also entitled to attorney's fees pursuant to the private Attorneys General statute.

428.    Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

///

///

///

**CLASS-ACTION COMPLAINT**

SNYDER ♦ DORENFELD, LLP

## COUNT XIII.

### AIDING & ABETTING FRAUD

(Against the BANK DEFENDANTS)

429.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

430.     The CITY CAPITAL CONSPIRATORS knew the representations made to Plaintiffs and Class members to induce them to invest in the CITY CAPITAL AFFILIATED COMPANIES were false, and yet they still made those representations to the investors, with the intent to induce the investors, including Plaintiffs and the Class members to invest and continue to invest in the CITY CAPITAL CONSPIRATORS so that the CITY CAPITAL CONSPIRATORS could defraud Plaintiffs and the Class members and utilize the Plaintiffs' monies for their own purposes, and to pay others who had invested in the CITY CAPITAL AFFILIATED COMPANIES and were expecting payments as a result of those investments.

431.     Plaintiffs and the Class Members justifiably relied on the material misrepresentations of the CITY CAPITAL CONSPIRATORS, and have lost all or nearly everything they invested with the CITY CAPITAL AFFILIATED COMPANIES.

432.     The BANK DEFENDANTS knew of and/or willfully disregarded said fraud as they continued to profit from their banking relationship with the CITY CAPITAL CONSPIRATORS.

433.     The BANK DEFENDANTS actively and substantially assisted the CITY CAPITAL CONSPIRATORS in this fraud by, among other things:

a.     Continuing to provide the CITY CAPITAL CONSPIRATORS with banking and wire services up until the present;

b.     Not investigating the CITY CAPITAL CONSPIRATORS'

### CLASS-ACTION COMPLAINT

SNYDER ♦ DORENFELD, LLP

activities despite their engaging in suspicious activity since at least 2006;

c.  Ignoring numerous red flags that were apparent from the nature of the CITY CAPITAL CONSPIRATORS' banking transactions and that it was required to review and investigate under existing banking rules and regulations.

434.  As a proximate result of Defendants' conduct, Plaintiffs and the Class members suffered damages in an amount to be proven at trial.

435.  Plaintiffs are also entitled to attorney's fees pursuant to the private Attorneys General statute.

436.  Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT XIV.
## AIDING AND ABETTING INTENTIONAL MISREPRESENTATION
### (Against the BANK DEFENDANTS)

437.  Plaintiffs incorporate the allegations and Exhibits contained in all prior

CLASS-ACTION COMPLAINT

SNYDER ♦ DORENFELD, LLP

Paragraphs of this Complaint as if restated and fully set forth herein.

438.    The CITY CAPITAL CONSPIRATORS intentionally represented to Plaintiffs and the Class members that important facts concerning investments with the CITY CAPITAL AFFILIATED COMPANIES were true when the CITY CAPITAL CONSPIRATORS knew they were false.

439.    The CITY CAPITAL CONSPIRATORS made the aforementioned representations with the intent to induce the Plaintiffs and the Class members' reliance.

440.    Plaintiffs and the Class members in fact reasonably relied on these false representations.

441.    Had Plaintiffs and the Class members known of the true facts, they would have not made investments in the CITY CAPITAL AFFILIATED COMPANIES or would have discontinued investing in the CITY CAPITAL AFFILIATED COMPANIES.

442.    As a result of Plaintiffs' and the Class members' reliance on the CITY CAPITAL CONSPIRATORS' numerous misrepresentations, Plaintiffs and the Class suffered substantial economic damages in an amount to be determined according to proof at the time of trial.

443.    The BANK DEFENDANTS knew of and/or willfully disregarded said intentional misrepresentations, and willfully disregarded the actions of the CITY CAPITAL CONSPIRATORS, as they continued to profit from their banking relationship with the CITY CAPITAL CONSPIRATORS.

444.    The BANK DEFENDANTS actively and substantially assisted the CITY CAPITAL CONSPIRATORS in this fraud by, among other things:

a.    Continuing to provide the CITY CAPITAL CONSPIRATORS with banking and wire services up until the present;

b.    Not investigating the CITY CAPITAL CONSPIRATORS'

-92-

**CLASS-ACTION COMPLAINT**

SNYDER ◆ DORENFELD, LLP

activities despite their engaging in suspicious activity since at least 2006;

c.   Ignoring numerous red flags that were apparent from the nature of the CITY CAPITAL CONSPIRATORS' banking transactions and that they were required to review and investigate under existing banking rules and regulations.

445.   As a proximate result of Defendants' conduct, Plaintiffs and the Class members suffered damages in an amount to be proven at trial.

446.   Plaintiffs are also entitled to attorney's fees pursuant to the private Attorneys General statute.

447.   Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California Civil Code §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT XV.
## AIDING AND ABETTING NEGLIGENT MISREPRESENTATION
### (Against the BANKING DEFENDANTS)

448.   Plaintiffs incorporate the allegations and Exhibits contained in all prior

-93-

CLASS-ACTION COMPLAINT

SNYDER ♦ DORENFELD, LLP

paragraphs of this Complaint as if restated and fully set forth herein.

449.    The CITY CAPITAL CONSPIRATORS made numerous unwarranted and untrue assertions to Plaintiffs and the Class Members concerning the financial investments in and financial status of the CITY CAPITAL AFFILIATED COMPANIES.

450.    The CITY CAPITAL CONSPIRATORS made the assertions negligently and without any reasonable grounds for believing them to be true.

451.    The CITY CAPITAL CONSPIRATORS made these assertions with the intent of inducing Plaintiffs and the Class members to invest in the CITY CAPITAL AFFILIATED COMPANIES.

452.    Plaintiffs and the Class members in fact reasonably relied on these negligent representations. Had Plaintiffs and the Class members known of the true facts, they would have not made investments in the CITY CAPITAL AFFILIATED COMPANIES or discontinued investing in the CITY CAPITAL AFFILIATED COMPANIES.

453.    As a result of the investors' reliance on the CITY CAPITAL CONSPIRATORS' numerous negligent misrepresentations, Plaintiffs and the Class members suffered substantial economic damages in an amount to be determined according to proof at the time of trial.

454.    The BANK DEFENDANTS knew of and/or willfully disregarded said negligent misrepresentations.

455.    The BANK DEFENDANTS willfully disregarded the CITY CAPITAL CONSPIRATORS' negligent misrepresentations as they continued to profit from their banking relationship with the CITY CAPITAL CONSPIRATORS.

456.    The BANK DEFENDANTS actively and substantially assisted the CITY CAPITAL CONSPIRATORS in their negligent misrepresentations by among other things:

-94-

**CLASS-ACTION COMPLAINT**

a.   Continuing to provide the CITY CAPITAL CONSPIRATORS with banking and wire services up until the present;

b.   Not investigating the CITY CAPITAL CONSPIRATORS' activities despite their engaging in suspicious activity since at least 2006;

c.   Ignoring numerous red flags that were apparent from the nature of the CITY CAPITAL CONSPIRATORS' banking transactions and that they were required to review and investigate under existing banking rules and regulations.

457.   As a proximate result of Defendants' aiding and abetting the CITY CAPITAL CONSPIRATORS' negligent misrepresentations, Plaintiffs and the Class members suffered damages in an amount to be proven at trial.

458.   Plaintiffs are also entitled to attorney's fees pursuant to the private Attorneys General statute.

## COUNT XVI

## FAILURE TO WARN

### (Against the JOINT CUSTODIANS)

459.   Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

460.   Defendants knew or should have known that their SDIRAs were being used by Fraudsters to perpetuate Ponzi Schemes and other fraudulent enterprises on their customers, including Plaintiffs and the other Class Members, resulting in the total loss of their customers' investment account to Fraudsters.

461.   When a financial services provider determines, or pursuant to the standards of its profession should determine, that utilization of its services may result in the substantial loss of its customers' investment funds, the financial services

-95-

SNYDER ◆ DORENFELD, LLP

advisor incurs an obligation to use reasonable care to protect the intended victim/customer against such danger.

462.     The discharge of this duty may require the financial services advisor to take one or more of various steps, depending upon the nature of the case. Thus the financial services advisor may be required to warn the intended victim/customer or others likely to apprise the customer of the danger, or to notify the proper authorities, or to take whatever other steps are reasonably necessary under the circumstances.

463.     Despite having actual notice of this danger, Defendants breached their duty of care by failing and refusing to warn Plaintiffs and other Class Members.

464.     As a direct and proximate result, Plaintiffs and other Class Members have sustained damages as set forth herein.

465.     Plaintiffs are also entitled to attorney's fees pursuant to the private Attorneys General statute.

466.     Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

///

///

-96-

**CLASS-ACTION COMPLAINT**

# XVII.

## VIOLATION OF CALIFORNIA'S ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT (*Welfare and Inst. Code § 15600, et seq.*)

### (Against the CITY CAPITAL CONSPIRATORS and the JOINT CUSTODIANS)

467.    Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

468.    Under California's Elder Abuse and Dependent Adult Civil Protection Act, *Welfare and Institutions Code* § 15600, *et seq.*, unscrupulous professionals or businesspersons, or persons posing as such may financially exploit a senior (65 years of age or older) on the basis of their age, health or mental condition by overcharging for services or products and using deceptive or unfair business practices.

469.    Defendants wrongfully took the monies and properties of Plaintiffs and other Class Members, who are 65 years of age or older, and intended to defraud them and unlawfully obtain possession of their retirement funds.

470.    Defendants wrongfully took the property of the affected Plaintiffs and other Class Members at the expense of those Plaintiffs and Class Members.

471.    As a result of the wrongful conduct of Defendants, Plaintiffs and other Class Members incurred economic harm and losses.

472.    As a direct and proximate result of this wrongful conduct, Plaintiffs and other Class Members sustained damages.

473..    The conduct of the Defendants constituted oppression, fraud and malice in the commission of the financial abuse and Plaintiffs and other Class Members are entitled to recover their reasonable attorney's fees and costs both on a statutory basis and as private Attorneys General.

474.    The conduct of the Defendants constituted oppression, fraud and malice in the commission of the financial abuse and Plaintiffs and other Class Members are entitled to recover damages for the sake of example and by way of punishing them for financial elder abuse under California law.

-97-

SNYDER ♦ DORENFELD, LLP

## COUNT XVIII.

## CONSTRUCTIVE TRUST

### (Against the CUSTODIANS and the BANK DEFENDANTS)

475.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

476.  Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, each of the Defendants sued herein was the agent and employee of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency and employment.

477.  As a proximate result of the Defendants' fraudulent and/or negligent misrepresentations and otherwise wrongful conduct as alleged herein, Plaintiffs have sustained damages.

478.  By reason of the fraudulent and otherwise wrongful manner in which the Defendants obtained their alleged right, claim or interest in and to the property, Defendants, each of them, have no legal or equitable right, claim or interest therein.

479.     Instead, Defendants, and each of them, are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiffs with the duty to convey the same to Plaintiffs forthwith.

## COUNT XIX.

## VIOLATION OF SECTIONS 25401/25501 OF THE CALIFORNIA CORPORATIONS CODE

### (Against the CITY CAPITAL CONSPIRATORS AND THE JOINT CUSTODIANS)

480.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

481.     Each of the Defendants offered to sell or sold securities by means of written and oral communications which included untrue statements of material fact

-98-

SNYDER ♦ DORENFELD, LLP

for omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

482.     Each of the Defendants knew or in the exercise of reasonable care should have known of the misrepresentations made by them.

483.     Plaintiffs did not know the truth regarding the Defendants' misrepresentations and/or omissions.

484.     By reason of the foregoing, Defendants named herein violated section 25401 of California *Corporations Code*, thereby entitling Plaintiffs to recover damages pursuant to section 25501 of California *Corporations Code*.

485.     Plaintiffs are entitled to compensatory and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys General.

## COUNT XX.

## VIOLATION OF SECTIONS 25402/25502 of the CALIFORNIA *CORPORATIONS CODE*

(Against Individual Defendants Only)

486.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

487.     The Individual Defendants are owners, officers and/or directors and controlling persons of the CITY CAPITAL AFFILIATED COMPANIES, whose relationships to the CITY CAPITAL AFFILIATED COMPANIES give them access to material information about the CITY CAPITAL AFFILIATED COMPANIES not generally provided to employees of the CITY CAPITAL AFFILIATED COMPANIES and the public.

488.     The Individual Defendants participated in the sale of CITY CAPITAL AFFILIATED COMPANIES' shares and investments to the public including Plaintiffs at a time when each of them knew or should have known material information about the CITY CAPITAL    AFFILIATED COMPANIES gained from

-99-

## CLASS-ACTION COMPLAINT

which would have significantly affected the price at which the CITY CAPITAL AFFILIATED COMPANIES securities were sold.

489.     The Individual Defendants knew or should have known the material adverse information complained of herein was not available to Plaintiffs. The Individual Defendants had no reason to believe that Plaintiffs were in possession of the adverse information.

490.     Plaintiffs would not have purchased CITY CAPITAL AFFILIATED COMPANIES' shares at the price they paid, if at all, if they had been aware that the price had been artificially and falsely inflated by Defendants' misrepresentations and omissions of material adverse information discussed herein.

491.     By reason of the foregoing, the Defendants named herein violated section 25402 of the California *Corporations Code*, thereby entitling Plaintiffs to recover damages pursuant to section 25502 of the California *Corporations Code*.

492.     Plaintiffs are entitled to compensatory and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys General.

## COUNT XXI.

## VIOLATION OF SECTION 25504 OF THE CALIFORNIA *CORPORATIONS* CODE

(Against Individual Defendants Only)

493.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

494.     The Individual Defendants acts as controlling persons of the CITY CAPITAL AFFILIATED COMPANIES within the meaning of section 25504 of the California *Corporations Code*.

495.     By reason of such wrongful conduct violative of California *Corporations Code* §25401, the Individual Defendants are liable pursuant to section 25504 of the California *Corporations Code*.

-100-

**CLASS-ACTION COMPLAINT**

As a direct and proximate result of their wrongful conduct, Plaintiffs suffered damage in connection with their purchase of CITY CAPITAL AFFILIATED COMPANIES' stock.

497.     Plaintiffs are entitled to compensatory and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys General.

## COUNT XXII.

## VIOLATION OF SECTIONS 1709-1719 OF THE CALIFORNIA *CIVIL CODE*

(Against the CITY CAPITAL CONSPIRATORS)

498.     Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

499.     For the purpose of inducing Plaintiffs and others to purchase or otherwise acquire CITY CAPITAL AFFILIATED COMPANIES' securities, and with the intent to deceive such investors, the Defendants, and each of them, employed a scheme and conspiracy to defraud as a part of which said Defendants made, participated in the making of, or aided and abetted the making of the misrepresentations of fact as set forth above. Said misrepresentations and statements were not true when made and Defendants did not believe them to be true. Said acts by Defendants were fraudulent, oppressive and malicious.

500.     Plaintiffs, individually, relied on one or more of the false statements and/or omissions alleged herein and were damaged thereby.

501.     Plaintiffs are entitled to compensatory and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys General.

///

///

///

///

///

## CLASS-ACTION COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated, demand upon Defendants jointly and severally for:

1. An Order certifying the case as a class action;

2. An Order appointing Plaintiffs as the Class Representatives of the Class;

3. An Order appointing undersigned counsel and their firms as counsel for the Class;

4. As to Counts I, II, IV, VII, VIII, IX, XII, XIII, XIV and XVI compensatory damages, punitive damages, and attorney's fees pursuant to the private Attorney General statutes;

5. As to Count III, VI, and XV, compensatory damages and attorney's fees pursuant to the private Attorney General statutes;

6. As to Count V, disgorgement of profits, statutory penalties, punitive damages, injunctive relief, and attorney's fees under statute and private Attorney General statutes;

7. As to Counts X, XI, XVII, XIX, XX, XXI, and XXII compensatory damages, statutory damages, and attorney's fees pursuant to the statute and private Attorneys General statutes;

8. As to Count XVIII, an order that a constructive trust be imposed over all monies in Defendants' possession which rightfully belong to Plaintiffs and/or an asset freeze of monies belonging to Defendants, and attorney's fees under private Attorney General statutes;

9. As to all Counts, pre and post-judgment interest as allowed by law;

10. As to all Counts, an award of taxable costs; and

11. As to all Counts, any and all such further relief as this Court deems just and proper.

///

///

-102-

**CLASS-ACTION COMPLAINT**

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

Respectfully Submitted:

Dated: _____4/17_____

**SNYDER ♦ DORENFELD, LLP**

By: _____

DAVID K. DORENFELD
MICHAEL W. BROWN
Attorneys for Plaintiffs

## CLASS-ACTION COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Margaret M. Morrow and the assigned discovery Magistrate Judge is Frederick F. Mumm.

The case number on all documents filed with the Court should read as follows:

## CV12- 3322 MMM  (FFMx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X]  Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ]  Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ]  Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 04/08) Civil Summons

# UNITED STATES DISTRICT COURT

### for the

SANDRA BRISSETTE, LIBERTY CITY CHURCH OF CHRIST, INC.,
WILLIAM LEE, GENNET THOMPSON, and GERTRUDE "TRUDY"
MORGAN, individually and on behalf of a class of similarly situated persons,

**Plaintiff**

EPHREN TAYLOR, MESHELLE TAYLOR, CITY CAPITAL CORPORATION, BRX ENERGY,
LLC, EQUITY TRUST COMPANY, ROBERT BATT, BANK OF AMERICA, NATIONAL
ASSOCIATION, MISSOURI BANK AND TRUST, BOK FINANCIAL CORP D/B/A BANK
OF KANSAS CITY, ENTRUST NEW DIRECTION IRA, INC. n/k/a NEW DIRECTION IRA,
INC., THE ENTRUST GROUP, INC, ENTRUST ADMINISTRATION, INC., SUNWEST TRUST,
INC., and DOES 1-10,

**Defendant**

)
)
)
)
)
)
)

Civil Action No.

**CV12-03322 MMM(FFMx)**

### Summons in a Civil Action

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within  21  days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, whose name and address are:

DAVID K. DORENFELD, State Bar No.: 145056
SNYDER * DORENFELD, LLP
5010 Chesebro Road, Agoura Hills, California 91301

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Jerry Napier*

Date:  APR 1 7 2012

Name of clerk of court

**JULIE PRADO**

Deputy clerk's signature

*(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3).)*

AO 440 (Rev. 04/08) Civil Summons (Page 2)

## Proof of Service

I declare under penalty of perjury that I served the summons and complaint in this case on _____,
by:

    (1) personally delivering a copy of each to the individual at this place, _____

    _____ ; or

    (2) leaving a copy of each at the individual's dwelling or usual place of abode with _____
    who resides there and is of suitable age and discretion; or

    (3) delivering a copy of each to an agent authorized by appointment or by law to receive it whose name is
    _____ ; or

    (4) returning the summons unexecuted to the court clerk on _____ ; or

    (5) other *(specify)* _____
    _____
    _____

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00
_____.

Date: _____

                                     _____
                                          Server's signature

                                     _____
                                          Printed name and title

                                     _____
                                          Server's address

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

SANDRA BRISSETTE, LIBERTY CITY CHURCH OF CHRIST, INC. WILLIAM LEE, GENNET THOMPSON, and GERTRUDE "TRUDY" MORGAN, individually and on behalf of a class of similarly situated persons,

**DEFENDANTS**

EPHREN TAYLOR, MESHELLE TAYLOR, CEY CAPITAL CORPORATION, ERX ENERGY, LLC, EQUITY TRUST COMPANY, ROBERT BATT, BANK OF AMERICA, NATIONAL ASSOCIATION, MISSOURI BANK AND TRUST, BOK FINANCIAL CORP DBA/A BANK OF KANSAS CITY, ENTRUST NEW DIRECTION IRA, INC. n/k/a NEW DIRECTION IRA, INC., THE ENTRUST GROUP, INC., ENTRUST ADMINISTRATION, INC., SUNWEST TRUST, INC., and DOES 1-15,

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Please see attachment

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒1 | ☐1 | Incorporated or Principal Place of Business in this State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☒2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. ORIGIN** (Place an X in one box only.)

☒1 Original Proceeding   ☐2 Removed from State Court   ☐3 Remanded from Appellate Court   ☐4 Reinstated or Reopened   ☐5 Transferred from another district (specify):   ☐6 Multi-District Litigation   ☐7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No    ☐ **MONEY DEMANDED IN COMPLAINT: $** In Excess of $5,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332 (d) (2) and the Class Action Fairness Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV12-03322

**FOR OFFICE USE ONLY:** Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                          CIVIL COVER SHEET                          Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**VIII(a).   IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).   RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s): CV12-3305 PA (MRWx)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
                             ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                             ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                             ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Sandra Brissette - Glendale | Liberty City Church of Christ, Inc - Florida; William Lee - North Carolina; Gennet Thompson - Florida; Trudy Morgan - Georgia |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Please see attachment |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Glendale |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____   Date ___4/1?___

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BRISSETTE v. TAYLOR | |

**ATTACHMENT** *(Number):*  1

*(This Attachment may be used with any Judicial Council form.)*

Attachment (b) Attorneys (Firm Name, Address and Telephone Number)

DAVID K. DORENFELD, State Bar No.: 145056
SNYDER * DORENFELD, LLP
5010 Chesebro Road
Agoura Hills, California 91301
TEL: (818) 865-4000
FAX: (818) 865-4010


CATHY J. LERMAN, Florida State Bar No.: 338788
CATHY JACKSON LERMAN, PA
7857 W. Sample Road, Suite 140
Coral Springs, Florida 33065
TEL: (954) 663-5818
FAX: (954) 341-3568
Pro Hac Vice Application to be Filed


JAMES P. GITKIN, Florida State Bar No.: 570001
SALPETER GITKIN, LLP
Museum Plaza - Suite 503
200 S. Andrews Avenue
Fort Lauderdale, Florida 33301
TEL: (954) 467-8622
FAX: (954) 467-8623
Pro Hac Vice Application to be Filed

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page  3  of  4

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

www.courtinfo.ca.gov

**MC-025**

| SHORT TITLE: BRISSETTE v. TAYLOR | CASE NUMBER: |
|---|---|

**ATTACHMENT** *(Number):* 2

*(This Attachment may be used with any Judicial Council form.)*

Attachment IX VENUE (b)

County outside of this District; State if other than California or Foreign Country:

EPHREN TAYLOR - New York

MESHELLE TAYLOR - New York

CITY CAPITAL CORPORATION - Nevada

ERX ENERGY, LLC  - Nevada

EQUITY TRUST COMPANY - Ohio

ROBERT BATT - Ohio

BANK OF AMERICA, NATIONAL ASSOCIATION - Florida

MISSOURI BANK AND TRUST - Colorado

BOK FINANCIAL CORP D/B/A BANK OF KANSAS CITY - Oklahoma

ENTRUST NEW DIRECTION IRA, INC.. n/k/a NEW DIRECTION IRA, INC. - Colorado

SUNWEST TRUST, INC., - New Mexico


THE ENTRUST GROUP, INC. - Los Angeles

ENTRUST ADMINISTRATION, INC. - Los Angeles

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 4 of 4

*(Add pages as required)*