1    **SNYDER ♦ DORENFELD, LLP**
     5010 Chesebro Road
2    Agoura Hills, CA 91301
     PHONE: (818) 865-4000
3    FAX:  (818) 865-4010
     DAVID K. DORENFELD, State Bar No. 145056
4    MICHAEL W. BROWN, State Bar No. 205380

5    Attorneys for Plaintiffs

6

7                 UNITED STATES DISTRICT COURT

8                 CENTRAL DISTRICT OF CALIFORNIA

9    WILLIAM LEE, GENNET                )  Case No.:  CV 12-03322 PA  (MRWx)
10   THOMPSON, and GERTRUDE             )
     "TRUDY" MORGAN,                    )  [Related to CV 12-03305 PA  (MRWx)]
11                                      )  **FIRST AMENDED COMPLAINT**
12              Plaintiffs,             )  **JURY TRIAL DEMANDED**
     v.                                 )
13                                      )
14   EPHREN TAYLOR, SR., EPHREN         )
     TAYLOR, JR., MESHELLE TAYLOR,      )
15   CITY CAPITAL CORPORATION,          )
     ERX ENERGY, LLC, EQUITY TRUST      )
16   COMPANY, ROBERT BATT, ALAN         )
     LIPINSKI and DONALD M.             )
17   MACINTYRE and DOES 1-15,           )
18                                      )
19              Defendants.            )
                                        )
20

21        Plaintiffs WILLIAM LEE, GENNET THOMPSON and TRUDY MORGAN

22   ("Plaintiffs"), bring this action, by and through their undersigned counsel, and allege

23   as follows in their First Amended Complaint:

24

25   **I.  INTRODUCTION**

26        1.    This action arises out of a well-executed, carefully-crafted fraud scheme

27   (in fact, a Ponzi scheme, *i.e.*, a fraudulent investment operation that pays returns to

28   prior investors from the monies paid by subsequent investors because the scheme

                              -1-

                    **FIRST AMENDED COMPLAINT**

1  does not actually generate revenue-producing activity) of the most insidious kind,

2  *i.e.*, a religious-affinity-fraud orchestrated and/or facilitated by Defendants EPHREN

3  TAYLOR, SR., EPHREN TAYLOR, JR., MESHELLE TAYLOR, ERX ENERGY,

4  LLC, EQUITY TRUST CORPORATION, ROBERT BATT, ALAN LIPINSKI,

5  DONALD M. MACINTYRE and DOES 1-15, (described sometimes hereinafter as

6  "Defendants") (described sometimes hereinafter as "Defendants").

7       2.   Defendants sold many of their targets promissory notes and/or

8  unqualified, nonexempt securities (in their Self Directed Individual Retirement

9  Accounts ("SDIRAS"))[1] and then diverted the investment monies to themselves or

10  shell corporations they controlled; and/or the principal investment funds of an

11  investor was used to repay that same investor their purported returns or interest

12  payments until the fraudulent scheme collapsed when it ran out of new investors

13  more accurately described as "VICTIMS".

14       3.   Defendants EPHREN TAYLOR, SR., EPHREN TAYLOR, JR.,

15  MESHELLE TAYLOR, CITY CAPITAL CORPORATION, ERX,   BATT, and

16  EQUITY TRUST will be referred to herein collectively as the "CITY CAPITAL

17  CONSPIRATORS."

18       4.   The CITY CAPITAL CONSPIRATORS intentionally targeted and

19  induced hundreds of innocent people, religious leaders, their churches and other

20  faith-based organizations in at least 43 states to transfer and invest their hard-earned

21  money in shell companies with a false sense of security that their money was

22  insured, protected and invested by persons in legitimate, no risk, multi-million dollar,

23  profitable, "leading"  public and private companies with "the highest ethics," and an

24

25

26     [1] A SDIRA is an Individual Retirement Account ("IRA") held by a trustee or custodian that permits
investment in a much broader set of assets than is permitted by most IRA custodians.  However, investors in
27  SDIRAs, whose administrators are also known as "custodians" or "trustees," are permitted to invest in a variety of
nontraditional investment options of their own choosing including tax lien certificates, promissory notes, real
28  estate, businesses, LLCs and private placement securities.  A stark contrast exists between the "administration"
performed by trustees and custodians of SDIRAs ("CUSTODIANS"), as compared to the "administration and
management" performed by of the trustees and custodians of IRAs ("CIRAs"). CIRAs are considered fiduciaries of

**FIRST AMENDED COMPLAINT**

overriding sense of social responsibility.

5.      In fact, the CITY CAPITAL CONSPIRATORS were neither licensed nor registered to sell securities or advise on investments under state or federal law. The purported "investments" they offered were neither licensed nor registered. The Defendants' shell companies, some publicly-traded, through which the CITY CAPITAL CONSPIRATORS offered investments were operating illegally in flagrant violation of SEC and IRS regulations as well as state securities regulations and consumer protection laws. The CITY CAPITAL CONSPIRATORS sold Plaintiffs "interests" in nonexistent or failing ventures and illegal gambling operations secured by worthless promissory notes or nothing at all.

6.      Defendants CITY CAPITAL and ERX as well as Amorocorp, Inc. a/ka/ Amoro Management Group a/k/a Amoro Management, Inc., a/k/a Amoro Corp. f/k/a Ephren Taylor Capital Corporation (all collectively referred to herein as "Amoro"), Incoming, Inc. and Resilient Innovations, LLC are referred to herein as the CITY CAPITAL AFFILIATED COMPANIES.

7.      Defendants falsely led Plaintiffs to believe that their "investments" in the CITY CAPITAL AFFILIATED COMPANIES would help others who were less fortunate. Plaintiffs, relying on those representations, in good faith gave their hard-earned money to the Defendants. Many investors lost their entire life savings.

## II.  JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965, the due process clause of the U.S. Constitution, and the California long-arm statute, *Code of Civil Procedure* § 410.10, which allows courts to "exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

the IRA account such that CIRAs are responsible for maintaining and managing the securities in the IRA account, keeping track of distributions and dividend income, and making sure everything is done legally and correctly.

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

9. The Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1332. Plaintiffs have asserted causes of action pursuant to federal law, including *Exchange Act* § 10 (b) and Rule 10b-5, *Securities Act* § 5 (a), and *Consumer Financial Protection Bureau Regulations*, 15 U.S.C. § 78u, *et seq*. In addition, Plaintiffs and certain Defendants are citizens of different states. The matter in controversy exceeds $75,000.00, exclusive of interest and costs.

10. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' additional claims arising under California state law for, *inter alia*, California *Business and Professions Code* § 17200 involving unfair competition and violation of California Corporations Code section 25000, *et seq*.

11. Venue in this district satisfies the requirements of 28 U.S.C. §1391 (b) (1)-(2) because some Defendants reside in this jurisdiction and some of the actions and events giving rise to the claims occurred in this District.

12. Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of California *Business and Professions Code* § 17200 *et seq*.

13. This is a private Attorney General action brought on behalf of the general public. As detailed below, Defendants have engaged in a pattern and practice of uniformly misrepresenting and/or repudiating their contractual and legal obligations. Equitable relief is appropriate to ensure adequate controls are in place to remedy the wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what transpired.

14. Based upon the obligations imposed upon Defendants and their experience in the industry, Defendants either knew, recklessly disregarded, reasonably should have known or were obligated under the law to provide correct and prompt information on the status of Plaintiff's SDIRAS and notify Plaintiffs if said SDIRAS were in default. Defendants failed to provide correct and prompt

-4-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

1   information; as a result Plaintiffs were subjected to unlawful, unfair and/or

2   fraudulent treatment.

3       15.   Defendants knew or should have known that their SDIRAs were being

4   used to perpetuate Ponzi Schemes and other fraudulent enterprises on their

5   customers, including Plaintiffs, resulting in significant and/or total loss of their

6   customers' investment accounts.

7       16.   The conduct of Defendants is of a continuing nature that requires

8   prompt relief. Defendants have uniformly represented to the general public through

9   their representatives that their actions were legally appropriate when in fact they

10   were not and/or have concealed material facts (as detailed throughout this

11   Complaint); and the disclosure of such information was necessary in order to make

12   Defendants' other representations not misleading for want of disclosure of such

13   omitted facts or because Defendants possess superior knowledge of the true facts.

14       17.   This private Attorney General action is brought by the Plaintiffs to

15   remedy violations of California's state consumer protection statutes arising out of

16   Defendants' and/or their representatives' misrepresentations, omissions of material

17   facts, and breaches of agreements.

18       18.   Members of the general public also face irreparable harm, such as, *inter*

19   *alia*, not being fully informed of the true facts, not having the full value of any

20   monies wrongfully received or saved provided to them, having the status of their

21   SDIRA wrongfully misrepresented, and/or the financial information as to the value

22   of their investment being falsely reported.

23

24   **III.   THE PARTIES**

25       19.   Plaintiff WILLIAM LEE ("LEE") is an individual and a resident of

26   Raleigh, North Carolina. On or about February of 2009, LEE invested $160,000 into

27   the CITY CAPITAL CONSPIRATORS' Socially Conscious Investment Ponzi Scam

28   as defined below.

-5-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

20.    Plaintiff GENNET THOMPSON ("THOMPSON") is an individual and a resident of Delray Beach, Florida.  On or about July of 2009, THOMPSON invested $17,200 in the CITY CAPITAL CONSPIRATORS' Socially Conscious Investment Ponzi Scam as defined below and in February of 2010, THOMPSON invested $10,500 in the Sweeps Machine Investment Ponzi Scam as defined below.

21.    Plaintiff TRUDY MORGAN ("MORGAN") is an individual and a resident of Lithonia, Georgia.  On or about May of 2010, MORGAN invested approximately $30,000 into the Sweeps Machine Investment Ponzi Scam as defined below.

22.    Defendant EPHREN TAYLOR a/k/a EPHREN TAYLOR II a/k/a EPHREN TAYLOR, JR. a/k/a EPHRAIM TAYLOR a/k/a EPHRAIN TAYLOR ("TAYLOR") is an individual who resided in the State of New York and is believed to be a fugitive, having failed and refused to respond to a number of subpoenas from the SEC, including a subpoena requiring his personal appearance for testimony.

23.    Defendant EPHREN TAYLOR SR. ("TAYLOR SR.") is an individual who resides in Overland Park, Kansas and is the father of TAYLOR and father-in-law of MTAYLOR.

24.    Defendant MESHELLE TAYLOR ("MTAYLOR") is an individual who last resided in the State of New York and is now believed to be a fugitive along with her husband.  At all times material hereto, TAYLOR and MTAYLOR were husband and wife.

25.    At all times material hereto, MTAYLOR was a beneficial and/or actual owner of all securities and interests owned by TAYLOR.  TAYLOR and MTAYLOR will be referred to collectively herein as ("THE TAYLORS").

26.    Defendant CITY CAPITAL CORPORATION ("CITY CAPITAL") is a Nevada corporation with its principal place of business in New Jersey.

27.    Defendant ERX ENERGY, LLC ("ERX") is a wholly-owned subsidiary of CITY CAPITAL and is a Nevada corporation with its principal place of

-6-

**FIRST AMENDED COMPLAINT**

business in Cypress, California.

28.   Defendant EQUITY TRUST CORPORATION ("EQUITY TRUST") is an Ohio corporation that bills itself as "the nation's leading provider of self-directed IRAs and 401ks, with over 128,000 clients in all 50 states and close to $10 billion dollars of retirement plan assets under administration."

29.   Defendant ROBERT BATT ("BATT") is an individual and resides in Cleveland, Ohio.  At all times material hereto BATT was an employee of EQUITY TRUST and held the position of Retirement Account Specialist.

30.   Defendant ALAN LIPINSKI is an individual and resides in Santa Clara, California.  From October 25, 2011 until May 30, 2012, Lipinski served as Vice President and a member of the Board of Directors of CITY CAPITAL and ERX.

31.   Defendant DONALD M. MACINTYRE is an individual and resides in San Jose, California.  From October 25, 2011 until May 30, 2012, MACINTYRE served as Chairman of the Board and CEO of CITY CAPITAL and ERX.

32.   At all times material hereto, Defendant TAYLOR was an officer, director and principal shareholder of Defendant CITY CAPITAL.

33.   At all times material hereto, TAYLOR served as a member of the Audit committee for CITY CAPITAL as well as Principal Financial Officer.

34.   At all times material hereto, Defendants TAYLOR, TAYLOR SR., and MTAYLOR were owners, officers, directors, shareholders and /or controlling principals that owned, controlled, managed, and/or directed the activities of and/or obtained unlawful monies or gains from the CITY CAPITAL AFFILIATED COMPANIES.

35.   Certain individuals who were co-conspirators with the CITY CAPITAL CONSPIRATORS are not named in this Complaint. The remaining CITY CAPITAL co-conspirators which have been identified to date are not sued because they are either under criminal investigation, have filed for bankruptcy or they have no attachable assets.  As to those who have not yet been identified, Plaintiffs will seek

-7-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

1   leave to join them upon identifying same.

2

3   ## V.  FACTUAL ALLEGATIONS

4   **THE CREATION OF EPHREN TAYLOR'S PUBLIC IMAGE AND THE**

5   **BUILDING OF HIS CREDIBILITY THROUGH SHELL COMPANIES**

6        36.    As part of his fraud scheme, TAYLOR created a public image based on

7   lies and misrepresentations.  While some of TAYLOR'S investment success

8   "stories" and personal financial dealings may have been real, the majority of them

9   were purely fabricated.  Many of these are listed below.

10       a.    He claimed to have come from humble beginnings;

11       b.    He bragged that he started working at 12 years old and became a

12   millionaire at the ripe old age of 16.

13       c.    He claimed to have "retired" with his "vast fortune" but became

14   "bored" and came back to work in 2000.

15       d.    He claimed that he had (in 1998) launched a company with a high

16   school partner called GoFerretGo.com that became a multi-million

17   dollar company.  Through repeated use of the GoFerretGo.com success

18   story, TAYLOR was able to claim membership in the ultra exclusive

19   "Teenage Millionaire Club."

20       e.    He repeatedly claimed in several different types of media that

21   GoFerretGo.com had a value of $3.5 million at some point during its

22   less-than-three-year history.   However, GoFerretGo.com mysteriously

23   dissolved in 2001.

24       f.    He maintained (from at least 2004 to 2010) a personal website,

25   www.ephren.com, which targeted minority and African-Americans and

26   provided investment advice and information on the CITY CAPITAL

27   AFFILIATED COMPANIES, although TAYLOR was never a licensed

28   investment broker, dealer or advisor.

SNYDER ♦ DORENFELD, LLP

g.     In 2006, he proclaimed himself the "youngest African-American CEO of any publicly traded company in United States history" and started preaching (literally) the concept of "socially conscious investing."

h.     From 2006 forward, he portrayed himself as a "Minister," financial guru, investment wizard, multi-million dollar business manager and philanthropic rock star," none of which was true.

i.     He claimed he was a successful businessman overseeing $250 million in assets of two publicly-traded companies.

j.     On May 13, 2007, TAYLOR posted an article on his website (www.urbanwealth.net) announcing his Urban Wealth Tour. The Urban Wealth Tour was an 18-city tour beginning in Columbus, Ohio where TAYLOR spoke to communities and churches about economic empowerment and investment opportunities through the CITY CAPITAL AFFILIATED COMPANIES.  From 2007 until 2010, TAYLOR conducted at least three of these national Urban Wealth tours which were used to solicit new investors for the CITY CAPITAL AFFILIATED COMPANIES.  TAYLOR would advise participants to bring their 401k statements and IRA statements so he could review them and, of course, convince them to invest in CITY CAPITAL AFFILIATED COMPANIES.

k.     In mid-2007 and beyond, TAYLOR'S carefully created persona gained national media attention.   TAYLOR appeared on 20/20, The Today Show, the Montel Williams Show, Fox News, CNBC, and on a multitude of Christian television and radio shows.

l.     He also became a commentator on news and financial television shows and radio broadcast (all of this exposure and publicity did nothing but add to TAYLOR'S credibility as an elite investment advisor

-9-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

and added authenticity to his investment recommendations in the CITY CAPITAL AFFILIATED COMPANIES).

m.    He also took advantage of the success of his award winning books, none of which he actually wrote, to solicit investors. TAYLOR conducted several national book tours across the U.S. Book tours gave TAYLOR the opportunity to expand his visibility as a successful businessman and professional investment advisor.

n.    In August of 2008, TAYLOR spoke at the Democratic National Convention to the Young Leader's Summit on his socially conscious corporate investment strategy.

o.    He used the Internet to facilitate fraudulent schemes by continually repeating the purported success stories of his many business ventures.

37.    In 2004 Defendant TAYLOR formed Christian Capital Group, LLC ("Christian Capital"), a Missouri limited liability company. Defendant TAYLOR was the "executive trustee" of Christian Capital.

38.    Christian Capital was purportedly a non-profit ministry that employs biblical principles to help individuals increase their financial resources through low-risk investment opportunities.

## DEFENDANTS BEGAN TO SELL UNREGISTERED SECURITIES EVEN THOUGH THEY WERE UNLICENSED TO SELL SECURITIES OR SERVE AS INVESTMENT ADVISORS

39.    As alleged herein, certain of the Defendants acted intentionally or with deliberate recklessness in that they knew that the securities of the CITY CAPITAL CONSPIRATORS were unregistered and that the CITY CAPITAL CONSPIRATORS were not licensed to sell securities or serve as investment advisors and that the statements they disseminated to the investing public were false when

-10-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

1  made.

2      40.   Defendants were motivated to engage in this fraudulent conduct because

3  it is believed that Defendants financed extravagant lifestyles for themselves and/or

4  the fraudulent conduct benefitted their corporate entities and personal businesses

5  from the proceeds of their illegal securities offering.

6      41.   The investments constitute investment contracts and therefore qualify as

7  securities under Section 2 (a) (a) of The Securities Act of 1933, 15 U.S.C.§77b(1)

8  and Section 3(a)(10) of The Securities and Exchange Act of 1934, 15

9  U.S.C.§78(a)(10).

10     42.   No registration statement has ever been filed in connection with the

11 investment contracts offered and sold by certain of the Defendants as alleged herein

12 and no exemption from registration applies.  Few, if any, of the purchasers or

13 offerees qualified as accredited investors under the federal securities law.

14

15            **TAYLOR BECOMES CEO OF CITY CAPITAL**

16     43.   In May of 2006, TAYLOR became CEO of CITY CAPITAL

17 CORPORATION.

18     44.   In October of 2006, CITY CAPITAL CORPORATION signed a $50

19 million credit facility with the Lucian Group.  This credit facility was terminated on

20 June 13, 2007 seven (7) months later.

21     45.   The CITY CAPITAL CONSPIRATORS were able to reach their

22 VICTIMS by devising and implementing sophisticated plans targeting minorities and

23 African Americans through television and radio ads, including Christian radio and

24 television stations, e-mail advertising, personal speaking engagements in

25 communities and churches, YouTube videos, appearances on national television

26 shows and news reports, personal meetings, blogs and websites and other devices.

27 The ads led Plaintiffs and other VICTIMS into believing that the CITY CAPITAL

28 CONSPIRATORS were able to use the VICTIMS' monies, from self-directed IRAs,

-11-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

401ks, and personal credit, credit cards and cash to purchase investments in the CITY CAPITAL AFFILIATED COMPANIES that would help working class families, single mothers, create new jobs and affordable homes in these poorer communities while "guaranteeing" that investors would double their return on investment ("ROI") within 12 months "risk free." These schemes are known as the Socially Conscious Investment Ponzi Scams.

46.   In fact, the Clean Sweeps Income sweepstakes machine investment through CITY CAPITAL'S wholly-owned subsidiary, Clean Sweeps Holding Group, LLC, was guaranteed as "100% RISK-FREE" such that Plaintiffs were assured in writing by Defendants that if they did not recoup their initial investment in the CITY CAPITAL CONSPIRATORS' Clean Sweeps machines within one year or three months (Defendants used both pitches), their monies would be returned. This scheme is referred to as the Clean Sweeps Machine Investment Ponzi Scam.

47.   The CITY CAPITAL CONSPIRATORS for their Clean Sweeps Machine investment scheme were able to reach their targeted VICTIMS by devising and implementing sophisticated plans targeting potential investors through television and radio ads, e-mail advertising, personal speaking engagements in communities and churches, You Tube videos, appearances on national television and radio ads, personal meetings, blogs and websites and other devices to attract and convince investors to use monies from their self-directed IRAs, 401ks, personal credit, credit cards and cash to purchase sweepstakes machines through CITY CAPITAL that were to be put in retail establishments around the country with promises of a no risk, guaranteed rate of return in a 100% legal gambling operation. Employees of CITY CAPITAL received a 10% commission for the sale of each Clean Sweeps machine and TAYLOR received a 10% commission on the sale of each Clean Sweeps machine.

48.   TAYLOR'S Urban Wealth tours permitted TAYLOR and the other CITY CAPITAL CONSPIRATORS to take their Ponzi schemes to a national level

-12-

**FIRST AMENDED COMPLAINT**

1    by convincing civic and religious leaders to permit TAYLOR to speak at a scheduled
2    event and give TAYLOR access to their members and participants.   Referring to
3    himself as "Minister Taylor", many times TAYLOR gave a sermon from the pulpit
4    of a church on Sunday and later that day or the next day offered his investment
5    advice to church members-from that same pulpit. TAYLOR always told his
6    audiences in closing to "Google" him and read all of his positive press.

7        49.    Sometime   in   mid-2007,   the   CITY   CAPITAL   AFFILIATED
8    COMPANIES started using a Tennessee business address. But the address was a
9    UPS store.

10       50.    In or around 2007, the CITY CAPITAL AFFILIATED COMPANIES
11   also  sold  interests  in  the  phantom  "Goshen  Division"  of  CITY   CAPITAL
12   CORPORATION. The Goshen Division (a/k/a Goshen Energy and a/k/a Goshen
13   Energy Division) is described by the CITY CAPITAL CONSPIRATORS as
14   focusing "primarily on developing biodiesel and other alternative fuels created from
15   plant matter and waste oil. This division partners primarily with small colleges and
16   has been involved in natural gas and oil reclamation projects with select clients,
17   where marginal wells are revitalized, creating on-going cash-flow."

18       51.    By this time the CITY CAPITAL CONSPIRATORS knew that Goshen
19   had already lost the rights to the one oil and gas lease that they had attempted to
20   purchase due to of lack of funds.

21       52.    The Goshen Division was also mentioned in a press release by
22   Defendants dated June 9, 2009 indicating that CITY CAPITAL, through its wholly-
23   owned subsidiary City Capital Petroleum, LLC, had acquired a "retail petroleum
24   distribution center with a convenience store attached" in New York with supposedly
25   "un-audited revenues of $3 million in 2008."   However, there is no evidence CITY
26   CAPITAL ever actually owned this Long Island gas station rather the facts reveal
27   that CITY CAPITAL was leasing it yet the CITY CAPITAL CONSPIRATORS sold
28   investment interests in this leased gas station to unsuspecting VICTIMS.

-13-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

53.   TAYLOR is quoted in the June 9, 2009 press release as stating "With our Goshen Energy division producing bio-fuels, we anticipate using our physical stations to distribute the fuel. This will create a vertically integrated company from production to retailers."

54.   Shortly after TAYLOR became CEO of CITY CAPITAL CORPORATION, he began moving investor funds from CITY CAPITAL CORPORATION to the bank accounts of other CITY CAPITAL AFFILIATED COMPANIES, using investor monies to pay his personal bills and credit cards as well as diverting funds to the personal bank accounts of TAYLOR and MTAYLOR. It is unknown what happened to those investor funds once they were diverted to these bank accounts.

55.   On March 3, 2009, Defendant TAYLOR did an interview with a writer for Forbes.com. The story centered on TAYLOR'S early success in business and again repeated the story about TAYLOR becoming a millionaire at 16. The story noted that TAYLOR was the CEO of Defendant CITY CAPITAL and mentioned investments in oil wells through the CITY CAPITAL AFFILIATED COMPANIES. However, at the time of this interview TAYLOR knew that the CITY CAPITAL AFFILIATED COMPANIES had lost the rights to lease of the oil and gas property it had purchased in 2007 because CITY CAPITAL did not make the July 2007 installment payment.

## LAWSUITS AND OTHER LEGAL TROUBLES FOR TAYLOR AND HIS AFFILIATED ENTITIES

56.   In September of 2004, TAYLOR, TAYLOR SR., AND MTAYLOR were sued for fraud in the case of <u>Williford et al v. Ephren Taylor, Jr.</u> ("Williford Complaint") in Missouri both personally and as trustee of the Prosperity Ministries trust. Also named as defendants in the suit were TAYLOR SR.'S church, Johnson

-14-

**FIRST AMENDED COMPLAINT**

County Church of Christ ("Johnson County Church") in Shawnee, Kansas.

57.     To give him credibility with church members and with the actual knowledge of TAYLOR SR and MTAYLOR, TAYLOR told potential investors that his Prosperity Fund a/k/a Prosperity Ministries was affiliated with the Johnson County Church of Christ, where TAYLOR SR was a minister and where TAYLOR SR had designated TAYLOR as an "associate minister." This is the first known affinity fraud masterminded by TAYLOR with the assistance of TAYLOR SR and MTAYLOR.

58.     Thereafter, rather than give up his scams, TAYLOR decided to expand his fraudulent schemes nationally with the help of TAYLOR SR and MTAYLOR as well as others.

59.     Subsequent to the Williford case being filed, Defendant TAYLOR SR assumed the title of "Consultant for Engineering" with TAYLOR's AmoroCorp companies.  TAYLOR SR was listed as an "exempt employee" in AmoroCorp's company records and employee rosters.

60.     It is unknown what exactly TAYLOR SR was supposed to do as an engineering consultant for Amorocorp. Although TAYLOR was purportedly soliciting investment monies nationally to develop properties in working-class neighborhoods and renovate potential rental investment properties we now know that TAYLOR never pursued development of those properties but instead was diverting the money for his personal use. It is unknown how much compensation TAYLOR SR received for his "services" to Amorocorp.

61.     It is also unknown as to why TAYLOR SR, after learning about his son's fraudulent investment schemes in the <u>Williford</u> case, would agree to work for Amorocorp as an engineering consultant.

62.     TAYLOR SR continued to provide credibility to TAYLOR'S investment schemes and refused and/or failed to warn TAYLOR's intended victims-who were all members of the same Christian sect that TAYLOR SR ministered to- of

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

1  TAYLOR'S investment schemes and fraudulent misrepresentations.

2  63.    In the beginning of his fraudulent crime spree, TAYLOR relied on

3  TAYLOR SR. to give him credibility with Church of Christ leaders, members and

4  ministers in order for TAYLOR to gain access to Church of Christ congregations -

5  TAYLOR's intended victims.

6  64.    TAYLOR SR served as a reference for TAYLOR with Church of Christ

7  leaders across the country and provided legitimacy to TAYLOR's investment

8  schemes and affinity fraud by continuing the façade that TAYLOR was a "Christian

9  Minister" just like TAYLOR SR.

10  65.    TAYLOR SR and MTAYLOR knew, at least by 2004, that TAYLOR

11  was soliciting monies for investment securities from members of the Church of

12  Christ for investments that did not exist or were illusory. In addition, TAYLOR SR

13  and MTAYLOR knew or should have known that TAYLOR was not licensed or

14  registered to sell securities.

15  66.    Yet TAYLOR SR and MTAYLOR did nothing to stop or deter

16  TAYLOR from executing these investment schemes or to warn TAYLOR's

17  VICTIMS about TAYLOR.

18  67.    Instead, MTAYLOR and TAYLOR SR received compensation and/or

19  monies from the monies TAYLOR was stealing from TAYLOR'S " investment

20  clients."

21  68.    With the money from her husband's VICTIMS, MTAYLOR pursued

22  an ill-advised music and acting career that never came to fruition for obvious

23  reasons-MTAYLOR can't act, sing or dance. Something TAYLOR probably knew-

24  but ignored.

25  ///

26  ///

27  ///

28

-16-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

## MORE LAWSUITS BEGIN TO BE FILED AGAINST TAYLOR AND HIS SHELL COMPANIES

69.     On October 5, 2005, Defendant TAYLOR and his company, Amoro Investment Corporation, a Tennessee corporation, was sued in San Francisco, California (Lake Street Partners, Inc. v. Amoro Investment Corporation, et al, Case number 05-445583, Superior Court City and County of San Francisco).

70.     The complaint alleged that Defendant TAYLOR and Amoro Investment Corporation entered into two written promissory notes with the plaintiff/investor for a total of one million dollars ($1,000,000) and that TAYLOR guaranteed both notes personally. However, when Plaintiff demanded payment, TAYLOR refused.

71.     It is unknown whether Defendant TAYLOR and Amoro Investment Corporation ever paid the plaintiff in the Lake Street Partners case. However, on August 27, 2007, Defendant TAYLOR'S company, Amoro Investment Corporation was administratively dissolved by the state of Tennessee. Indeed, the California "office" address TAYLOR used for the CITY CAPITAL AFFILIATED COMPANIES was nothing but a Mailboxes, Etc. store.

72.     On July 6, 2007 the SEC revoked the registration of securities for AmoroCorp for failure to make required periodic filings. It is believed that TAYLOR deliberately failed to make the required SEC periodic filings so that no one could ascertain the actual financial status of AmoroCorp by reviewing its publicly filed financial statements.

73.     On December 8, 2008, TAYLOR, CITY CAPITAL, AmoroCorp, Ephren Capital Corporation, Escrow Express, LLC, Amoro Management Group LLC, and Own the Pond, LLC were sued in Kansas Federal District Court for securities fraud. Plaintiff claimed damages of $150,000. (Escalada et al v. Taylor et al, Case number 6:2008cv1379, Sedgwick, Kansas).

74.     In September and October of 2010, most of the Clean Sweeps operations were shut down by local law enforcement as illegal gambling operations.

-17-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

However, the CITY CAPITAL CONSPIRATORS continued to take in and process investment funds for the Clean Sweeps machines without advising investors that the operations had already been shut down! In total, the CITY CAPITAL CONSPIRATORS sold Clean Sweeps machines to over 250 investors in multiple states.

75.   On June 3, 2010, the State of Illinois, Securities Department issued a Temporary Order of Prohibition charging TAYLOR, CITY CAPITAL and Clean Sweep Holdings with failure to register securities and soliciting through an unregistered Dealer/Salesperson based upon advertising by Defendants on the radio in Chicago from April 12-16, 2010.

76.   On December 21, 2010, a Cease and Desist Order was issued by the State of Alabama Securities Commission against Defendants TAYLOR, CITY CAPITAL CORPORATION and others.

77.   The Alabama resident who had filed the complaint with the State of Alabama had attended an investment seminar in Orlando, Florida where TAYLOR was a speaker. This investor was issued two promissory notes, one for $50,000 and one for $25,000. The notes had an annual return on investment (ROI) of 20.00% (net after fees) and an annual cash return of $10,000.00 per unit. The Alabama Securities Commission concluded that the CITY CAPITAL CONSPIRATORS were operating as an unlicensed and unregistered securities dealer and therefore violated Alabama securities law.

78.   In February of 2011, the I-Team Fox News ("I-Team") in Atlanta published a news article and aired a news story concerning a scandal linked to Bishop Eddie Long and his church. Long's church is the New Birth Missionary Baptist Church ("New Birth") in Georgia. The article states that TAYLOR made a presentation at New Birth about the Clean Sweeps sweepstakes video game machines and then the parishioners started investing in CITY CAPITAL.

-18-

**FIRST AMENDED COMPLAINT**

79.    However the I-Team investigation revealed that in September of 2010 police in Virginia had raided a number of sweepstakes store fronts and charged 11 owners or companies with illegal gambling.  One of them was CITY CAPITAL through Clean Sweeps. Bishop Long posted a You Tube video appealing to TAYLOR to return his parishioners' investment money which Long indicated totaled about $1,000,000.

80.    TAYLOR responded to Bishop Long's plea by stating that CITY CAPITAL was already working on settling with all of the New Birth members and returning their money.  However, there is no evidence that any New Birth members received any of their investment monies back as TAYLOR had promised.

81.    In March of 2011, the North Carolina Attorney General announced an investigation of Clean Sweeps Holdings based upon consumer complaints from buyers of investments in Clean Sweeps via CITY CAPITAL.

## EQUITY TRUST AND BATT WERE ACTIVE PARTICIPANTS IN THESE INVESTMENT PONZI SCHEMES AND RELIGIOUS-AFFINITY-FRAUDS AND KNOWINGLY PROVIDED AUTHENTICITY AND CREDIBILITY TO DEFENDANTS' INVESTMENT SCHEMES

82.    The CITY CAPITAL CONSPIRATORS were locked arm-in-arm as they advertised and promoted nationally their close working relationship.  In fact, in documents they went so far as to state that CITY CAPITAL CORPORATION both "controlled the investments" transferred to EQUITY TRUST and worked "directly" with EQUITY TRUST.

83.    In investor solicitation documents prepared by the CITY CAPITAL CONSPIRATORS, the "close working relationship" between EQUITY TRUST and CITY CAPITAL was emphasized as proof of the legitimacy of the investments being offered by the CITY CAPITAL CONSPIRATORS. In addition, investor solicitation documents tout that CITY CAPITAL pre-paid all setup and management fees for

-19-

SNYDER ◆ DORENFELD, LLP

EQUITY TRUST.

84.   By their own admission, the CITY CAPITAL CONSPIRATORS illegally controlled the investment monies, belonging to Plaintiffs, in EQUITY TRUST.

85.   EQUITY TRUST and BATT viewed and treated TAYLOR and the other CITY CAPITAL affiliated companies as their partner and client, not the Plaintiffs, which is why when the money ran out and the Ponzi scheme crumbled, EQUITY TRUST and BATT refused to provide assistance or help the Plaintiffs understand what happened to their investment money.

86.   Upon information and belief, EQUITY TRUST sent e-mail solicitations and letters to potential CITY CAPITAL CONSPIRATOR targets touting the opportunity for inexperienced investors to open a SDIRA and invest in the CITY CAPITAL AFFILIATED COMPANIES.

87.   EQUITY TRUST and BATT did more than just assist the CITY CAPITAL CONSPIRATORS. They also solicited potential investors, advertised investment opportunities in the CITY CAPITAL AFFILIATED COMPANIES, and convinced the VICTIMS to invest even though they knew the CITY CAPITAL CONSPIRATORS were not licensed or registered to sell securities. BATT and EQUITY TRUST even served as "references" for TAYLOR with potential investors regardless of whether the investor was going to invest through a SDIRA. Additionally, BATT and EQUITY TRUST knew that the investments the CITY CAPITAL CONSPIRATORS were selling were illegal under state and federal securities law.

88.   Defendant EQUITY TRUST is prominently mentioned in marketing documents prepared for CITY CAPITAL and the CITY CAPITAL AFFILIATED COMPANIES as the ONLY Company that manages self-directed IRAs for CITY CAPITAL to give TAYLOR further credibility with his intended victims.

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

89.   BATT served as the sole liaison between EQUITY TRUST and investors in the CITY CAPITAL AFFILIATED COMPANIES and BATT also served as a liaison and reference between the CITY CAPITAL CONSPIRATORS and other TAYLOR investors who did NOT invest through an EQUITY TRUST SDIRA.

90.   BATT was introduced to the Plaintiffs as TAYLOR'S personal investment banker.  BATT gave TAYLOR another layer of credibility through his position as an agent/employee of EQUITY TRUST and established TAYLOR as an affluent investment advisor.

91.   BATT also served as a business and personal "reference" for TAYLOR and the CITY CAPITAL AFFILIATED COMPANIES with TAYLOR'S intended victims.   If potential investors inquired as to TAYLOR'S investment success, experience, etc. they were given BATT'S contact information and BATT would provide an excellent reference regardless of whether the potential investor was going to invest through a self-directed IRA or in cash.

92.   BATT was present at multiple investment seminars, including many at churches, given by TAYLOR where TAYLOR referred to EQUITY TRUST as his business partner and TAYLOR stated that CITY CAPITAL "managed" the investments of its clients/investors that were held by EQUITY TRUST.

93.   BATT falsely told TAYLOR's targets at churches and other investment seminars given by TAYLOR that monies invested through EQUITY TRUST were fully insured by the FDIC.

94.   TAYLOR frequently emphasized EQUITY TRUST's size and experience as a CUSTODIAN as further evidence of the strength of the CITY CAPITAL team and used the EQUITY TRUST name frequently to add credibility to the investment schemes the CITY CAPITAL CONSPIRATORS were constantly pumping in press releases and other media.

-21-

**FIRST AMENDED COMPLAINT**

95.   TAYLOR marketed the CITY CAPITAL investment vehicles to potential investors as a seamless way to invest. TAYLOR kept emphasizing in other interviews and articles as well as blogs that the "ease" of investing in CITY CAPITAL as "hassle free" was a major advantage because CITY CAPITAL managed and controlled the investment therefore providing busy investors with a worry-free investment opportunity.

96.   The CITY CAPITAL CONSPIRATORS kept tight control over the direction of investments and creation of self-directed IRAs to BATT and EQUITY TRUST. The CITY CAPITAL CONSPIRATORS wanted to make sure they controlled the investment and the communications with the investors in the CITY CAPITAL AFFILIATED COMPANIES such as Plaintiffs so that no suspicions were aroused.

97.   The CITY CAPITAL AFFILIATED COMPANIES starting defaulting on investor loans and notes in mid-2007.

98.   Yet BATT and EQUITY TRUST kept making money on the "administration" of the VICTIMS' self-directed IRA accounts. In fact, BATT boasts in his Linked- In biography that during his tenure with EQUITY TRUST he was ranked number seven (7) in sales during EQUITY TRUST'S 36 years of business by generating $3,000,000 in new revenue for EQUITY TRUST.

99.   As of December 31, 2007, CITY CAPITAL CORPORATION had less than $100,000 in cash and AmoroCorp owed CITY CAPITAL CORPORATION over $2 Million.

100.   In addition, CITY CAPITAL CORPORATION was in default on one of its notes payable with a principal of $250,000 and accrued interest of $475,683.

101.   Also as of this time, CITY CAPITAL CORPORATION had not filed its 2005 or 2006 tax returns.

102.   In 2008 CITY CAPITAL CORPORATION first issued the 3 Simple Steps marketing brochure where EQUITY TRUST was prominently mentioned. The

-22-

**FIRST AMENDED COMPLAINT**

CITY CAPITAL CONSPIRATORS falsely indicated that Plaintiffs' self-directed IRA deposits were insured by the FDIC for up to $250,000. In fact, only cash deposits were insured by the FDIC. The marketing documents of CITY CAPITAL indicated that all fees for EQUITY TRUST were pre-paid by CITY CAPITAL.

103. In April of 2008, TAYLOR indicated that he was opening a new CITY CAPITAL office around Wall Street in New York. The address for this "Wall Street" office turned out to be a "virtual office," *i.e.*, simply rental of an address and not a real physical location.

104. The CITY CAPITAL CONSPIRATORS maintained an 800 number for www.iracashflow.com and www.citycapcorp.com where unlicensed and unregistered telemarketing sales reps sold SDIRA investment vehicles with BATT as the sole contact and EQUITY TRUST as the exclusive CUSTODIAN. All of the sales reps were paid on a commission basis only and the entire operation was illegal.

## USING MONEY FRAUDULENTLY OBTAINED FROM THE PLAINTIFFS TO FINANCE MUSIC VIDEOS

105. In January of 2009, THE TAYLORS uploaded a You Tube video of MTAYLOR'S first record release titled "I can be that." It is unknown exactly which of the VICTIMS' investment monies were used to produce this music video and the corresponding record but it is believed that the TAYLORS used monies from the Plaintiffs to fund production of MTAYLOR's record and music video through an entity called Resilient Music.. It is unknown whether MTAYLOR ever made any sales from this record or music video.

106. The TAYLORS made another music video and record in 2010 starring MTAYLOR. This record, titled "Billionaire (I don't care)" was produced by Flash Rodriguez, CEO of the FEAM Group, who was supposedly an artist development expert in the music industry. It is unknown which VICTIMS' monies was used to finance this music production.

**FIRST AMENDED COMPLAINT**

## THE CLEAN SWEEPS MACHINE INVESTMENT PONZI SCAM

107.   On January 7, 2010, the CITY CAPITAL CONSPIRATORS uploaded a video to YouTube about a Sweep Income RISK-FREE Investment Opportunity presented by TAYLOR.

108.   Money for an investment in the Clean Sweeps machines would come in to a Clean Sweeps Bank of America account (Account number 237018134155) controlled by the CAPITAL CITY CONSPIRATORS from either:

> a.   EQUITY TRUST for self-directed IRA investments or 401k transfers;
>
> b.  Credit card payments which were processed for CITY CAPITAL related entities; or
>
> c.  Cash payments deposited by investors into to a Bank of America Clean Sweeps account ("Sweeps Monies").

109.   Sweeps Monies would then be moved by the CITY CAPITAL CONSPIRATORS from the Sweeps Monies account to multiple accounts owned and/or controlled by the CITY CAPITAL CONSPIRATORS and/or the CITY CAPITAL AFFILIATED COMPANIES.

110.   The bank and credit card accounts for purchase of Clean Sweeps machines were finally shut down by Bank of America for suspicious activity in October of 2010.

111.   Telemarketing sales reps for CITY CAPITAL illegally operated a "telephone room" selling Clean Sweeps machines as an investment which could be purchased through the client's SDIRA by moving the SDIRA over to EQUITY TRUST, with credit cards or with cash.  The sales reps were paid on a commission basis only.

112.   Investors who had already "qualified" for the Socially Conscious Investment Ponzi Scam were also "qualified" to apply for the Clean Sweeps Machine Investment Ponzi Scam.  Indeed many investors invested in both of the

-24-

SNYDER ♦ DORENFELD, LLP

schemes with no idea that neither was a legal, legitimate investment opportunity.

113.   The CITY CAPITAL CONSPIRATORS initiated thousands of "Robocalls" (A Robocall is a term for an automated phone call that uses both a computerized autodialer and a computer-delivered pre-recorded message) to prior and current investors in the CITY CAPITAL AFFILIATED COMPANIES to attempt to sell them Clean Sweeps machines.

114.   By May of 2010, the CITY CAPITAL CONSPIRATORS were telling potential investors in the Clean Sweeps scam that CITY CAPITAL had been in the sweepstakes machine business for 3 years, had over 100 locations, 3,000 machines and that 20% of the proceeds of the sweepstakes machines went to charity. None of these statements were true.

## MORE FRAUDULENT AND FAILED VENTURES

115.   On June 15, 2010, CITY CAPITAL filed a Form 10-K ("June 09 10K") with the SEC. This annual report was for CITY CAPITAL'S fiscal year ending December 31, 2009. The June 09 10K indicates that CITY CAPITAL sold its operating subsidiary Perfect Turf, Inc. incurring a loss of $64,170.00.

116.   The June 09 10K further states that City Laundry Services, LLC ("City Laundry") which was formed on January 22, 2009 to purchase laundry cleaning businesses.

117.   The June 09 10K indicates that CITY CAPITAL purchased 3 laundries between February and April of 2009 and sold 2 of the 3 in November of 2009. None of the laundries were operational by December of 2010 and in fact the last laundry was shut down due to CITY CAPITAL's failure to pay the rent.

118.   CITY CAPITAL also purchased City Juice Systems KS, LLC ("City Juice") which later acquired L.A. Juice Company, Inc. and Blends 101, LLC. Both the L.A. Juice location and the Blends 101 location were closed by CITY CAPITAL after attempts to sell them failed. City Beauty Systems, LLC ("City Beauty")

-25-

SNYDER ♦ DORENFELD, LLP

purchases health and beauty businesses and was still in existence at the time of the filing of the June 09 10K. However, although CITY CAPITAL received investment monies in City Beauty, no investment properties were ever purchased by City Beauty and no one knows what happened to those investment monies.

119.   According to CITY CAPITAL'S SEC filings, City Capital Petroleum, LLC ("City Petroleum") purchased gas stations. Upon information and belief, City Capital Petroleum never purchased a gas station, it only leased one. This gas station closed in 2010 due to declining revenues.

120.   Nitty Gritty, LLC was owned by City Capital and was a social network and internet training site. CITY CAPITAL indicated it was for sale in the June 09 10K.

121.   CITY CAPITAL owned 33% of The Millionaire Lifestyle Group which ceased operations in December of 2009.

122.   CITY CAPITAL also owned a 2.18% interest and was a managing member in NYC Liquidation Group, LLC. These were Ebay drop-off locations which were closed in July of 2009 after being purchased for over a quarter of a million dollars in January of 2009.

123.   CITY CAPITAL owned a 40% interest in The Male Room, LLC which was closed in December of 2009.

124.   As of December 31, 2009 CITY CAPITAL had a total of 28 employees: 15 administrative staff and 13 customer service employees.

125.   CITY CAPITAL incurred net losses of $6,316,328 for the year ending December 31, 2009 and $2,602,457 for the year ending December 31, 2008. Yet EPHREN TAYLOR received compensation of cash and stock of over one million dollars from CITY CAPITAL in each of those years.

126.   As of December 31, 2009 CITY CAPITAL had closed nine properties and generated $94,010 in revenues from its credit investor program.

-26-

**FIRST AMENDED COMPLAINT**

127. The June 09 10K indicates that CITY CAPITAL'S accounting firm expressed doubt that CITY CAPITAL could continue as a going concern because of its accumulated deficit of $18,468,522.

128. As of December 31, 2009, CITY CAPITAL had a working capital deficit of $7,186,142.

129. As of December 31, 2009, TAYLOR'S AmoroCorp owed CITY CAPITAL $1,635,174, the balance on an outstanding promissory note for monies borrowed by AmoroCorp from CITY CAPITAL.

130. In late 2009 and early 2010, some of the promissory notes of investors held in EQUITY TRUST SDIRAs with the CITY CAPITAL AFFILIATED COMPANIES began maturing and the investors wanted to cash out. However, these investors were unable to do so. By February 2010 EQUITY TRUST and BATT were receiving multiple calls from anxious investors in the CITY CAPITAL AFFILIATED COMPANIES who wanted their money back. EQUITY TRUST and BATT simply referred the investors back to TAYLOR.

## TAYLOR'S EMPIRE BEGINS TO CRUMBLE AS THE FRAUD GETS EXPOSED

131. Beginning in May of 2010, the CITY CAPITAL CONSPIRATORS started receiving an increasing number of customer complaints in their telemarketing call center in Raleigh, North Carolina. Customers who had purchased Clean Sweeps machines in late 2009 or early 2010 were complaining that they had not received any income from the machines as they had been promised, or that their machines had never been placed and activated or that the amount of return investment they received was substantially lower than what they had promised they would receive or that they were being overcharged by EQUITY TRUST.

132. Sometime prior to June of 2010, EQUITY TRUST started notifying VICTIMS who had invested in Clean Sweeps machines through EQUITY TRUST

-27-

SNYDER ♦ DORENFELD, LLP

SDIRAs that EQUITY TRUST was terminating its services as their CUSTODIANS although EQUITY TRUST claimed to be a "Passive Custodian" without authority to control its customers' investments including Plaintiffs herein. By August of 2010, the CITY CAPITAL telemarketing call center in Raleigh could not handle all of the complaint calls due to the frustration of dealing with the non-stop angry customer calls. Many CITY CAPITAL employees walked out or simply did not show up for work again.

133.   EQUITY TRUST and BATT were also receiving calls from worried and angry investors trying to find out what happened to their investments. EQUITY TRUST and BATT refused to assist the investors including Plaintiffs. The accounts of the Plaintiffs revealed little about their investments other than their initial purchase of the business, machine or real estate and that they held a promissory note. EQUITY TRUST and BATT refused to provide any other information.

134.   It is estimated that less than 20% of the investment proceeds received by the CITY CAPITAL CONSPIRATORS were ever actually invested in real estate, sweeps machines or anything else. The remaining proceeds were misappropriated and diverted by the CITY CAPITAL CONSPIRATORS to pay themselves, pay earlier investors, or solicit new investors to perpetuate the Defendants' fraudulent schemes.

135.   On November 2, 2010, CITY CAPITAL announced the resignation of Defendant TAYLOR as CEO and Chairman of the Board of CITY CAPITAL effective October 22, 2010.

136.   On November 23, 2010, TAYLOR held a conference call with investors of CITY CAPITAL.   TAYLOR told the investors that they would receive a full refund for their investments.   That refund never materialized.

137.   On June 3, 2010 (the same day that the Illinois Securities Department issued a Temporary Order of Prohibition) Defendants issued a press release announcing that 21 Clean Sweeps terminals had been placed in Rolesville, North

-28-

**FIRST AMENDED COMPLAINT**

1    Carolina. Incredibly, the press release states that the Clean Sweeps program is *100%*

2    *legal.*

3        138.    In April of 2012, the SEC filed a civil enforcement action against

4    TAYLOR ( Case 1:12-cv-01249-WSD) in Atlanta, Georgia alleging that TAYLOR

5    and his cohorts had stolen at least $11 million in a Ponzi scheme/affinity fraud

6    involving the sale of unregistered securities by unlicensed agents.

## EQUITY TRUST WAS NOT A PASSIVE CUSTODIAN; RATHER, EQUITY TRUST ACTIVELY FACILITATED MULTIPLE FRAUDULENT ENTERPRISES

11       139.    The CITY CAPITAL CONSPIRATORS utilized the CITY CAPITAL

12   AFFILIATED COMPANIES and investment vehicles to facilitate their Ponzi

13   schemes. Chief among the investment vehicles used was an SDIRA. As discussed

14   above, SDIRA rules permit investment in a much broader set of assets than are

15   permitted by most IRA custodians. ("Custodians" or "trustees," the name given the

16   manager/administrators of regular IRAs, are mainly banks and broker-dealers that

17   restrict investment holdings in regular IRAs to approved stocks, bonds, mutual funds

18   and CDs ( i.e., more traditional investments).

19       140.    However CUSTODIANS, though sharing similar but misleading names

20   with CIRAs (custodian IRA's), deny any type of fiduciary responsibilities. In fact, as

21   will be established herein, it is very, very difficult to ascertain exactly what

22   CUSTODIANS claim to be responsible for, if anything, in "administering" SDIRAs.

23   It is even more difficult to rationalize how the CUSTODIANS' mystery "services"

24   justify the exorbitant fees that EQUITY TRUST charged their customers including

25   the Plaintiffs herein.

26       141.    The monies deposited into SDIRAs "administered" by EQUITY

27   TRUST were stolen from Plaintiffs through fraud, Ponzi schemes, and other criminal

28   conduct encouraged, facilitated, aided, abetted, promoted and consummated by the

     CITY CAPITAL CONSPIRATORS.                          -29-

**FIRST AMENDED COMPLAINT**

142.   EQUITY TRUST reported substantial increases in the value of each VICTIM'S SDIRAs via IRS Form 5498 year after year when, in fact, the monies in the VICTIMS' SDIRAs had been stolen by the CITY CAPITAL CONSPIRATORS months or years before.

143.   EQUITY TRUST substantially assisted in the CITY CAPITAL CONSPIRATORS' fraudulent schemes by mismanaging the Plaintiffs' SDIRA accounts and violating their own internal policies.

144.   But for the CITY CAPITAL CONSPIRATORS' mandated, exclusive use of EQUITY TRUST to "administer" the "investments" of Plaintiffs, the retirement accounts and life savings of these VICTIMS would not have been stolen.

145.   EQUITY TRUST gave Plaintiffs a false sense of security by making false and deceptive representations that their "investments" would be safe, insured, accurately administered, and legally sound.   Plaintiffs, relying on those representations, in good faith gave their hard-earned money to EQUITY TRUST who enabled the CITY CAPITAL CONSPIRATORS to steal the VICTIMS' monies. Most investors lost their entire life savings.

146.   Although EQUITY TRUST charged excessive fees for their CUSTODIAN "administrative services," EQUITY TRUST failed to perform one of the few "duties" they actual concede exists for custodians which is to maintain custody of the paperwork proving ownership of a designated asset by the SDIRA.

147.   From 2008 continuing to the present, EQUITY TRUST inaccurately reported account values that concealed the CITY CAPITAL CONSPIRATORS' repeated defaults and delinquent interest payments. EQUITY TRUST also continued to allow reinvestments in the CITY CAPITAL CONSPIRATORS' securities even after learning that the CITY CAPITAL CONSPIRATORS were engaged in the sale of unlawful securities. EQUITY TRUST continued to do so over the course of many months despite numerous detailed customer complaints alerting EQUITY TRUST to serious problems with the investments.

-30-

**FIRST AMENDED COMPLAINT**

148.   Many of the VICTIMS' SDIRA account statements reflected missing documentation. The SDIRA statements prepared by EQUITY TRUST contained notations year after year that documentation reflecting ownership of the investment such as the original promissory note, an original collateral agreement, the LLC operating agreement, and/or a stock certificate evidencing ownership in some of the CITY CAPITAL AFFILIATED COMPANIES to name a few were never received and/or the LLC operating agreement was never received. Yet the EQUITY TRUST charged the VICTIMS administrative fees to manage their accounts yet still failed to follow up and obtain their own mandated paperwork for each investment account leaving many VICTIMS to ponder exactly where their money went and what it was used for. Most VICTIMS to this day still do not know where their money went.

149.   EQUITY TRUST, through a myriad of nonsensical, confusing and overly complex illusory, adhesion contracts and documents, as well as false, misleading and deceptive advertising, diverted millions of dollars belonging to Plaintiffs to the CITY CAPITAL CONSPIRATORS.

150.   EQUITY TRUST has publicly acknowledged the fact that they are aware that SDIRAs are and were being used by fraud promoters to swindle their customers and that such fraud claims are escalating.

151.   Fraud promoters are acutely aware that their affiliation with and use of CUSTODIANS entice inexperienced investors, who might otherwise be more cautious, into an investment scam because the investors believe they are protected by large, purportedly well-funded CUSTODIANS with secure, trusting names like "Trust Company", "Trustee," or "Custodian."

152.   EQUITY TRUST attempted to disclaim responsibility for anything and everything. EQUITY TRUST utilized highly technical contracts which were full of unintelligible legalese. Such that even experienced lawyers would have trouble understanding such language. This was all being done while EQUITY TRUST was being paid handsomely to do nothing other than provide the means and method

-31-

**FIRST AMENDED COMPLAINT**

through which tens of thousands of people have been scammed of their life savings.

153.  EQUITY TRUST has acknowledged that although they claim to be a "passive" CUSTODIAN, they have stopped "allowing customers to invest" in some SDIRA programs upon discovering issues with the investment promoter that contradicts their purported status as a "passive" custodian.

154.  EQUITY TRUST knew that the CITY CAPITAL CONSPIRATORS were making the investment decisions for the Plaintiffs as well as paying the administrative fees of EQUITY TRUST at times.. EQUITY TRUST knew that the Plaintiffs' SDIRAs were being illegally controlled and managed by third parties-not the SDIRA account owners.

155.  The SEC issued an Investor Alert in September of 2011 warning consumers about the popularity of SDIRAs among fraud promoters particularly in Ponzi schemes.

156.  EQUITY TRUST has tried to limit their liability in their adhesion contracts to serve their best interests while at the same time facilitating criminal conduct directly resulting in the total loss of their customers' investments.

157.  Since at least 2005 it has been known in the CUSTODIAN industry that Ponzi schemers were utilizing SDIRAs to facilitate their criminal enterprises.  Yet EQUITY TRUST has done nothing to detect, prevent, stop or warn their customers about this popular fraudulent investment scheme using SDIRA CUSTODIAN services even  if EQUITY TRUST had actual knowledge of the Fraud promoter's fraudulent investment scheme .

158.  Fraud promoters, including the Defendants herein, insisted and required that their VICTIMS, including Plaintiffs, utilize SDIRAs administered by EQUITY TRUST because the Defendants knew that the SDIRAs of the Plaintiffs were set up to automatically renew or "rollover" each year. The VICTIMS could not liquidate their investments automatically at the end of the investment period and, in fact, were not even notified at the end of any investment period that they could withdraw their

-32-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

investment funds or "choose" to reinvest.

159. In addition, Defendants knew that the investment interest that purportedly was being earned in the SDIRAs of Plaintiffs "appeared" in the account statement of the VICTIMS' SDIRAs administered by EQUITY TRUST regardless of whether the accrued interest on the investment was actually deposited in the VICTIMS' accounts. It was not for the majority of VICTIMS.

160. The administration of the SDIRAs by EQUITY TRUST gave the illusion to Plaintiffs that their SDIRAs were increasing in value and that their investments were profitable and legitimate. However, EQUITY TRUST failed to conduct a sufficient review of the SDIRAs of the VICTIMS to ascertain problems inherent with the accounts on their face.

161. EQUITY TRUST periodically sent out investment account statements or made them available through the Internet to VICTIMS showing what appeared to be extraordinary investment returns in their SDIRAs thus maintaining the deception that the schemes of the Defendants were providing high returns and that the value of the VICTIMS' SDIRAs was increasing.

162. In fact, VICTIMS' investment monies were stolen within days or weeks after EQUITY TRUST wired the funds to the CITY CAPITAL CONSPIRATORS.

163. Under the plan documents of EQUITY TRUST, EQUITY TRUST had a duty to furnish periodic reports to the Plaintiffs concerning the status of their account and a statement of assets. Instead EQUITY TRUST fraudulently concealed information that they had a duty to disclose i.e., that the securities held by the Plaintiffs' SDIRAs had defaulted and/or that the CITY CAPITAL CONSPIRATORS had failed to make distributions into their accounts.

164. CUSTODIANS, such as EQUITY TRUST, are required to report the fair market value ("FMV") of the SDIRA assets annually on Form 5498 and to report the value of any distributions to the SDIRA owner on Form 1099-R. However, EQUITY TRUST failed and refused to ascertain the FMV of the SDIRAs owned by

-33-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

Plaintiffs. Instead, EQUITY TRUST reported the same value year after year unless, of course, the CITY CAPITAL CONSPIRATORS provided a greater value to EQUITY TRUST who then recorded it as the updated value of the SDIRA thus further deceiving Plaintiffs into believing their investments were increasing in value and secure.

165. EQUITY TRUST had actual knowledge that the CITY CAPITAL CONSPIRATORS had defaulted on the securities held in the Plaintiffs SDIRAs while at the same time the CITY CAPITAL CONSPIRATORS were taking in new investors and investments. The CITY CAPITAL CONSPIRATORS started defaulting on the securities held by EQUITY TRUST by at least 2008 while the Ponzi schemes did not implode until late 2010.

166. To enhance the appearance of legitimacy of their CUSTODIAN services, EQUITY TRUST sponsored Webinars about the safety, efficiency and profitability of investing in SDIRAs.

167. EQUITY TRUST sponsored Webinars about investing in its SDIRAs featuring IRS agents as speakers. Such marketing were intended to lead consumers, including Plaintiffs, to believe that the EQUITY TRUST'S services are validated and approved by the IRS.

168. "IRS Approved" sales pitches are well known in investment circles and among securities regulators for being a frequently used method of investment advertising and marketing solicitation, designed to solicit consumers seeking IRA custodial services.

169. EQUITY TRUST encouraged Plaintiffs to utilize Limited Liability Companies ("LLC") to hold their SDIRA investments.

170. Most state consumer protection laws require investment promoters to disclose in writing all relevant facts about both themselves and the offered investment. However, it is common knowledge among securities regulators that individuals promoting fraudulent investments favor LLCs or partnerships to hold

-34-

**FIRST AMENDED COMPLAINT**

investments to evade the consumer protection requirements of state and federal securities laws.

171. If a person intent on committing fraud utilizes an LLC then they can hide personal bankruptcies and previous securities violations as well as avoid written disclosure of the investment risks, actual marketing costs, and their investment experience.

172. EQUITY TRUST utilized deceptive and unfair trade practices as well as false and misleading advertising to entice consumers, including Plaintiffs, to utilize their CUSTODIAN services with claims of attainment of new found riches and untold wealth.

173. EQUITY TRUST failed to disclose that their SDIRAs were being used by fraud promoters to steal their customers' monies. This omission of a material fact and/or active concealment by EQUITY TRUST caused Plaintiffs to invest in what they believed was a legitimate, profitable investment opportunity. Instead they invested in a Ponzi scheme or fraudulent enterprise designed to bilk the targeted investors.

174. In addition, through use of substantive and procedurally unconscionable contracts, EQUITY TRUST and the other Defendants were able to utilize contracts of adhesion to bind Plaintiffs to an illusory contract with no meaningful bargaining between the parties because of the economic disparity between the Plaintiffs and EQUITY TRUST. Moreover, the Victims were **forced** to use the CUSTODIANS selected by the CITY CAPITAL CONSPIRATORS.

175. The contracts of EQUITY TRUST are best described as contracts "such as no man in his sense and not under delusion would make on the one hand, and no honest and fair man would accept on the other." Sears Termite & Pest Control, Inc. v. Robinson, 883 So. 2d 153,158 (Ala. 2003). But the VICTIMS had no choice.

176. EQUITY TRUST permitted the CITY CAPITAL CONSPIRATORS to illegally control the investment accounts of the Plaintiffs.

-35-

**FIRST AMENDED COMPLAINT**

177. EQUITY TRUST enjoyed free marketing services by the CITY CAPITAL CONSPIRATORS who placed their name in marketing documents and e-mails to the VICTIMS detailing the fact that EQUITY TRUST was the ONLY custodian that managed SDIRAs for that particular fraudulent scheme.

178. EQUITY TRUST aided, facilitated and supported the CITY CAPITAL CONSPIRATORS' control of the VICTIMS SDIRA accounts-so EQUITY TRUST could maintain a revenue stream of fees comprised of hundreds or thousands of dollars per year per account from each VICTIM for essentially doing nothing.

179. EQUITY TRUST knew that the loans and notes in the VICTIMS' SDIRAs were defaulting repeatedly over multiple years but turned a blind eye. EQUITY TRUST failed to accurately report the value of the SDIRAs of Plaintiffs resulting in the VICTIMS being unaware that their investment monies were been stolen although their SDIRAs appeared to be increasing in value.

180. The IRS requires that IRA owners withdraw at least a minimum amount, known as a Required Minimum Distribution ("RMD") from their retirement accounts annually, starting the year an investor turns age 70 ½ . Thus the RMD requirement demands that retirement assets have a certain degree of liquidity. While RMDs may vary based on the ages of the investor and beneficiary, as well as the rate of return earned on the investment, RMD amounts on most retirement accounts are usually less than 1/20 of the principal in the retirement account.

181. EQUITY TRUST knew that the investments of the Plaintiffs who were over age 70 1/2 were completely illiquid and that the CITY CAPITAL CONSPIRATORS were breaching their duty to investors and mismanaging their investments because the investment accounts of the VICTIMS frequently failed to maintain enough cash to pay RMDs. In addition, because the value of the VICTIMS' SDIRA accounts were grossly inflated, so were the RMD amounts subjecting EQUITY TRUST'S customers to greater penalties upon their failure to take the distribution.

-36-

**FIRST AMENDED COMPLAINT**

182. In marketing documents, investment seminars, e-mail solicitations and other advertising used to solicit potential investors such as the Plaintiffs, it was repeatedly stated that the CITY CAPITAL AFFILIATED COMPANIES managed the investment assets held by EQUITY TRUST.

183. A "managed" account is very different from the legal definition of a SDIRA which mandates that the investor makes all decisions about the account. Yet EQUITY TRUST, who claimed to be passive, routinely took investment instructions from the Defendants-not the VICTIMS.

184. EQUITY TRUST knew that the funds in the SDIRAs of the VICTIMS were not going to be used for their intended purpose yet did nothing.

185. At all times material hereto, Defendant EQUITY TRUST knew or should have known that the investment seminars, conference calls and presentations they were participating in with TAYLOR and the other Defendants were illegal.

186. At all times material hereto, Defendant EQUITY TRUST knew or should have known that the investments being made by the Plaintiffs were illegal either due to the fact that the investments themselves constituted an illegal enterprise (i.e., Sweepstakes machines) or due to the fact that the investment sponsors/brokers/promoters, the CITY CAPITAL CONSPIRATORS and the CITY CAPITAL AFFILIATED COMPANIES were neither licensed nor registered in any state to sell the investment or give investment advice as required by state and Federal securities laws.

187. EQUITY TRUST knew or should have known that the written investment solicitation documents given the Plaintiffs falsely indicated that the SDIRAs of the VICTIMS were insured by the FDIC.

188. EQUITY TRUST knew or should have known the written investment solicitation documents given the Plaintiffs falsely stated that the promissory notes in the SDIRAs of the VICTIMS were secured by tangible assets. This statement was blatantly false and in fact EQUITY TRUST knew or should have known that there

-37-

1 was no documentation evidencing that the VICTIMS' investments were secured by

2 tangible assets.

3     189.  EQUITY TRUST failed to act in accordance with industry standards to

4 maintain custody over, hold, preserve and safeguard the SDIRA assets of Plaintiffs;

5 failed to maintain title of the assets in the SDIRAS; and failed to furnish legally

6 mandated statements accurately reflecting the value of the assets held in the SDIRAs

7 of the VICTIMS.

8     190.  EQUITY TRUST failed to act in accordance with applicable regulatory

9 requirements in the conduct of their duties as SDIRA CUSTODIANS.

10     191.  On information and belief, EQUITY TRUST failed and/or refused to

11 comply or abide by the regulatory requirements applicable to Custodians of SDIRAs

12 in the rendition of their services as Custodian to Plaintiffs.

13     192.  At all times material hereto EQUITY TRUST had actual knowledge of

14 their complicit involvement in a highly organized Ponzi scheme and/or was

15 recklessly or willfully blind to their role in materially supporting the scheme.

16     193.  On April 4, 2012, the Better Business Bureau ("BBB") suspended the

17 BBB accreditation of EQUITY TRUST due to its repeated failure to address

18 consumer complaints about service issues and the failure to respond to specific

19 consumer complaints which demonstrated a pattern of unacceptable conduct.

20 EQUITY TRUST attempted on April 19, 2012 to persuade the BBB to lift the

21 suspension, however, the BBB refused and has indicated that the suspension will

22 remain in effect for at least six months.

23     194.  Upon information and belief, although EQUITY TRUST classifies itself

24 as a "Passive Custodian," the conduct of EQUITY TRUST appears to fall outside of

25 a Passive Custodian role.

26     195.  Upon information and belief, EQUITY TRUST acted outside of a

27 Passive Custodian capacity by: jointly marketing their SDIRA custodial services

28 with the other CITY CAPITAL CONSPIRATORS; running background checks on

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

investment promoters including TAYLOR but failing and refusing to disclose the results of the background checks to their affected customers even if EQUITY TRUST determined that the investment scheme that their customers were investing in through SDIRAs was a fraud such as they did with TAYLOR; and continuing to process new investments through SDIRAs with the CITY CAPITAL CONSPIRATORS even though EQUITY TRUST had actual knowledge that the TAYLOR-controlled investments were fraudulent investment schemes.

196.   EQUITY TRUST permitted the CITY CAPITAL CONSPIRATORS to provide the FMV of the assets of the SDIRAs of their VICTIMS but once the fraudulent scheme was exposed EQUITY TRUST required the CITY CAPITAL CONSPIRATORS' VICTIMS to provide third party proof that their SDIRA investment with CITY CAPITAL was worthless and refused to modify the value of the VICTIMS' SDIRAs unless the VICTIM paid the EQUITY TRUST's administrative fees.

197.   EQUITY TRUST'S acts and/or omissions in assisting, facilitating and participating in the Ponzi schemes of the CITY CAPITAL CONSPIRATORS render EQUITY TRUST as a direct and proximate cause of the Plaintiffs' losses and therefore EQUITY TRUST is liable for the damages incurred by Plaintiffs herein.

**THE FRAUDULENT SCHEMES OF THE DEFENDANTS CONTINUE**

198.   The CITY CAPITAL CONSPIRATORS continued to illegally solicit and sell investments even after their Ponzi scheme fell through.  Through Global Sweepstakes and Investment Properties LLC, a North Carolina limited liability company, Defendants continued to sell sweepstakes machines and investments in real property.

199.   TAYLOR was still sending solicitation e-mails to the VICTIMS in December of 2010, trying to get VICTIMS to invest in new schemes TAYLOR had

SNYDER ♦ DORENFELD, LLP

SNYDER ♦ DORENFELD, LLP

1  designed. In fact, the day after TAYLOR allegedly resigned from CITY CAPITAL
2  as CEO, he sent solicitation e-mails to some of the VICTIMS soliciting further
3  investments on behalf of CITY CAPITAL and the rest of the CITY CAPITAL
4  CONSPIRATORS.

5      200.   Plaintiffs do not believe TAYLOR ever truly stepped down or
6  relinquished control of the CITY CAPITAL AFFILIATED COMPANIES and
7  believe the CITY CAPITAL CONSPIRATORS, LIPINSKI and MACINTYRE were
8  or are still operating Ponzi schemes through illegal investments to this day.

9      201.   In October of 2011, TAYLOR, CITY CAPITAL, BATT and EQUITY
10  TRUST, among others, were sued for illegal sale of securities and fraud in state court
11  in Dekalb County, Georgia (Case No. 1/A39373-5) by 10 members of the New Birth
12  Missionary Baptist Church ("New Birth") who alleged that they had invested over $1
13  million with TAYLOR and the TAYLOR-controlled entities after TAYLOR
14  preached and held an investment seminar at the New Birth Church in 2009.  That
15  case is still pending.

16      202.   In February of 2012, LIPINSKI and MACINTYRE on behalf of CITY
17  CAPITAL, issued a press release indicating that Legal Outsourcing Group, LLC
18  ("LOG") had been retained to "separate and address the old liabilities and
19  contingencies of CITY CAPITAL CORPORATION." This press release was issued
20  by LIPINSKI and MACINTYRE to attempt to placate the VICTIMS and dissuade
21  them from moving forward with litigation against TAYLOR, ERX and CITY
22  CAPITAL.  After that, the VICTIMS started receiving phone calls and e-mails from
23  someone claiming to be a representative of LOG scheduling a time to discuss their
24  "settlement" of claims against CITY CAPITAL and the other TAYLOR-controlled
25  shell companies. These purported settlements were and are an extension of the
26  fraudulent schemes perpetrated by the CITY CAPITAL CONSPIRATORS and
27  facilitated by LIPINISKI and MACINTYRE to the present time. In order to "settle,"
28  the VICTIMS were required to sign releases and waivers of all liability and, in

**FIRST AMENDED COMPLAINT**

1   return, would receive shares of stock in CITY CAPITAL that were worthless,

2   unmarketable and illegally issued (something known by Defendants but unknown by

3   the VICTIMS).

4        203.   LIPINSKI   and   MACINTYRE   and   the   CITY   CAPITAL

5   CONSPIRATORS failed to disclose to the victims that trading in CITY CAPITAL

6   stock was halted by the SEC on April 13, 2012 due to the fact that CITY CAPITAL

7   had not filed any periodic reports with the SEC since its delinquent 2009 Form 10-K

8   was filed on June 15, 2010 yet CITY CAPITAL and the CITY CAPITAL

9   AFFILIATED COMPANIES continued to sell securities.

10       204.   The CITY CAPITAL CONSPIRATORS, LIPINSKI and MACINTYRE

11   in 2012 continued to perpetuate the fraudulent scheme of the CITY CAPITAL

12   CONSPIRATORS on the VICTIMS through their purported transfer of illegal,

13   unregistered securities as consideration for a release and hold harmless agreement to

14   be executed by the VICTIMS that would waive all legal rights of the VICTIMS to

15   pursue their claims against the Defendants for investment fraud resulting from the

16   sale of unregistered securities by unlicensed agents of Defendants.

17       205.   However, some time later in 2012, LOG had to take down its website

18   because of all of the threats LOG received due to its participation in the

19   TAYLOR/CITY CAPITAL settlement process scam wherein LOG was purportedly

20   resolving investment losses per the direction of LIPINSKI and MACINTYRE and

21   the CITY CAPITAL CONSPIRATORS through a settlement plan that violated

22   applicable securities law.

23       206.   On March 29, 2012, the Securities Division of the North Carolina

24   Department of the Secretary of State issued a Final Order to Cease and Desist against

25   Ephren W. Taylor, City Capital Corporation, City Laundry Services, LLC, City

26   Petroleum, LLC, and Clean Sweeps Holdings Group, LLC (collectively

27   "Respondents"). The Final Order to Cease and Desist permanently ordered that

28   Respondents shall cease and desist from offering for sale, soliciting offers to

-41-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

purchase or selling, in or from North Carolina, any securities, including but not limited to the securities of City Capital Corporation, City Laundry Services, LLC, City Petroleum, LLC, and Clean Sweeps Holdings Group, LLC. The Final Order to Cease and Desist found that Ephren W. Taylor was not licensed to sell securities in North Carolina and that City Capital Corporation, City Laundry Services, LLC, City Petroleum, LLC, and Clean Sweeps Holdings Group, LLC employed unlicensed salespersons to offer and sell their securities, in violation of the North Carolina Securities Act. The Final Order to Cease and Desist also permanently ordered Respondents to cease and desist from making untrue statements of a material fact and omitting to state material facts in connection with the offer, sale or purchase of any security.

## HOW THE PLAINTIFFS HAVE BEEN DUPED AND SWINDLED BY TAYLOR

## PLAINTIFF WILLIAM LEE INVESTS IN DEFENDANTS' PONZI SCHEMES

207.  In February of 2009, Plaintiff WILLIAM LEE invested $160,000 in City Laundry. This was after LEE had attended an investment presentation where he heard TAYLOR talk about 3 Simple Steps.

208.  The investment opportunity was initially presented to LEE by Anthony Hall, a contractor working for the CITY CAPITAL CONSPIRATORS.

209.  LEE was told by Defendants that the assets of City Laundry were worth more than twice the purchase price and that City Laundry would be "debt free." In fact, most of the equipment was leased in the City Laundry location LEE was investing in, but this was not disclosed to LEE by the CITY CAPITAL CONSPIRATORS at the time he made the investment.

-42-

SNYDER ♦ DORENFELD, LLP

210.  LEE received a one year promissory note from City Laundry as the "Maker" signed by TAYLOR. The promissory note contained a 20% annual interest rate for one year. It was verbally agreed that once the transition from promissory note to an equity position was made, that the profits in excess of 20% were to be split evenly between LEE and CITY CAPITAL.

211.  LEE had been told that the ultimate goal was for Defendants to give LEE an equity position in City Laundry. At the time of the investment, Defendants had indicated that City Laundry was a growing business with no debt. Again, this representation was false, but LEE was not aware of that because, despite his repeated requests, he was not permitted to review the books and financial records of City Laundry either before or after his investment.

212.  In April of 2009, LEE was asked to sign as a personal guarantor on the equipment lease for City Laundry. LEE did not know that the City Laundry equipment was subject to such an equipment lease until after he had made the investment in City Laundry.  The CITY CAPITAL CONSPIRATORS told LEE that unless this equipment was leased for City Laundry, they could not move forward with the business and it would fold. LEE did not want to lose the money he had already invested in City Laundry, so he agreed to personally guarantee the equipment lease.

213.  LEE again requested financial information and the books and records of City Laundry in order to determine if he wanted to become an equity member of City Laundry. But LEE never received any information.

214.  In November of 2009, CITY CAPITAL sold the City Laundry Blue Ridge Cleaners for $10,002 (which was the balance of a promissory note due to be paid by CITY CAPITAL including interest) that it had purchased for $148,500 in March of 2009.

215.  In November of 2009, CITY CAPITAL sold the City Laundry 39th Street Laundromat for $20,000 that it had purchased for $97,625 in February of

-43-

2009.

216. On February 1, 2010, LEE requested his money back before the promissory notes became due on February 10, 2010.

217. LEE'S EQUITY TRUST account revealed little about his investment other than the initial purchase of the business and that the investment was secured by a promissory note. It appears that EQUITY TRUST was charging fees multiple times and deducting them from LEE'S accounts. CITY CAPITAL was also supposed to be paying the fees so it is unknown why EQUITY TRUST would be deducting anything from Plaintiffs' accounts.

218. LEE decided to exit the investment because of the lack of information, reports or financial data received from Defendants despite repeated requests. But LEE has not received return of his monies.

219. LEE was asked to attend a meeting in May of 2010 with CITY CAPITAL management to discuss the situation. However, when LEE got to the meeting, LEE was told that he could not review the books and records for City Laundry or City Petroleum unless LEE executed a confidentiality, non-disclosure and indemnification agreement. LEE refused to sign the documents.

220. At this meeting LEE was told that CITY CAPITAL did not have the funds to pay back the monies due LEE on the promissory notes because TAYLOR had loaned a bunch of money to some churches and these churches defaulted on their loans

221. In November of 2010, LEE learned that CITY CAPITAL was trying to sell City Laundry for $15,000 but had been unable to find a buyer because the buyer had to qualify to take over the lease payments on the City Laundry dry cleaning equipment. CITY CAPITAL had not paid the rent, and there was a large amount outstanding i.e., $100,000.

222. In March of 2011, LEE was named as a defendant along with City Laundry, TAYLOR, and Kinta Dixon in a law suit in Jackson County, Missouri

-44-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

seeking damages for breach of the equipment leases by City Laundry and breach of the personal guarantees of TAYLOR, LEE and Dixon. LEE and the other defendants had a judgment entered against them for $133,457.33. LEE is still attempting to get the CITY CAPITAL CONSPIRATORS to assist him in satisfying the judgment.

223.   LEE was told repeatedly that CITY CAPITAL had set up a trust fund to reimburse VICTIMS of the CITY CAPITAL Ponzi schemes and that Defendants would return LEE'S investment funds.   Sadly, those representations were also false and LEE has been forced to file this action to try to recoup his lost investment monies.

## PLAINTIFF GENNET THOMPSON INVESTS IN DEFENDANTS' PONZI SCHEMES

224.   Sometime prior to July of 2009, THOMPSON saw an advertisement on the Black Entertainment Television Network ("BET") advertising investment opportunities with Defendants. Defendant TAYLOR was the spokesperson and was talking about investing in real estate through a SDIRA with a guaranteed rate of return. The SDIRA was renewable for one or two years.

225.   THOMPSON called the toll-free number on the television ad and requested information on the investments Defendants offered. When THOMPSON called to inquire about investing, she was told by Defendants' representative that the ROI on her investment through the SDIRA was guaranteed to double. Defendants requested THOMPSON's e-mail address so they could send her further information.

226.   Defendants also advised THOMPSON that their SDIRA products provided an opportunity for "socially conscious" investing such that the monies invested through the SDIRA were used to fund affordable homes, local businesses and revitalization projects for working class families and "green initiatives" involving oil wells and biofuel.

-45-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

227.  On July 1, 2009, THOMPSON received an e-mail from the CITY CAPITAL CONSPIRATORS via Defendant TAYLOR. This e-mail outlined the CITY CAPITAL CONSPIRATORS' investment program and advised that THOMPSON could double her return on investment by investing with the Defendants through City Capital's socially-conscious programs.

228.  After THOMPSON faxed the completed Client Application then THOMPSON was advised to call the Defendants' toll free number and set up an appointment to get her questions answered about Defendants' programs by an investment counselor.

229.  THOMPSON also received an e-mail purportedly from TAYLOR including the 3 Simple Steps marketing brochure (first issued by CITY CAPITAL CORPORATION in 2008) where EQUITY TRUST was prominently mentioned.

230.  3 Simple Steps is 64 pages long. The length is probably intentional. It is too long for most investors to have time to read and long enough that Defendants can point to it and declare that they had adequately disclosed the risk of their investment schemes. The Introduction begins with "How would you feel if you were to discover an investment strategy that earned *at least (emphasis in original)* twice what you current investments get now…"

231.  3 Simple Steps further states: "On the other hand, if 100% of your investment money-including 100% of your annual profits could be plowed back into your ongoing investments without taxation, can you imagine how much faster your nest egg would grow?"

232.  3 Simple Steps lists the options in which THOMPSON could choose to invest the proceeds of her self-directed IRA in the CITY CAPITAL AFFILIATED COMPANIES:

    a.    Money Market, CDs, Saving Accounts (but Defendants advised that these are "probably not the top choices").

    b.    Stock, bonds, mutual funds (but Defendants advised that they are

-46-

**FIRST AMENDED COMPLAINT**

"too much work").

c.     Collectibles (but Defendants advised that there is a "much smaller, niche market of potential buyers if you need to go liquid quickly").

d.     Real Estate Properties (Defendants stated this is the most common investment for SDIRAS but this investment option "is only practical if you have a professional management group doing all the work, so you don't have to").

e.     Notes or Mortgages-Defendants advised this is a good use of investment funds because "you control it with the note or mortgage and earn whatever rate you establish" however Defendants caution that "there is essentially no way to increase the return through the life of the loan."

f.     Cash-Flowing Businesses-Defendants recommended this option as a way to "collect all profits from a thriving business tax-free (or tax-deferred)!"

g.     Producing Oil or Gas Properties-Defendants recommended this investment option to THOMPSON and state "Who doesn't dream of owning their own oil well?"

h.     Alternative Fuels and "Green Technologies"-Defendants also recommended this option so that THOMPSON could invest "in the growing demand for cleaner, "greener" energy sources."

233.   Defendants' advised THOMPSON in 3 Simple Steps that a self-directed IRA is like "becoming your own bank" and that banks and brokerage houses don't recommend self-direction because banks want to keep investors money" in their vault."

234.   Defendants assured THOMPSON that everything about the transaction was all arms-length yet you retain complete control (yet in other documents

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

1  Defendants indicated that CITY CAPITAL CORPORATION or one of CITY
2  CAPITAL AFFILIATED COMPANIES managed the investments and did all of the
3  work); if you have a self- directed account, you can begin doubling your interest
4  immediately"; once your rollover funds are released to the new custodial trustee,
5  "you begin receiving *at least* twice your current rate of return the day you assign
6  your funds to the City Capital program."

7      235.  Defendants also stated: "You do <u>nothing</u>. We do everything.  And *you*
8  get the profits."

9      236.  THOMPSON also received another document, dated 2008, from
10  Defendants entitled "Eliminate the Roadblocks to Profitable & Secure Real Estate
11  Investing (Eliminate the Roadblocks)." This document is 29 pages long and again
12  describes Defendants' real estate investing programs.

13      237.  Defendants in Eliminate the Roadblocks describe CITY CAPITAL
14  CORPORATIONS' investment program as using real estate investing to create
15  socially-conscious investing opportunities and to empower communities.

16      238.  The CITY CAPITAL CORPORATION program outlined in Eliminate
17  the Roadblocks also includes the CITY CAPITAL CORPORATION "One Year
18  Limited Mortgage Payment Guarantee" which provides for "unseen vacancies" in
19  the investment property and guarantees that the property will be rented for the first
20  year or CITY CAPITAL CORPORATION will pay the mortgage.

21      239.  Based upon the representations, promises, assurances and guarantees
22  provide by Defendants via phone, e-mail, radio ad, television ads, advertising
23  materials and brochures, THOMPSON in July of 2009 contacted Defendants and
24  advised them she was ready to make an investment in Defendants' SDIRA Real
25  Estate program. THOMPSON was instructed to use EQUITY TRUST for her
26  SDIRA by Defendants. THOMPSON invested $16,000 through a SDIRA with
27  EQUITY TRUST and received a promissory note signed by TAYLOR.

28

-48-

**FIRST AMENDED COMPLAINT**

240.   On February 19, 2010, THOMPSON received an e-mail from Defendants via EPHREN TAYLOR.   This e-mail, with the subject line, "Congratulations, you're in the door…" solicited to THOMPSON the promise of a "once in a lifetime opportunity."

241.   THOMPSON then e-mailed Ebony Rowland, a representative of Defendants at CITY CAPITAL, to get the necessary documents to make an investment in Defendants' "Sweep Income Investment."   Rowland e-mailed back "EPHREN just announced this opp (opportunity) on CNN and took it public."   Ms Rowland indicated that as a result they were "swamped" with calls by investors trying to get in on this "opportunity."

242.   THOMPSON ordered 3 machines from Defendants and paid $10,500 via wire transfer for all three machines. The Sweeps Terms and Conditions stated that THOMPSON received a "100% Satisfaction Guarantee" from Defendants.  This 100% Satisfaction Guarantee stated that if THOMPSON did not recoup her investments from the return on investment of the machines within 3 months of the Sweeps machine placement then THOMPSON's investment monies would be returned to her.

243.   In August of 2010, THOMPSON was notified that as of September 1, 2010 all three of THOMPSON's terminals were placed at a location on Newtown Road in Virginia Beach, Virginia.

244.   Then on October 20, 2010, THOMPSON received a letter from Defendants advising her that the Virginia Beach location had been shut down since mid-September  and  was  not  producing  income  so  CITY  CAPITAL CORPORATIONS sent her a check for her losses of $262.17.

245.   Defendants indicated they would continue to send THOMPSON checks for her financial loss until the Virginia Beach location was back on line.  Defendants stated that they anticipated the Virginia Beach location being back on line within 30 days of October 20, 2010.

-49-

**FIRST AMENDED COMPLAINT**

246.  THOMPSON never received another check and the Virginia Beach location never reopened.  THOMPSON also never received return of her investment funds despite repeatedly requesting same.

247.  But the CITY CAPITAL CONSPIRATORS continued their operations and fraudulent schemes through new corporate shells.

248.  On December 11, 2010, THOMPSON sent an e-mail to an employee of CITY CAPITAL who had served as her "investment counselor".  The e-mail indicated that she had received a call from a "Scott" who wanted to know if THOMPSON wanted to continue the Sweeps program with another company that he worked for. Scott had indicated that the Clean Sweeps machines were being placed in other stores and that Scott's company was taking over the operations.  However, THOMPSON declined and never heard from Scott again.

249.  Thompson has filed this action after failing to obtain return of her investment monies despite many promises by Defendants that Thompson's monies would be returned and the receipt by Thompson of multiple fraudulent settlement proposals from Defendants.

## PLAINTIFF TRUDY MORGAN INVESTS IN THE SWEEPS MACHINE INVESTMENT PONZI SCHEME

250.  MORGAN met TAYLOR in 2009 at her church in Lithonia, Georgia when TAYLOR was invited to speak to the congregation about successful investing and the investment programs that were recommended by TAYLOR.

251.  When TAYLOR spoke at MORGAN'S church,  he was accompanied by BATT.

252.  TAYLOR introduced BATT to MORGAN'S congregation as "TAYLOR'S personal banker." However, BATT was not a banker, BATT was a sales agent of Defendant EQUITY TRUST who also worked for CITY CAPITAL.

-50-

**FIRST AMENDED COMPLAINT**

253. In fact, BATT was an agent/employee of EQUITY TRUST whom Defendants utilized exclusively at that time as a self-directed IRA custodian for investors of CITY CAPITAL and its subsidiaries. TAYLOR and the other CITY CAPITAL CONSPIRATORS required that CITY CAPITAL investors use the EQUITY TRUST for their self-directed IRAs.

254. At the meeting at MORGAN'S church, TAYLOR discussed his long standing success as a businessman, teenage millionaire story and his investment advice to the participants like MORGAN who were trying to find more successful investment strategies and a greater return on investment.

255. After hearing TAYLOR speak, MORGAN decided to transfer her $20,000 IRA account to EQUITY TRUST per the CITY CAPITAL CONSPIRATORS' instructions. BATT was MORGAN'S sole contact at EQUITY TRUST and handled all communications.

256. The Ponzi schemes orchestrated by the CITY CAPITAL CONSPIRATORS were particularly well planned because the "investments" of the Plaintiffs in the Clean Sweeps machines were set up to automatically renew or "rollover" each year such that the investors could not liquidate their investments automatically at the end of the investment period and, in fact, were not even notified at the end of any investment period that they could withdraw their investment funds or" choose" to reinvest; the interest or profit that purportedly was being earned on the investment "appeared" in the investors/VICTIMS' self-directed IRA accounts at EQUITY TRUST or on their Clean Sweeps investment account statements automatically and regardless of whether the accrued interest/profit had actually been placed in the account. (It had not for the majority of investors/VICTIMS).

257. A few months after she made her initial investment, MORGAN was told that the CITY CAPITAL CONSPIRATORS were trying to reach her (which she believed was not true) and that she needed to move her self-directed IRA from EQUITY TRUST to SUNWEST TRUST. MORGAN was told that the change was

-51-

**FIRST AMENDED COMPLAINT**

necessary because EQUITY TRUST had become "jealous" of all the money CITY CAPITAL was making. Again MORGAN was directed to one employee of SUNWEST TRUST for any information on his investment with Defendants.

258.  In May of 2010, MORGAN'S self-directed IRA was moved to SUNWEST TRUST in Albuquerque, New Mexico.

259.  MORGAN received a booklet from SUNWEST TRUST titled "A Custodial Self-Directed Traditional IRA Plan Agreement").

260.  MORGAN also received a "Prohibited Transactions-Summary" from SUNWEST TRUST.

261.  The CITY CAPITAL CONSPIRATORS in May of 2010 formed a Georgia limited liability company for MORGAN called Infinite Acquisitions 119 LLC ("Infinite Acquisitions") to hold her investments.

262.  MORGAN'S investment of $19,070.00 in Clean Sweeps was wired from her Infinite Acquisitions bank account to CITY CAPITAL'S Bank of America bank account (Bank of America, account # 237018134155, routing number 026009593). MORGAN also invested cash of $10,000 in the Sweeps Machines.

263.  MORGAN received two Certificates of Satisfaction providing a guarantee that if the sweepstakes machines she purchased do not generate revenue within 12 months, then MORGAN could return the machines and would receive her money back.

264.  MORGAN then received a letter dated June 3, 2010 from the CITY CAPITAL CONSPIRATORS indicating that they were "working" to have her machines in place by July 18, 2010, some 7 months after she had initially transferred her retirement funds to them. No explanation was ever given MORGAN for the delay.

265.  MORGAN was notified in August of 2010 that her 6 Sweeps Machines had been placed in Virginia Beach, Virginia.

**FIRST AMENDED COMPLAINT**

266.   MORGAN was surfing the Internet in September of 2010 and found out by accident that the Virginia Beach location where her 6 sweeps machines were placed had been shut down as an illegal gambling operation.

267.   MORGAN then called CITY CAPITAL and spoke to Richard Wynn, a manager, who assured MORGAN that she would be receiving her anticipated income from the Sweeps Machines and that MORGAN'S machines would be operational again in Virginia Beach by November 10th.

268.   Thereafter MORGAN received a letter dated October 20, 2010 indicating her machines would be back on line within 30 days and a check for $524.34 from Defendants which represented her anticipated profit from each of the 6 machines, i.e., $87.39 per machine for 6 machines.

269.   This check was from CITY CAPITAL'S Bank of America account. MORGAN went to Bank of America to cash the check but was advised by the bank representatives that there was no money in the bank account.

270.   MORGAN has never received return of her investment monies, anticipated profits from her investment or interest.

271.   On November 16, 2010, MORGAN received an e-mail from James Contaccessa at www.selfdirectedassets.com indicating that Contascessa had become aware that CITY CAPITAL could be a fraud and that individuals running the company have committed a scam.

272.   On March 17, 2011, MORGAN received an e-mail from MTAYLOR with a link to a video about another "leader's summit" where TAYLOR was a speaker on successful investment strategies.   MTAYLOR continued to shamelessly promote TAYLOR and encourage potential victims to invest even after the CITY CAPITAL Ponzi scheme collapsed.

273.   MORGAN was told repeatedly after the Sweeps Machine program was shut down that CITY CAPITAL had set up a trust fund to reimburse VICTIMS.

**FIRST AMENDED COMPLAINT**

274.   MORGAN received the same settlement documents, tolling agreement and information as the other Plaintiffs, but she did not receive any of her money back. All of the representations made by Defendants that Plaintiffs were going to be made whole have proven to be false and MORGAN has been forced to file this action to try to recoup her lost investment monies, interest, overcharges and other damages.

## COUNT I.

## CONVERSION

### (Against all Defendants)

275.   Plaintiffs incorporate the allegations and Exhibits contained in all the prior paragraphs of this Complaint as if restated and fully set forth herein.

276.   This is a claim for conversion.

277.   As described more fully above, the "investment" programs of Defendants that Plaintiffs invested in were bogus. Defendants were operating a series of Ponzi schemes which permitted Defendants to exercise unauthorized dominion and control over the property of Plaintiffs when they absconded with the Plaintiffs' money. Defendants took and appropriated that money for their own use.

278.   Defendants' conversion has permanently deprived Plaintiffs of their property.

279.   Plaintiffs have repeatedly demanded, and were promised by Defendants, that their funds would be returned but Defendants did not in fact return them.

280.   Defendants' actions have directly caused injury and damages to Plaintiffs.

281.   Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious

-54-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT II

## INTENTIONAL FRAUD

### (Against All Defendants)

282. Plaintiffs incorporate the allegations and Exhibits contained in all the prior paragraphs of this Complaint as if restated and fully set forth herein.

283. The CITY CAPITAL CONSPIRATORS made several misrepresentations to the public at large and to the Plaintiffs as set forth above.

284. These Defendants knew that these statements were false when they made them.

285. The Defendants intended for Plaintiffs to rely upon their false statements.

286. Plaintiffs did in fact rely on these Defendants' false statements, and would never have invested in the CITY CAPITAL AFFILIATED COMPANIES were it not for the false statements.

287. These Defendants have enjoyed substantial financial gain, and Plaintiffs have suffered severe financial loss as a result of the reliance of Plaintiffs on these false statements.

288. Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by

-55-

SNYDER ♦ DORENFELD, LLP

1  Defendants, and each of them, with a willful and conscious disregard of the rights of

2  the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious

3  disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or

4  concealment of material facts known to the Defendants, and each of them, with the

5  intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury,

6  loss, and damage such as to constitute malice, oppression, or fraud under California

7  *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in

8  an amount appropriate to punish or set an example of Defendants, and each of them.

9  Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum

10  according to proof.

11

12  ## COUNT III.

13  ## NEGLIGENT MISREPRESENTATION

14  (Against All Defendants)

15  289.  Plaintiffs incorporate the allegations and Exhibits contained in all the

16  prior paragraphs of this Complaint as if restated and fully set forth herein.

17  290.  The   CITY   CAPITAL   CONSPIRATORS   made   several

18  misrepresentations to the public at large and to the Plaintiffs as set forth above.

19  291.  These Defendants should have known that these statements were false

20  when they made them.

21  292.  These Defendants intended for Plaintiffs to rely upon their false

22  statements.

23  293.  Plaintiffs did in fact rely on these Defendants' false statements, and

24  would never have invested in CITY CAPITAL were it not for the false statements.

25  294.  These Defendants have enjoyed substantial financial gain, and Plaintiffs

26  have suffered severe financial loss as a result of Plaintiffs' reliance on false

27  statements.

28  295.  Plaintiffs are entitled to attorney's fees pursuant to the private Attorney

## FIRST AMENDED COMPLAINT

SNYDER ♦ DORENFELD, LLP

1  General statutes.

2

3                          **COUNT IV.**

4                  **BREACH OF FIDUCIARY DUTY**

5            (Against the CITY CAPITAL CONSPIRATORS)

6       296.   Plaintiffs incorporate the allegations and Exhibits contained in all the

7  prior paragraphs of this Complaint as if restated and fully set forth herein.

8       297.   At all times material hereto, the CITY CAPITAL CONSPIRATORS

9  owed the Plaintiffs a fiduciary duty for reasons including, but not limited to,

10  Defendants held themselves out as investment advisors and custodians to Plaintiffs,

11  and the fact that they purported to serve Plaintiffs as competent custodians of their

12  investments and as participants in a common investment scheme.

13      298.   These Defendants breached their fiduciary duties through their actions

14  by methods including but not limited to:

15       a.     Investing the Plaintiffs' money in a Ponzi scheme or schemes;

16       b.     Working together to perpetuate the false notion that TAYLOR

17              was a successful, multimillionaire and would help Plaintiffs make

18              double or triple their ROI;

19       c.     Mismanaging the CITY CAPITAL investments;

20       d.     Issuing inaccurate account statements that concealed repeated

21              defaults on the promissory notes that the EQUITY TRUST' clients,

22              including the Plaintiffs had purchased;

23       e.     Overcharging the Plaintiffs for their services; withdrawing funds

24              from CITY CAPITAL for personal use; and

25       f.     By profiting from these things at Plaintiffs' expense.

26      299.   Plaintiffs are entitled to attorney's fees pursuant to the private Attorney

27  General statutes.

28

                              -57-

                    **FIRST AMENDED COMPLAINT**

300.  Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT V.

## UNFAIR COMPETITION UNDER CALIFORNIA *BUSINESS AND PROFESSIONS CODE* § 17200 *et seq.*

(Against all Defendants)

301.  Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

302.  California *Business and Professions Code* § 17200, *et seq.*, prohibits acts of "unfair competition," including any unlawful, fraudulent or deceptive business act or practice, as well as "unfair, deceptive, untrue or misleading advertising."

303.  This private Attorney General action is brought by the Plaintiffs listed above to remedy violations of California's state consumer protection statutes arising out of Defendants' and/or their representatives' misrepresentations, omissions of material facts, and breaches of agreements.

-58-

**FIRST AMENDED COMPLAINT**

SNYDER ◆ DORENFELD, LLP

304. Defendants, at all times material hereto, have engaged in "trade or commerce" by advertising, soliciting, offering or distributing a good or service by soliciting consumers within the definition of California *Business and Professions Code* § 17200 *et seq.*

305. As discussed herein, this is a private Attorney General action brought on behalf of the general public. As detailed herein, Defendants have engaged in a pattern and practice of uniformly misrepresenting and/or repudiating their contractual and legal obligations.

306. Defendants' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving" investments" in illegal gambling activities, shell companies and ghost investment vehicles orchestrated by Defendants without regard to Plaintiff's legal and equitable rights constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of California's Unfair Competition Law.

307. The conduct of Defendants is of a continuing nature that requires prompt relief. Defendants have uniformly represented to the general public through their representatives that their actions were legally appropriate when in fact they were not and/or have concealed material facts (as detailed throughout this Complaint); and the disclosure of such information was necessary in order to make Defendants' other representations not misleading for want of disclosure of such omitted facts or because Defendants possess superior knowledge of the true facts.

308. Plaintiffs have suffered, and continue to suffer, actual injury in fact due to the willful acts of Defendants which are contrary to the public policy of California, are substantially injurious to consumers of California and constitute unfair trade practices and competition under Section 17200, *et seq.* of the California *Business and Professions Code.*

309. Defendants' actions discussed herein constitute unfair competition within the meaning of California *Business and Professions Code* § 17200.

**FIRST AMENDED COMPLAINT**

310. As a result of the Defendants' conduct as described herein, Plaintiffs were subjected to unlawful, unfair and/or fraudulent treatment and Defendants were unjustly enriched and should be ordered to pay restitution pursuant to *Business and Professions* Code §§ 17203 and 17204.

311. Members of the general public also face irreparable harm, such as, *inter alia*, not being fully informed of the true facts and, not having the full value of any monies wrongfully received or saved provided to them.

312. Equitable relief is appropriate to ensure adequate controls are in place to remedy the wrongful acts, prevent recurrence, and apprise the public of the true facts regarding what transpired. Pursuant to California *Business and Professions Code* § 17203, the Plaintiffs are entitled to preliminary and permanent injunctive relief ordering Defendants to cease this unfair competition, as well as disgorgement of all of Defendants' profits associated with this unfair competition.

313. Plaintiffs seek an order from this Court prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Defendants perform their obligations under the law and reimburse Plaintiffs all monies owed them as alleged in this Complaint.

314. Plaintiffs additionally request an order from this Court requiring that Defendants make restitution of profits and return or pay to Plaintiffs all of Defendants' ill-gotten gains obtained from its illegal transactions and Ponzi schemes and/or pay restitution, including the amount of monies that should have been paid had Defendants complied with their legal obligations, or, as equity requires.

315. The above-described unlawful, unfair or fraudulent business acts and practices engaged in by Defendants continue to this day and/or present a threat of irreparable harm to the general public. Defendants have failed to publicly acknowledge the wrongfulness of their actions and provide the complete relief required by the statute.

-60-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

316.   Pursuant to California *Business & Professions Code* §17203, Plaintiffs, on behalf of the general public, seek a temporary, preliminary and/or permanent order from this Court prohibiting Defendants from continuing to engage in the unlawful, unfair, or fraudulent business acts or practices set forth in this Complaint and from failing to fully disclose the true facts as set forth herein, and or ordering Defendants or their representatives to stop misleading the public and engage in a corrective campaign, particularly in light of the public misperception created by Defendants' and/or their representatives' misstatements and omissions of material fact, as well as provide appropriate equitable monetary relief as the court deems just and appropriate to all persons with a vested interest therein.

317.   Plaintiffs further request a court order that an asset freeze or constructive trust be imposed over all monies in Defendants' possession which rightfully belong to Plaintiffs.

318.   Plaintiffs request judgment and restitution from Defendants in an amount to be proven at trial for unfair, fraudulent and illegal business practices, damages, statutory penalties, and attorney's fees (pursuant to the Unfair Competition Law and the private Attorney General statute) together with court costs.

319.   Pursuant to California *Business and Professions Code* § 17203, the Plaintiffs are entitled to preliminary and permanent injunctive relief ordering Defendants to cease this unfair competition, as well as disgorgement of all of Defendants' profits associated with this unfair competition.

320.   Defendants' deliberate acts of fraud and misrepresentation accomplished through Ponzi schemes involving" investments" in illegal gambling activities, shell companies and ghost investment vehicles orchestrated by Defendants without regard to Plaintiff's legal and equitable rights constitute acts of unlawful, unfair or deceptive business acts and practices that are injurious to the public within the meaning of California's *Unfair Competition laws*.

**FIRST AMENDED COMPLAINT**

321.   Plaintiffs seek an order from this Court prohibiting Defendants from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint and/or ordering that Defendants perform their obligations under the law and reimburse Plaintiffs all monies owed them as alleged in this Complaint.

322.   Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT VI.

## NEGLIGENCE

(Against EQUITY TRUST)

323.   Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

324.   EQUITY TRUST owed Plaintiffs a duty of ordinary and reasonable care which arises from their relationships with them and their position and status.

325.   EQUITY TRUST also owed Plaintiffs duties of ordinary and reasonable care applicable to banks and financial institutions holding custody of customer's assets and accounts, as well as just and equitable principals of their respective trades.

-62-

**FIRST AMENDED COMPLAINT**

1  EQUITY TRUST breached their duties owing to Plaintiffs.

2      326. The Defendants breached their obligations to Plaintiffs by and through

3  their:

4          a.    Failure to maintain actual custody of funds;

5          b.    Failure to perform sufficient due diligence to safeguard and

6          ensure the existence and continued existence of Plaintiffs' funds;

7          c.    Failure to perform sufficient due diligence to ensure that

8          account statements sent to Plaintiffs did not report false and

9          deceptive asset "values"; and

10          d.    Failure to disclose material facts to Plaintiffs.

11      327. As a result of the wrongful conduct of the Defendants, Plaintiffs have

12  suffered and will continue to suffer economic and non-economic losses, all in an

13  amount to be determined according to proof at trial.

14

15  **COUNT VII.**

16  **FRAUDULENT CONCEALMENT**

17  (Against All Defendants)

18      328. Plaintiffs incorporate the allegations and Exhibits contained in all prior

19  paragraphs of this Complaint as if restated and fully set forth herein.

20      329. This is a claim for fraudulent concealment.

21      330. As described more fully above, Defendants were operating Ponzi

22  schemes through the CITY CAPITAL AFFILIATED COMPANIES.

23      331. In furtherance of the Ponzi schemes, Defendants knowingly made

24  material false statements and representations, including but not limited to

25  representing that Defendants' investment programs were legal, legitimate, licensed

26  and registered, delivered two or three times the return on investment of normal

27  investments, that Defendants' investment programs were "guaranteed" and that

28  Defendants through the CITY CAPITAL AFFILIATED COMPANIES had the

-63-

**FIRST AMENDED COMPLAINT**

financial assets to back up the guarantees made by Defendant.

332. Defendants intended for Plaintiffs to act on their knowingly false representations.

333. Plaintiffs in fact relied on these false representations to their detriment.

334. Plaintiffs' reliance upon Defendants' representations was justifiable given the Plaintiffs' lack of knowledge of their falsehood.

335. As a direct and proximate result of Defendants' false statements, Plaintiffs have sustained damages

336. Defendants' conduct described herein was intended by Defendants, and each of them to cause injury to Plaintiffs or was despicable conduct carried on by Defendants, and each of them, with a willful and conscious disregard of the rights of the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or concealment of material facts known to the Defendants, and each of them, with the intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury, loss, and damage such as to constitute malice, oppression, or fraud under California *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in an amount appropriate to punish or set an example of Defendants, and each of them. Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum according to proof.

## COUNT VIII.

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

(Against EQUITY TRUST)

337. Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

338. The CITY CAPITAL CONSPIRATORS having rendered investment advice to the Plaintiffs were themselves fiduciaries owing a duty of care to the

-64-

SNYDER ♦ DORENFELD, LLP

1   Plaintiffs.

2       339.   EQUITY TRUST had knowledge of the investment fraud being

3   perpetrated through the CITY CAPITAL AFFILIATED COMPANIES and rendered

4   substantial assistance in their fraudulent conduct.

5       340.   As a result of the conduct of EQUITY TRUST in aiding and abetting

6   the fraud perpetrated by the CITY CAPITAL CONSPIRATORS and the CITY

7   CAPITAL CONSPIRATORS' breaches of fiduciary duties, the fraudulent

8   enterprises of the CITY CAPITAL AFFILIATED COMPANIES were allowed to

9   grow and flourish, causing all Plaintiffs to suffer damages, with interest thereon, in

10  an amount to be determined at trial.

11

12                              **COUNT IX.**

13         **AIDING AND ABETTING COMMON LAW FRAUD**

14                          (Against EQUITY TRUST)

15      341.   Plaintiffs incorporate the allegations and Exhibits contained in all prior

16  paragraphs of this Complaint as if restated and fully set forth herein.

17      342.   EQUITY TRUST had knowledge of the fraud being committed by the

18  CITY CAPITAL AFFILIATED COMPANIES and rendered substantial assistance to

19  the CITY CAPITAL AFFILIATED COMPANIES in their fraudulent conduct.

20      343.   As a result of the conduct of EQUITY TRUST in aiding and abetting

21  the CITY CAPITAL AFFILIATED COMPANIES, the fraud of the CITY CAPITAL

22  CONSPIRATORS was allowed to flourish, and Plaintiffs suffered damages, with

23  interest thereon, in an amount to be determined at trial.

24      344.   Defendants' conduct described herein was intended by Defendants, and

25  each of them to cause injury to Plaintiffs or was despicable conduct carried on by

26  Defendants, and each of them, with a willful and conscious disregard of the rights of

27  the Plaintiffs, thereby subjecting Plaintiffs to cruel and unjust hardship in conscious

28  disregard of Plaintiffs' rights and was an intentional misrepresentation, deceit or

                                  -65-

                    **FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

1   concealment of material facts known to the Defendants, and each of them, with the

2   intention to deprive the Plaintiffs of property, legal rights, or to otherwise cause injury,

3   loss, and damage such as to constitute malice, oppression, or fraud under California

4   *Civil Code* §3294, thereby entitling Plaintiffs, and each of them, to punitive damages in

5   an amount appropriate to punish or set an example of Defendants, and each of them.

6   Accordingly, Plaintiffs are entitled to exemplary and punitive damages in a sum

7   according to proof.

8

9                                  **COUNT X.**

10   **VIOLATIONS OF EXCHANGE ACT SECTION 10 (b) and RULE  10b-5**

11                              (Against all Defendants)

12        345.   Plaintiffs incorporate the allegations and Exhibits contained in all prior

13   paragraphs of this Complaint as if restated and fully set forth herein.

14        346.   During the time period alleged herein, Defendants have employed

15   schemes, and devices to make material and misleading statements of fact, and have

16   omitted to state material facts necessary in order to make the statements made, in the

17   light of the circumstances in which they were made, not misleading; and

18        347.   Defendants have engaged in practices and a course of business that has

19   operated as a fraud and deceit upon all Plaintiffs.

20        348.   Defendants knowingly or with deliberate recklessness, engaged in the

21   violations of the federal securities law described herein, and they knowingly, or with

22   deliberate recklessness made the misstatements alleged herein.

23        349.   The Plaintiffs reasonably relied on Defendants' statement to them and

24   purchased unregistered securities and now have suffered great financial loss because

25   of that reliance.

26        350.   Plaintiffs are entitled to compensatory and/or statutory damages, and

27   attorney's fees pursuant to both the statute and as private Attorneys General.

28

-66-

**FIRST AMENDED COMPLAINT**

## COUNT XI.

## VIOLATIONS OF SECURITIES ACT SECTION 5 (a)

### (Against all Defendants)

351.   Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

352.   From at least January 1, 2006 through the present, Defendants directly and indirectly, singly and in concert, have, and unless enjoined will continue to abuse the instrumentalities of interstate commerce to offer and sell unregistered securities in unexempt offerings to the general public.

353.   Plaintiffs have sustained damages as a result of this illegal activity.

354.   Plaintiffs are entitled to compensatory and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys General.

## COUNT XII.

## FAILURE TO WARN

### (Against EQUITY TRUST)

355.   Plaintiffs incorporate the allegations contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

356.   EQUITY TRUST knew or should have known that their SDIRAs were being used by fraud promoters to perpetuate Ponzi Schemes and other fraudulent enterprises on their customers, including Plaintiffs, resulting in the total loss of their customers' SDIRAs to fraud promoters.

357.   When a financial services provider determines, or pursuant to the standards of its profession should determine, that utilization of its services may result in the substantial loss of its customers' investment funds, the financial services advisor incurs an obligation to use reasonable care to protect the intended victim/customer against such danger.

-67-

358.   The discharge of this duty may require the financial services advisor to take one or more of various steps, depending upon the nature of the case. Thus the financial services advisor may be required to warn the intended victim/customer or others likely to apprise the customer of the danger, or to notify the proper authorities, or to take whatever other steps are reasonably necessary under the circumstances.

359.   Despite having actual notice of this danger, EQUITY TRUST breached their duty of care by failing and refusing to warn Plaintiffs.

360.   As a direct and proximate result, Plaintiffs have sustained damages as set forth herein.

## COUNT XIII.

## CONSTRUCTIVE TRUST

### (Against all Defendants)

361.   Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

362.   Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, each of the Defendants sued herein was the agent and employee of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency and employment.

363.   As a proximate result of the Defendants' fraudulent and/or negligent misrepresentations and otherwise wrongful conduct as alleged herein, Plaintiffs have sustained damages.

364.   By reason of the fraudulent and otherwise wrongful manner in which the Defendants obtained their alleged right, claim or interest in and to the property, Defendants, each of them, have no legal or equitable right, claim or interest therein.

365.   Instead, Defendants, and each of them, are involuntary trustees holding said property and profits therefrom in constructive trust for Plaintiffs with the duty to convey the same to Plaintiffs forthwith.

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

## COUNT XIV.

## VIOLATION OF SECTIONS 25401/25501 OF THE CALIFORNIA

### *CORPORATIONS* CODE

(Against all Defendants)

366.   Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

367.   Each of the Defendants offered to sell or sold securities by means of written and oral communications which included untrue statements of material fact or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

368.   Each of the Defendants knew or in the exercise of reasonable care should have known of the misrepresentations made by them.

369.   Plaintiffs did not know the truth regarding the Defendants' misrepresentations and/or omissions.

370.   By reason of the foregoing, Defendants named herein violated section 25401 of California *Corporations Code*, thereby entitling Plaintiffs to recover damages pursuant to section 25501 of California *Corporations Code*.

371.   Plaintiffs are entitled to compensatory and/or statutory damages, and attorney's fees pursuant to both the statute and as private Attorneys General.

## COUNT XV.

## VIOLATION OF SECTIONS 25402/25502 of the CALIFORNIA

### *CORPORATIONS CODE*

(Against Individual Defendants TAYLOR, MTAYLOR, TAYLOR SR, BATT, MACINTYRE and LIPINSKI Only)

372.   Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

-69-

SNYDER ◆ DORENFELD, LLP

373. The Individual Defendants are owners, officers and/or directors and controlling persons of the CITY CAPITAL AFFILIATED COMPANIES, whose relationships to the CITY CAPITAL AFFILIATED COMPANIES give them access to material information about the CITY CAPITAL AFFILIATED COMPANIES not generally provided to employees of the CITY CAPITAL AFFILIATED COMPANIES and the public.

374. The Individual Defendants participated in the sale of CITY CAPITAL AFFILIATED COMPANIES' shares and investments to the public including Plaintiffs at a time when each of them knew or should have known material information about the CITY CAPITAL AFFILIATED COMPANIES gained from such relationship which would have significantly affected the price at which the CITY CAPITAL AFFILIATED COMPANIES securities were sold.

375. The Individual Defendants knew or should have known the material adverse information complained of herein was not available to Plaintiffs. The Individual Defendants had no reason to believe that Plaintiffs were in possession of the adverse information.

376. Plaintiffs would not have purchased CITY CAPITAL AFFILIATED COMPANIES' shares at the price they paid, if at all, if they had been aware that the price had been artificially and falsely inflated by Defendants' misrepresentations and omissions of material adverse information discussed herein.

377. By reason of the foregoing, the Defendants named herein violated section 25402 of the California *Corporations Code*, thereby entitling Plaintiffs to recover damages pursuant to section 25502 of the California *Corporations Code*.

///
///
///
///
///

-70-

**FIRST AMENDED COMPLAINT**

**COUNT XVI.**

<u>**VIOLATION OF SECTION 25504 OF THE CALIFORNIA *CORPORATIONS***</u>

<u>**CODE**</u>

(Against Individual Defendants TAYLOR, MTAYLOR, TAYLOR SR, BATT,

MACINTYRE and LIPINSKI Only)

378. Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

379. The Individual Defendants act as controlling persons of the CITY CAPITAL AFFILIATED COMPANIES within the meaning of section 25504 of the California *Corporations Code*.

380. By reason of such wrongful conduct in violation of California *Corporations Code* §25401, the Individual Defendants are liable pursuant to section 25504 of the California *Corporations Code*.

381. As a direct and proximate result of their wrongful conduct, Plaintiffs suffered damage in connection with their purchase of CITY CAPITAL AFFILIATED COMPANIES' stock.


**COUNT XVII.**

<u>**VIOLATION OF SECTIONS 1709-1719 OF THE CALIFORNIA *CIVIL CODE***</u>

(Against all Defendants)

382. Plaintiffs incorporate the allegations and Exhibits contained in all prior paragraphs of this Complaint as if restated and fully set forth herein.

383. For the purpose of inducing Plaintiffs and others to purchase or otherwise acquire CITY CAPITAL AFFILIATED COMPANIES' securities, and with the intent to deceive such investors, the Defendants, and each of them, employed a scheme and conspiracy to defraud as a part of which said Defendants made, participated in the making of, or aided and abetted the making of the misrepresentations of fact as set forth above. Said misrepresentations and statements

-71-

SNYDER ♦ DORENFELD, LLP

1  were not true when made and Defendants did not believe them to be true.  Said acts
2  by Defendants were fraudulent, oppressive and malicious.

3      384.  Plaintiffs, individually, relied on one or more of the false statements
4  and/or omissions alleged herein and were damaged thereby.

5      385.  Plaintiffs are entitled to compensatory and/or statutory damages, and
6  attorney's fees pursuant to both the statute and as private Attorneys General.

7

8                              **COUNT XVIII**
9  **VIOLATION OF THE CONSUMER FINANCIAL PROTECTION BUREAU'S**
10                              **REGULATIONS**
11                        *(15 U.S.C. § 78u, et seq.)*
12                        (Against EQUITY TRUST)

13     386.  Plaintiffs incorporate the allegations contained in all the prior
14  paragraphs as if restated and fully set forth herein.

15     387.  Financial entities that engage in conduct that poses a risk to consumers
16  as well as financial entities that engage in unfair, deceptive or abusive acts or
17  practices are regulated by and subject to enforcement actions from the Consumer
18  Financial Protection Bureau ("CFPB"), which was created by the Dodd-Frank Act,
19  15 U.S.C. section 78u, *et seq.*

20     388.  EQUITY TRUST herein materially interfered with their customers'
21  ability to understand a term or condition of a consumer financial product or service;
22  took unreasonable advantage of their customers' lack of financial savvy; and
23  precluded the customers' ability to protect themselves in the selection or use of
24  consumer financial products or services.

25     389.  The aforementioned conduct by EQUITY TRUST constitutes unfair,
26  deceptive and misleading practices by financial service firms within the meaning of
27  the CFPB Rules.

28     390.  Plaintiffs have suffered damages as a proximate result of EQUITY

-72-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

1  TRUST's violation of the CFPB rules.

2

3  **COUNT XIX**

4  **ALTER EGO/VEIL PIERCING**

5  (Against Defendants MACINTYRE, TAYLOR and LIPINSKI)

6  391.  Plaintiffs incorporate by reference all of the allegations of all prior

7  paragraphs as though fully set forth herein.

8  392.  This Count XIX is asserted against MACINTYRE, TAYLOR and

9  LIPINSKI by Plaintiffs.

10  393.  MACINTYRE, TAYLOR and LIPINSKI are liable for the conduct of

11  CITY CAPITAL as set forth above under a theory of alter ego / veil piercing because

12  they used the corporate form of CITY CAPITAL and the CITY CAPITAL

13  AFFILIATED COMPANIES to accomplish fraudulent objects, namely, to

14  fraudulently promote the sale of fraudulent investments in the CITY CAPITAL

15  AFFILIATED COMPANIES and to conceal the proceeds of that fraud and frustrate

16  the ability of victims to obtain redress for the fraud.

17  394.  MACINTYRE, TAYLOR and LIPINSKI have used CITY CAPITAL's

18  corporate form to conceal their profits and income derived from the CITY CAPITAL

19  AFFILIATED COMPANIES' Ponzi Schemes and fraudulent investment schemes.

20  TAYLOR is the founding shareholder of CITY CAPITAL and has operated CITY

21  CAPITAL as his alter ego since he became the CEO of CITY CAPITAL in May of

22  2006 to perpetuate numerous Ponzi schemes and fraudulent investment schemes in

23  violation of applicable SEC and state securities regulations in at least 43 states.

24  MACINTYRE and LIPINSKI from October of 2011 until at least May of 2012

25  controlled the operations of the CITY CAPITAL AFFILIATED COMPANIES and

26  perpetuated the fraudulent schemes of the CITY CAPITAL CONSPIRATORS.

27  395.  CITY CAPITAL is severely undercapitalized and has been since

28  inception. The SEC filings of CITY CAPITAL demonstrate that CITY CAPITAL

SNYDER ♦ DORENFELD, LLP

-73-

**FIRST AMENDED COMPLAINT**

1   has never been profitable and has maintained a negative balance sheet since May of

2   2006. CITY CAPITAL has no significant assets, no insurance coverage and no

3   reserve for potential liabilities and is delinquent in filing mandated disclosures with

4   the SEC, certain state regulatory agencies and has failed to file corporate tax returns

5   with the IRS and certain state agencies.

6        396.   CITY CAPITAL does not follow the required corporate formalities.

7   CITY CAPITAL has consistently failed to: adopt corporate by-laws; hold regular

8   meetings of the board of directors; file SEC disclosure documents required to be

9   filed by publicly-traded companies; comply with the requirements of Sarbanes-Oxley

10  in reporting its financial results and disclosures; issue stock certificates to its

11  shareholders; properly document, obtain necessary shareholder approval and disclose

12  the issuance of "loans" to the CITY CAPITAL AFFILIATED COMPANIES and

13  the CITY CAPITAL CONSPIRATORS with no prospects for repayment; and elect

14  and remove officers and directors of CITY CAPITAL without a required vote of the

15  shareholders.

16       397.   TAYLOR, MACINTYRE and LIPINSKI have caused the unauthorized

17  diversion of corporate funds and/or assets to other corporate uses or their own

18  personal use and/or have treated the assets of CITY CAPITAL as their own as set

19  forth herein.

20       398.   CITY   CAPITAL,   ERX   and   the   remaining   CITY   CAPITAL

21  AFFILIATED COMPANIES continue to operate at a loss and apparently are on the

22  verge of bankruptcy.

23       399.   In light of their domination of CITY CAPITAL, there is such a unity of

24  interest and ownership between CITY CAPITAL and TAYLOR, MACINTYRE and

25  LIPINSKI that their separate personalities no longer exist. Moreover, failure to

26  disregard the corporate entity would sanction fraud and promote injustice in these

27  circumstances since the individual defendants will have absconded with the proceeds

28  of the fraud, having left CITY CAPITAL insolvent and unable to satisfy any

-74-

**FIRST AMENDED COMPLAINT**

SNYDER ♦ DORENFELD, LLP

judgment that may be obtained in this action.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, pray and demand upon Defendants jointly and severally for:

1.    Compensatory and punitive damages, restitution, disgorgement of profits and statutory penalties;

2.    Injunctive relief;

3.    An order that a constructive trust be imposed over all monies in Defendants' possession which rightfully belong to Plaintiffs and/or an asset freeze of monies belonging to Defendants, and attorney's fees under private Attorney General statutes;

4.    Pre and post-judgment interest as allowed by law;

5.    An award of attorneys' fees and costs; and

6.    Any and all such further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury as to all issues so triable as a matter of right.

Respectfully Submitted:

Dated: 8-14-12

**SNYDER ♦ DORENFELD, LLP**

By: _____
DAVID K. DORENFELD
MICHAEL W. BROWN
Attorneys for Plaintiffs

**FIRST AMENDED COMPLAINT**